David L. Brandon, Esq., SBN 105505
dbrandon@clarkhill.com
Ryan C. McKim, Esq., SBN 265941
rmckim@clarkhill.com
**CLARK HILL LLP**
1055 West Seventh Street
24th Floor
Los Angeles, CA 90017
Telephone: 213-891-9100
Fax: 213-487-1156

Attorneys for defendants and counterclaimants Denice Shakarian Halicki, Eleanor
Licensing, LLC, and Gone in 60 Seconds Motorsports, LLC

## UNITED STATES DISTRICT COURT

## CENTRIAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARROLL SHELBY LICENSING, INC., a California Corporation, and the CARROLL HALL SHELBY TRUST, <br><br> Plaintiffs, <br><br> vs. <br><br> DENICE SHAKARIAN HALICKI, an individual, ELEANOR LICENSING, LLC, a Delaware limited liability company, GONE IN 60 SECONDS MOTORSPORTS, LLC, a Delaware limited liability company, and DOES 1 – 10, <br><br> Defendants. | Case No.: 8:20-cv-01344 <br><br> **COUNTER-CLAIM FOR:** <br><br> 1. **Breach of Written Contract;** <br> 2. **Breach of Written Contract;** <br> 3. **False Designation of Origin under 15 U.S.C. § 1125(a));** <br> 4. **Common Law Unfair Competition;** <br> 5. **Breach of Written Contract;** <br> 6. **Copyright Infringement;** <br> 7. **Violation of California Business & Professions Code § 17200, et seq.;** <br> 8. **Declaratory Relief;** <br> 9. **Declaratory Relief;** <br> 10. **Violation of the Anticybersquatting Consumer Protection Act;** <br> 11. **Declaratory Relief; and** <br> 12. **Trademark Infringement** |
| DENICE SHAKARIAN HALICKI, an individual, ELEANOR LICENSING, LLC, a Delaware limited liability company, GONE IN 60 SECONDS MOTORSPORTS, LLC, a Delaware limited liability company <br><br> Counter-claimants, | |

vs.

CARROLL SHELBY LICENSING, INC., a California Corporation, and the CARROLL HALL SHELBY TRUST, a trust organized under Texas law, CLASSIC RECREATIONS, LLC, an Oklahoma limited liability company, JASON ENGEL, an individual, TONY ENGEL, an individual, SPEEDKORE PERFORMANCE GROUP, LLC, a Wisconsin limited liability company, and Does 1 to 10,

Counter-defendants.

2

**COUNTERCLAIM**

Counter-claimants Denice Shakarian Halicki, Eleanor Licensing, LLC and Gone in 60 Seconds Motorsports, LLC, assert this counterclaim against Carroll Shelby Licensing, Inc. and the Carroll Hall Shelby Trust and allege as follows:

**THE PARTIES**

1.    Counter-claimant Denice Shakarian Halicki ("Denice") is an individual residing in the State of California.

2.    Counter-claimant Eleanor Licensing, LLC ("Eleanor Licensing") is a Delaware limited liability company licensed to do business and with its principal place of business in Irvine, California.

3.    Counter-claimant Gone in 60 Seconds Motorsports, LLC ("Motorsports") is a Delaware limited liability company licensed to do business and with its principal place of business in Calabasas, California.

4.    Denice, Eleanor Licensing and Motorsports are sometimes referred to collectively as the "Halicki Parties."

5.    Counter-defendant Carroll Shelby Licensing, Inc. ("CSL") is a corporation organized under the law of Texas that is licensed to do business in California, with its principal place of business in Gardena, California.

6.    Counter-defendant Carroll Hall Shelby Trust ("the Trust") is a trust organized and existing under the law of Texas, whose trustees are M. Neil Cummings ("Cummings") and Joe Conway ("Conway"). The acts of Cummings referred to in this counter-claim are imputed to the Trust.

7.    CSL and the Trust are sometimes referred to collectively as the "Shelby Parties."

8.    The Shelby Parties are the plaintiffs who filed the complaint in this action.

9.    Counter-defendant Classic Recreations, LLC ("CR"), is a limited liability company organized under the laws of Oklahoma, whose principal place of business is in Oklahoma. CR is a licensee of CSL and/or the Trust.

3

10.     Counter-defendant Jason Engel ("Jason") is an owner of CR.

11.     Counter-defendant Tony Engel ("Tony") is an owner of CR.

12.     CR, Jason and Tony are sometimes referred to collectively as the "CR Parties."

13.     Counter-defendant SpeedKore Performance Group, LLC ("SpeedKore") is limited liability company organized under the laws of Wisconsin.

14.     The Halicki Parties are informed and believe that counter-defendants Roes 1 through 10, inclusive, are at fault in whole or in part for the claims alleged herein.  The true names, whether corporate, individual, or otherwise of Roes 1 through 10, inclusive, are presently unknown to the Halicki Parties and, therefore, these Roes are being sued by fictitious names, and the Halicki Parties will seek leave to amend this counterclaim to include the true names and capacities when the same have been ascertained.

15.     The Halicki Parties are informed and believe that at all times relevant to this action, each of the counter-defendants was the agent, affiliate, officer, director, member, principal, alter-ego, and/or employee of the other counter-defendants and was at all times acting within the scope of such agency, affiliation, alter-ego relationship and/or employment, and actively participated in or subsequently ratified and adopted, or both, each and all of the acts or conduct alleged herein with full knowledge of each and every violation of the Halicki Parties' rights and the damages to the Halicki Parties proximately caused thereby.

## JURISDICTION AND VENUE

16.     This court has subject matter jurisdiction over this counterclaim pursuant to 28 USC § 1367(a) because the first claim for relief for violation of the Lanham Act 15 USC § 1051 is a compulsory counterclaim.  This court has supplemental jurisdiction, pursuant to 28 U.S.C. Section 1367, over the subject matter of the state law claims because those claims are so related to the Halicki Parties' federal claim as to form part of the same case or controversy under Article

lll of the United States Constitution.

17.    Venue is proper because the Shelby Parties are the plaintiffs.  Venue is also appropriate as to all third party counter-defendants pursuant to *R.E. Linder Steel Erection Co., Inc. v. Alumisteel Systems, Inc.* (D MD 1980) 88 FRD 629.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR REILEF

### Introduction

18.    This counter-claim arises out of the Shelby Parties' decades-long effort by the late Carroll Shelby, and now his predatory successor entities the Shelby Parties, to blatantly, deliberately and knowingly misappropriate the intellectual properties of the Halicki Parties, specifically the Halicki Parties' sole and exclusive ownership rights in the 46-year old valuable intellectual property rights in the "Gone in 60 Seconds" film franchise (the "Franchise"), the Franchise's brands, and particularly the Franchise's copyrighted star car character "Eleanor", including her name, look, image and goodwill.  (The copyrighted star car character "Eleanor" is referred to throughout this counter-claim as "Eleanor".)

19.    The Halicki Parties' exclusive rights to the "Gone in 60 Seconds" 2000 remake film (the "GI60S Remake") copyrighted star car character "Eleanor" name, look, image, and goodwill is well settled and has been reconfirmed on multiple occasions, including but not limited to, multiple published appellate opinions (see *Halicki Films, LLC v. Sanderson Sales & Mktg.* (9th Cir. 2008) 547 F3d. 1213 and *Eleanor Licensing LLC v. Classic Recreations LLC* (2018) 21 Cal.App.5th 599), a quitclaim from Hollywood Pictures Corporation (a Disney subsidiary), and a written acknowledgement by Carroll Shelby himself, on behalf of himself, the Trust, and all entities operated or controlled by them.  The 2008 *Halicki Films* published Ninth Circuit opinion was relied upon by the Ninth Circuit in its later published opinion in *DC Comics v. Towle* (9th Cir. 2015) 802 F.3d 1012, where the Ninth Circuit held that an "automotive character [the Batmobile] can be copyrightable." (*DC Comics, supra,* 802 F.3d at 1019, citing *Halicki Films.*)  "As indicated in *Halicki,* a character

may be protectable if it has distinctive character traits and attributes, even if the character does not maintain the same physical appearance in every context." (*DC Comics, supra,* 802 F.3d at 1020.)

20.    This is not the first lawsuit in which the Halicki Parties have had to deal with the Shelby Parties and CR's infringing activity, in an attempt to misappropriate the Halicki Parties treasured "Eleanor" from the GI60S Remake.  In two prior litigation matters, one between the Halicki Parties and the Shelby Parties, and one between the Halicki Parties and the CR Parties, the total that has been paid to the Halicki Parties (in settlement and as attorney fees) has been in excess of $1.1 million.

21.    In furtherance of their attempts to misappropriate the rights to "Eleanor", the Shelby Parties have asserted that "Eleanor", as she appears in the GI60S Remake, is a 1967 GT500 Mustang Fastback.  Nothing could be further from the truth.  The 1967 GT500 Mustang Fastback is one of many variations on the stock 1967 Mustang Fastback, and shares many characteristics with it, with a few variations.  "Eleanor", as she appears in the GI60S Remake, is not based on a 1967 GT500 Mustang Fastback.  Rather, both vehicles (the 1967 GT500 Mustang Fastback and "Eleanor") are based on a stock 1967 Mustang Fastback.  "Eleanor", as she appears in the GI60S Remake, has many unique design features that have never been features of the 1967 GT500 Mustang Fastback.  "Eleanor's" unique accumulation of parts and distinctive features, and her one-of-a-kind look, were first seen when "Eleanor" reprised her role in the GI60 Remake and her look is nowhere to be found on any authentic 1967 GT500 Shelby vehicle.  A few of those distinctive features and attributes of "Eleanor" include, but are not limited to, the prominent, one-of-a-kind hood, fender flares, side exhaust flares, a rear quarter fastback panel fuel cap, a fiberglass front bumper, and the distinctive pepper grey metallic color of the "Eleanor," and the position of the gas cap.

## The Parties and the Vehicles At Issue

22.     Lee Iacocca ("Iacocca") was the legendary designer at Ford who is widely known as "The Father of the Ford Mustang." Iacocca championed the development of the Mustang as Ford division manager. Iacocca became President of Ford in 1970 and served in that capacity until 1978; he was President and Chairman of Chrysler Corporation from 1978 to 1992.

23.     The Mustang began production approximately five months before the 1965 model year, although the first Mustangs were titled by Ford as 1965 Mustangs. The Mustang is the fifth best-selling Ford model. Over ten million Mustangs have been produced.

24.     Over the years there have been various different types of Mustangs offered for sale by Ford. For example, in 1967, the different models of the Ford Mustang, sold at Ford's dealerships, included the following: "GT Fastback Mustangs," "GTA Mustangs," "GT500 Mustangs," "California Special Mustangs," "High Country Mustangs," and "Stallion Mustangs." The "GT500 Mustang" (referred to by the Shelby Parties in their first amended complaint a "Shelby") is therefore just one of several models of the Mustang offered by Ford in 1967.

25.     Attached to this counter-claim as Exhibit 1 and incorporated by this reference is a page of photographs of a stock 1967 GT Fastback Mustang that notes its features. Attached to this counter-claim as Exhibit 2 and incorporated by this reference is a page of photographs chart of a 1967 GT500 Fastback Mustang that notes its features. As can be seen from these photographs, there are little differences between the stock 1967 GT Fastback Mustang and the 1967 GT500 Fastback Mustang:

a.     The 1967 GT500 Fastback Mustang hood has an air scoop; the stock 1967 GT Fastback Mustang does not.

b.     The wheels are different on the two models.

c.     The stock 1967 GT Fastback Mustang has a Mustang horse emblem in the middle of the front grill between the two fog lights; the 1967 GT500

7

Fastback Mustang does not.

d. The stock 1967 GT Fastback Mustang has two vertical chrome "bumper guard" pieces below, and perpendicular to, the chrome front bumper; the 1967 GT500 Fastback Mustang does not.

e. The stock 1967 GT Fastback Mustang has a GT mark in the lower side stripes: the 1967 GT500 Fastback Mustang has a GT500 mark in the lower side stripes.

f. The lower side scoops past the rear doors ending before the rear wheel well are different on the two models.

g. Although there is no rear seat side window on the stock 1967 GT Fastback Mustang panel, on both the stock 1967 GT Fastback Mustang and the 1967 GT500 Fastback Mustang, there is a faux rear window covering. On the stock 1967 GT Fastback Mustang it is an air vent scoop on the fastback panel; on the 1967 GT500 Fastback Mustang it is a double trapezoid cover on the fastback panel.

h. The stock 1967 GT Fastback Mustang has a GT gas cap and the 1967 GT500 Fastback Mustang has a GT500 gas cap. Both models have their gas cap located between the rear tail lights.

i. The stock 1967 GT Fastback Mustang has rear exhaust with dual pipes; the 1967 GT500 Fastback Mustang has rear exhaust with single pipes, on each side of the lower rear valance.

j. Attached to this counter-claim as Exhibit 3 and incorporated by this reference is a chart that illustrates these differences.

26.    Attached to this counter-claim as Exhibit 4 and incorporated by this reference are photographs depicting "Eleanor" as she appears in the GI60S Remake. The major differences between "Eleanor" and both the stock 1967 Fastback Mustang and the 1967 GT500 Fastback Mustang include the following:

a. "Eleanor's" faux rear window covering is a round molded upper air

scoop on her side Fastback panel; the faux rear window covering on both the stock 1967 Fastback Mustang and the 1967 GT500 Fastback Mustang do not have this feature.

b. "Eleanor's" wheel wells are flared. No stock 1967 Fastback Mustang Fastback or 1967 GT500 Fastback Mustang ever had flared wheel wells.

c. "Eleanor's" hood is different from the hood on both the stock 1967 Fastback Mustang and the 1967 GT500 Fastback Mustang.

d. "Eleanor's" front end is completely different from the front end of both the stock 1967 Fastback Mustang and the 1967 GT500 Fastback Mustang: the "Eleanor" headlight placement is different and there are two additional fog lights in the lower front grill.

e. "Eleanor" has no visible front chrome bumper; all stock 1967 Fastback Mustangs and 1967 GT500 Fastback Mustangs have front chrome bumpers.

f. "Eleanor" has a molded lower front bumper valance below the front headlights; this feature is absent from all stock 1967 Fastback Mustangs and all 1967 GT500 Fastback Mustangs.

g. "Eleanor" has a lower side rocker molded exhaust covered with the side exhaust pipe; this feature is absent from all stock 1967 Fastback Mustangs and all 1967 GT500 Fastback Mustangs.

h. "Eleanor" has a fuel gas cap on her fastback pillar. This feature is absent from all stock 1967 Fastback Mustangs and all 1967 GT500 Fastback Mustangs (and indeed all Mustangs from this era), which have a functional gas cap in the middle of the rear, between the rear tail lights, just below the trunk lid.

27.    Indeed, at an April 22, 2009 deposition, Jason testified that he was very familiar with all three vehicles (the stock 1967 Fastback Mustang, the 1967 GT500

Fastback Mustang, and "Eleanor") and while the 1967 GT500 Fastback Mustang looks very similar to a stock 1967 Fastback Mustang, "Eleanor" did not look like either of them. He testified: "I don't believe the "Eleanor" looks anything like the front-end of a '67 GT500. It doesn't have any lower rocker (side exhaust). It doesn't, you know, hang down on there, it doesn't, you know have any flares bulging out. The front valances, you know are smooth and under. The "Eleanor" is way down. It's got a big, you know, bottom lower bumper . . . I don't think the "Eleanor" looks anything like other cars."

28.    Attached to this counter-claim as Exhibit 5 and incorporated by this reference is Jason's August 10, 2009 email with six attached photographs, in which Jason asked and answered questions regarding the major differences between "Eleanor" and the 1967 GT500 Fastback Mustang. He noted that while "Eleanor" has fender flares, a fiberglass side exhaust, a rear quarter panel fuel gas cap, and a fiberglass front lower ground effect/fascia (bumper), he notes that the 1967 GT500 Mustang Fastback did not have those features.

29.    Attached as Exhibit 6 to this counter-claim and incorporated by this reference is a photograph of a vehicle advertised on CR's website, labeled a "Classic GT500CR." (Presumably the word "Classic" here is implying that it is akin to the original 1967 GT500 Fastback Mustang.) It is substantially similar to the 1967 GT500 Fastback Mustang depicted in Exhibit 2; the sole apparent difference is that two of the headlights are closer together than those on the original 1967 GT500 Fastback Mustangs depicted on Exhibit 2 and on page six of Exhibit 5.

30.    Attached as Exhibit 7 to this counter-claim and incorporated by this reference is a photograph of another vehicle being advertised on CR's website, labeled a "GT500CR" (on the spec sheet it is called a "1967 Mustang Fastback Shelby G.T. 500CR"), and therefore purports to be a version of the 1967 GT500 Fastback Mustang. CR's GT500CR bears the following features which are unique to "Eleanor" and which have never appeared on the 1967 GT500 Fastback Mustang, to name a few:

a.  The GT500CR contains elements from "Eleanor's" front end, such as
the two additional fog lights (although placed in a different position).

b.  The GT500CR, like "Eleanor", has no visible front chrome bumper,
unlike all 1967 GT500 Fastback Mustangs which had front chrome
bumpers.

c.  The GT500CR has "Eleanor's" front lower bumper below the front
headlights, a feature absent from all 1967 GT500 Fastback Mustangs
and all other Mustangs from this era.

d.  The GT500CR contains "Eleanor's" flared wheel wells, a feature absent
from all 1967 GT500 Fastback Mustangs and all other Mustangs from
this era.

e.  The GT500CR has "Eleanor's" molded side covered exhaust pipe and
exhaust, a feature absent from all 1967 GT500 Fastback Mustangs and
all other Mustangs from this era (whose exhaust came out the rear lower
valance below the chrome rear bumper).

f.  The GT500 CR has "Eleanor's" gas cap above the left rear side fastback
quarter panel, a feature absent from all 1967 GT500 Fastback Mustangs
and all other Mustangs from this era, which had a functional gas cap in
the middle of the rear, between the rear lights, just below the trunk lid.

g.  Attached to this counter-claim as Exhibit 8 and incorporated by this
reference is a photograph that notes the differences between CR's
"GT500CR" and "Classic GT500CR".

h.  Attached to this counter-claim as Exhibit 9 and incorporated by this
reference is a page of photographs that demonstrates that there is no
difference between the look of CR's "GT500CR" and "GT500CR
Carbon".

**COUNTERCLAIM**

31.     CR has used the domain www."ELEANOR"mustang.net to direct commercial traffic to CR's website www.classic-recreations.com, to market and sell commercial products.

32.     Attached as Exhibit 10 to this counter-claim and incorporated by this reference is a page from a February 14, 2020 Google search for the phrase "Eleanor" star car." Exhibit 10 demonstrates that CR is maintaining an advertisement stating: "Custom "Eleanor" Mustang/Classic Recreations®" "spec Out Your One-of-a-Kind "Eleanor" Mustang Today!" Exhibit 10 also contains the results of a July 5, 2020 Google search for the phrase "Eleanor" mustang builders." Exhibit 10 demonstrates that CR is maintaining an advertisement stating: "Custom "Eleanor" Mustang/Classic Recreations®. Spec Out Your One-of-a-Kind "Eleanor" Mustang Today! Free Quote Today, Optional Carbon Body."

33.     Exhibits 1 through 10 demonstrate that the counter-defendants are incorporating "Eleanor's" unique distinctive design elements and attributes, and passing them off as elements that were featured on the 1967 GT500 Fastback Mustang. The "GT500CR" contains "Eleanor's" copyrighted features, which are being passed off as 1967 GT500 Fastback Mustang features. As noted, the Shelby Parties have acknowledged that Denice owns the copyright to "Eleanor". Despite this, the Shelby Parties are using the copyrighted "Eleanor" features, and passing them off as 1967 GT500 Fastback Mustang features, without permission from the Halicki Parties.

**Toby Halicki, Denice Shakarian Halicki, The 46 Year Old Valuable Gone In 60 Seconds Film Franchise and The Copyrighted Star Car Character "Eleanor"**

34.     In 1974, H.B. "Toby" Halicki ("Toby") created, wrote, produced, directed, acted in, marketed, promoted, financed, and released the independent (and now cult classic) original 1974 film entitled Gone in 60 Seconds ("the Original GI60S"). The only character listed in the opening credits of the Original GI60S film is the star car character "Eleanor." The Original GI60S achieved success worldwide, grossing $40 million (approximately $220 million today), and catapulted Toby's

creation "Eleanor" to worldwide stardom. "Eleanor" is the only Mustang to have a starring role in a film. Indeed, Iacocca declared under oath that "Eleanor" is the only Ford Mustang in history to receive star title credit in a feature film."

35.    The plot of the Original GI60S involves a group of car thieves who get a list of 48 muscle and exotic cars that they must steal, including the elusive hard to capture "Eleanor." "Eleanor" in the film plays a customized 1973 yellow Fastback Mustang, although the vehicle used to portray "Eleanor" is actually a 1971 customized Fastback Mustang. The Original GI60S features "Eleanor" in her 40-minute car chase scene that is the longest car chase in film history, which is recognized as one of the greatest car chases of all time.

36.    Toby extensively and continually maintained, protected, promoted, marketed, advertised, and exploited "Eleanor" star car character, the "Eleanor" name, the image and look of "Eleanor", and "Eleanor's" goodwill.

37.    On May 11, 1989, Toby married Denice after a six-year engagement. Together they continually maintained, protected, promoted, marketed, advertised, and exploited the "Eleanor" star car character, the "Eleanor" name, the image and look of "Eleanor" and her goodwill. Throughout the engagement and marriage Toby and Denice worked tirelessly together running the businesses, licensing deals, attending global film festivals, and developing and strengthening the worldwide film franchise, brands and star car character "Eleanor".

38.    On August 20, 1989, Toby died in a tragic accident while filming one of his big stunt sequences for his new film, "Gone in 60 in Seconds 2." Denice was on the set with Toby at the time. Although much of Toby's action stunts were filmed, due to Toby's tragic death, "Gone in 60 Seconds 2" was never fully completed. However, the high action shots were later released by Denice on one of the "Gone in 60 Seconds" Trilogy DVD's for the enjoyment of the global fans.

**COUNTERCLAIM**

39.    In 1994, by operation of law, Denice obtained all right, title, and interest to the Original GI60S and the character "Eleanor" from the estate of H.B. "Toby" Halicki.

40.    In 1995, Michael Lynton, President of Hollywood Pictures, a subsidiary of Disney, invited Denice to Disney Studios to talk about doing a remake based off of the Original GI60S.  In these discussions, Denice explicitly stated that she was to reserve all rights, name, look and image to "Eleanor," no matter how "Eleanor" appeared in a remake.  Disney agreed to Denice's non-negotiable request.

41.    On October 12, 1995, Denice entered into a written agreement with Hollywood Pictures Corporation ("HPC"), a division of the Walt Disney Company, to develop a remake based off of the original GI60S.  Denice retained (among other things) all rights and interests, including but not limited to all rights, trademarks, trade dress, copyright rights, intellectual property rights, merchandising rights, goodwill to the look, image, character, name, and mark of the "Eleanor" star car character from the Original GI60S and the remake made by HPC, regardless of how "Eleanor" would appear in the remake.

42.    On June 9, 2000, Disney, with Denice as Executive Producer, released the remake of GI60S (the "GI60S Remake"), starring Nicholas Cage, Angelina Jolie, Robert Duvall and "Eleanor."  The plot in the GI60S Remake is based off of the Original GI60S, and involves a group of car thieves stealing 50 muscle and exotic cars, including the elusive hard to capture "Eleanor."  In both films the thefts of the other cars go largely as planned, but whenever the main human character tries to steal "Eleanor," circumstances invariably become complicated.

43.    In the GI60S Remake, "Eleanor" is portrayed by a heavily unique and distinctive customized one-of-a-kind never before seen 1967 Grey Fastback Mustang.  "Eleanor" has one-of-a-kind, unique distinctive attributes and characteristics which have never been featured on any 1967 GT500 Mustang.  Neither of these "Eleanors" (from the Original GI60S and the GI60S Remake) were built on or based off of a 1967

GT500 Fastback Mustang. Both "Eleanors" are not 1967 GT500 Fastback Mustangs. In fact, Carroll Shelby admitted under oath that the "Eleanor" in the GI60S remake was not an authentic GT500.

44.    The GI60S Remake grossed over $101 million in its domestic release, and over $232 million worldwide. On the day the GI60S Remake was released, it was number one at the box office and ranked as Disney's 15th top worldwide grossing movie ever. The GI60S Remake was globally released on June 9, 2000. Both the Original GI60S and the GI60S Remake were released on DVD in December 2000, and the Original GI60S was Walmart's biggest grossing sales for an independent title in its history.

45.    Denice owns copyrights in the Original GI60S and the GI60S Remake.

46.    Denice has continuously marketed and promoted the GI60S film franchise and the "Eleanor" star car character on a global scale, using the GI60S and "Eleanor" brands in a wide variety of markets and products. Currently, there are two officially licensed "Eleanor" builders: Fusion Motors (https://www.fusionmotorco.com/"Eleanor"-legacy) and Brand New Muscle Car (https://www.brandnewmusclecar.com/"Eleanor".html).

### Carroll Shelby and the Shelby Parties' Years' Long Attempts to Misappropriate the Rights to "Eleanor"

47.    Carroll Shelby worked with Iacocca and Ford to develop versions of the Ford Mustang labeled as GT350 and GT500. Shelby died in 2012. On information and belief, Carroll Shelby's interests in the Shelby Mustangs passed to the Trust, and CSL has the exclusive rights to license and exploit those interests.

48.    As noted in the first amended complaint in this action, events involving the creation of the GT40 were the subject of the 2019 film entitled "Ford v. Ferrari." In that film, Carroll Shelby is portrayed as defrauding his buyers. For example, in one scene, at time code 34:52:00, after Carroll Shelby (portrayed by Matt Damon) sells one

15

of his Cobras to a buyer, a co-worker observes that Carroll Shelby had already sold the same car to three buyers, including the actor Steven McQueen.

49.    Ford has produced various versions of a Shelby Mustang, including "GT500" and "GT500KR," but one aspect of the Mustangs with the Shelby moniker that has remained constant over the years is that they have never contained any of the unique "Eleanor" design elements, as previously noted.

50.    On June 5, 2000 the GI60S Remake premier was held at the same theater in Westwood, California that Toby premiered his second film "The Junkman." The premier party was held at the Peterson Automotive Museum (the "Peterson") and on highlighted display at the Peterson were "Eleanors" from both GI60S films. On June 9, 2000, the GI60S Remake made its blockbuster worldwide release.

51.    On or about June 15, 2000, while both versions of "Eleanor" were still on display at the Peterson as part of an event entitled "Great Cars of the Movies," Iacocca introduced Shelby to Denice. Denice told Shelby that the GI60S Remake was number one at the box office, and discussed "Eleanor" and her background. Denice suggested that Shelby view both "Eleanor" versions which were on display.

52.    Beginning in or about 2001, Shelby and his related entities began a scheme to misappropriate the "Eleanor" star car character for their own materialistic ends, despite the fact that Shelby was aware that he had no involvement in any aspect of (including but not limited to the creation, marketing or promotion) of the Original GI60S, the GI60S Remake, or "Eleanor" herself. This scheme included the following actions, which is not an exhaustive list:

    a.    On September 28, 2001, the Trust improperly applied for registration of a trademark "Eleanor" for model cars (which was abandoned December 31, 2005).

    b.    On August 20, 2002, the Trust improperly applied for registration of a trademark "Eleanor" for automobiles and structural parts of automobiles (on November 18, 2009, the Trust turned over to Denice

**COUNTERCLAIM**

with any associated goodwill).

c.  Unique Motorcars, Inc. ("Unique" built and sold 25 counterfeit and
    infringing "Eleanor" replicas and labeled them as "GT500E." Unique's
    owner, Doug Hasty, improperly filed a trademark application for
    "GT500E" on September 3, 2002 (which was abandoned on March 4,
    2004). On September 3, 2002, Hasty improperly filed a trademark
    application for "Eleanor" (which was abandoned on February 17,
    2003).

d.  On September 10, 2002, CSL issued a license to Unique Motorcars,
    Inc., to use various marks, including the improperly obtained "Eleanor"
    mark, the Shelby mark and the improperly applied for GT-500E mark.
    Carroll Shelby later admitted in the trademark office that he had
    nothing to do with "Gone in 60 Seconds" and that the "E" in GT-500E
    stood for "Eleanor". This license agreement was facilitated by Steve
    Sanderson of Sanderson Sales & Marketing, Sanderson C&C, Inc., and
    Sanderson C&C Management, Inc. (collectively "Sanderson"), to build
    "Eleanors" as she looked and performed in the GI60S Remake.

e.  Unique Motorcars, Inc. continued to manufacture, produce and sell the
    "Eleanor" star car character in the GI60S remake. Sanderson issued
    advertisements that included pictures of the vehicles being produced
    pursuant to the license agreement, which included the marks "Eleanor,"
    "GT500E," and "Gone in 60 Seconds." CSL approved of these
    advertisements.

f.  In 2003, despite having had nothing to do with the Original GI60S, or
    the GI60S Remake, Shelby filed a false trademark application for the
    name "Eleanor" for vehicles, claiming first use of "Eleanor" in 2003,
    even though Shelby later admitted meeting Denice, that he eventually
    saw the GI60S Remake around the time it was globally released in June

of 2000, and (as he stated in a June 14, 2005 deposition) that he never heard the name "Eleanor" in connection with a car before seeing the GI60S Remake, did not come up with the name "Eleanor" for the car and never told anyone he came up with the name "Eleanor".

**The Prior Lawsuits Between The Halicki Parties and the Shelby Parties**

53.    On October 25, 2004, in order to protect the valuable rights in the Original GI60S, the GI60S Remake, and the star car character "Eleanor", Denice filed a complaint in the United States District Court for the Central District of California, as case number CV-04-8813, and assigned to Judge S. James Otero (*Halicki v. Shelby I*). Eventually, the plaintiffs in that action were Denice, The Original Gone in 60 Seconds, LLC, Halicki Films, LLC, and Eleanor Licensing.  The operative complaint was eventually a second amended complaint, naming as defendants the Shelby Parties, along with other parties who are not parties to this lawsuit: Carroll Shelby International, Inc., Shelby individually, Carroll Shelby Engineering, Inc., Carroll Shelby Motors, Inc., and Carroll Shelby Distribution International, Inc. ("the Shelby entities"); Unique Motorcars, Inc. and Unique Performance, Inc. ("the Unique Parties") and Sanderson.  The Shelby Parties and the other Shelby entities then filed a counter-claim in which they asserted that unauthorized Shelby marks were utilized in the GI60S Remake.

54.    On June 14, 2005, Mr. Shelby was deposed in *Halicki v. Shelby I,* and testified in part as follows:

      a.    Shelby admitted he was not claiming any rights in the Original GI60S or the GI60S Remake.

      b.    Shelby admitted he did not own any copyright in the Original GI60S or the GI60S Remake.

      c.    Shelby admitted that he had not heard the name "Eleanor" in connection with a car before seeing the GI60S Remake.

      d.    Shelby admitted that he did not come up with the name "Eleanor" for

the car.

e.  Shelby admitted that the "E" in "GT500E" stood for "Eleanor".

f.  Shelby admitted that the car in the GI60S Remake was not an authentic GT500.

g.  Shelby admitted that he licensed the name "Eleanor" to a Unique entity.

55.    In late 2005, Judge Otero erroneously granted summary judgment to the Unique Parties and the Shelby Parties, dismissing the Halicki Parties' claims in *Halicki v. Shelby I*.  As stated by Judge Otero in his later minute orders denying the Shelby and Unique Parties' motions for attorney fees (numbers 192 and 193 in the *Halicki v. Shelby I* docket): "Nothing in the record demonstrates that Halicki's lawsuit is groundless, unreasonable, vexatious, or pursued in bad faith."  The summary judgment was granted based on Judge Otero's determination that the Halicki Parties did not have standing to assert the claims in *Halicki v. Shelby I,* because in his erroneous view those claims were owned by Disney's subsidiary Hollywood Pictures Company, later proved false when overturned by the Ninth Circuit, that the district court had erred in failing to consider the Halicki Parties' motion to reconsider extrinsic evidence, Denice's declaration and Disney's HPC's acknowledgment, both reconfirming that Denice had reserved in her deal with Disney GI60S Remake "Eleanor" and Original "Eleanor."

56.    On April 28, 2006, Judge Otero granted the Halicki Parties' motion for summary judgment on the Shelby Parties' counter-claim (docket number 194).  Judge Otero found that any reference to any Shelby mark in the GI60S Remake was nominative fair use.  That order is final and has never been reversed.

57.    On May 26, 2006, the Halicki Parties filed a notice of appeal from Judge Otero's order granting the summary judgment in *Halicki v. Shelby I*.

58.    While *Halicki v. Shelby I* was pending in the Ninth Circuit, the Unique Parties filed for bankruptcy.

59.    On July 30, 2007, HPC and Denice entered into a Quitclaim Agreement, a copy of which is attached to this counter-claim as Exhibit 11 and incorporated by this

reference.  The purpose of the 2007 Quitclaim Agreement was to make abundantly clear what both HPC and Denice already knew and reconfirmed in Disney's 2005 Acknowledgement Agreement: that HPC (the arm of Disney involved in the GI60S remake) had never obtained any "Eleanor" merchandising rights, which belonged to and had always been retained by Denice.  The Quitclaim Agreement specifically stated: "While HPC believes that under the Option Agreement it does not own the "Eleanor" Merchandising Rights, as set forth in the Acknowledgment, for the avoidance of doubt, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, HPC hereby quitclaims to Halicki all of HPC's goodwill, right, title and interest of every kind and nature whatsoever (collectively, the "Rights") in and to the "Eleanor" Merchandising Rights."

60.    On October 23, 2007, while *Halicki v. Shelby I* was pending in the Ninth Circuit, the Halicki Parties filed a separate action in the United States District Court for the Central District of California as case number 07-06859 (*Halicki v. Shelby II*).  The eventual operative pleading in *Halicki v. Shelby II* was a first amended complaint filed on January 25, 2008, and named as defendants Shelby, the Trust, and various Shelby entities, Steve Sanderson, Sanderson C&C, Ltd., and Sanderson C&C Management, LLC and the Unique Parties.

61.    On August 4, 2008, in *Halicki v. Shelby I,* the Ninth Circuit ruled in favor of the Halicki Parties by, among other things, reversing Judge Otero's erroneous grant of summary judgment and affirming Judge Otero's denial of the Shelby Parties' motion for attorney fees, in a published opinion, *Halicki Films, LLC v. Sanderson Sales and Marketing* (9th Cir. 2008) 547 F.3d 1213.

62.    On December 4, 2008, Shelby, the Shelby Parties and Shelby Automobiles, Inc., filed a complaint against the Halicki Parties, T&D Motor Company, Inc., and CR in the United States District Court for the Central District of California as case number 08-08004 (*Shelby v. Halicki*).  The operative complaint was a first amended complaint, in which the Shelby Parties improperly alleged that they (and not

the Halicki Parties) had a federal trademark registration in "Eleanor" (despite, as noted previously, knowing that they had no involvement with the Original GI60S, the GI60S Remake, or the creation of "Eleanor").

63.     At the time that *Shelby v. Halicki* was filed, CR was a licensee of the Halicki Parties, with a license to produce officially licensed replicas of the star car character "Eleanor" from the GI60S remake.

64.     On August 7, 2009, Judge Otero consolidated all three cases: *Halicki v. Shelby I, Halicki v Shelby II,* and *Shelby v. Halicki,* with a trial scheduled for February 2, 2010.

65.     On or about October 16, 2009, CR settled with the Shelby Parties and terminated its license agreement with the Halicki Parties.

66.     On October 30, 2009, the Halicki Parties and the Shelby Parties conducted a settlement conference before Judge Otero.  A portion of the settlement conference was transcribed and has been made part of the public record as Docket No. 400 in the consolidated action.  At the settlement conference, Judge Otero asked, and all parties and attorneys confirmed, that they understood the terms of the Confidential Settlement Agreement, and agreed to its terms, including the words used and the photographs attached.  In addition, Judge Otero stated on the record that the Confidential Settlement Agreement bound each side to a confidentiality provision.  Judge Otero also entered an order stating that the court retained jurisdiction to enforce the Confidential Settlement Agreement.  Judge Otero also stated that any breach of the confidentiality provision would result in sanctions, which could reach six or seven figures.  A copy of the publicly filed and available transcript of that hearing is attached to this counter-claim as Exhibit 12 and incorporated by this reference.

67.     The October 30, 2009 Confidential Settlement Agreement between the Halicki and the Shelby Parties did not in any way resolve any claims against the Unique Parties or the Sanderson Parties, either in fact or in "spirit."  Neither the Sanderson Parties nor the bankrupt Unique Parties were questioned by Judge Otero at

the October 30, 2009 settlement conference, and neither of them were parties to the Confidential Settlement Agreement.

68.     In addition, after the October 30, 2009 settlement conference, Judge Otero held numerous hearings regarding the status of a separate settlement agreement between the Halicki Parties and the Sanderson Parties, resulting in multiple orders continuing various Orders to Show Cause regarding dismissing the Sanderson Parties. For example, on December 7, 2009, Judge Otero entered a minute order striking the answer of the Sanderson Parties and directing the Halicki Parties to enter the defaults of the Sanderson Parties.  A copy of that order is attached to this counter-claim as Exhibit 13 and incorporated by this reference.

69.     In fact, it was not until December 18, 2009 that the Sanderson Parties were dismissed by a separate order.  A copy of that order is attached to this counter-claim as Exhibit 14 and incorporated by this reference.

70.     As part of the October 30, 2009 settlement, Carroll Shelby, individually and on behalf of the Trust and all Shelby entities, signed a November 2, 2009 document ("the Shelby Acknowledgement"), a copy of which is attached to this counter-claim as Exhibit 15 and incorporated by this reference.  In that document, Shelby stated and agreed that he, his trust and all of his entities, including all of the Shelby Parties:

   a.   "Shelby has transferred to Denice Shakarian Halicki and/or to an entity or entities designated by her, all right, goodwill, title, intellectual property rights, and interest to the copyrights in and to the following: the remake of the theatrical motion picture 'Gone in 60 Seconds,' and particularly the 'Eleanor' car character from the remake."

   b.   "Shelby has transferred to Denice Shakarian Halicki and/or to an entity or entities designated by her, all right, goodwill, title, intellectual property rights, and interest to the 'trademarks' in and to the following: 'Eleanor'; 'E'; and  'Gone in 60 Seconds' from the original, remake and

22

**COUNTERCLAIM**

sequels of the theatrical motion picture."

c.  "Shelby shall not use, or license in any way, shape or form any of the
property rights as described herein transferred to Denice Shakarian
Halicki and/or to an entity or entities designated by her."

d.  "Halicki owns the copyright to the character 'Eleanor' from the remake
of the theatrical motion picture 'Gone in 60 Seconds.'"

e.  "Shelby cannot sue Denice Shakarian Halicki, her entities, or her
licensees for licensing, using, manufacturing, or selling 'Eleanors' from
the remake of the theatrical motion picture 'Gone in 60 Seconds'
(vehicles or merchandise)."

71.    On December 2, 2009, the Trust formally withdrew and abandoned all
GT500E rights into the infringing and counterfeiting marks in the Trademark Office.

72.    On December 18, 2009, the Trust assigned "Eleanor" with any associated
goodwill to Denice Shakarian Halicki for vehicles, namely automobiles, engines for
automobiles, and structural parts for automobiles.

**The Prior Lawsuit Between The Halicki Parties and Classic Recreations, LLC**

73.    On November 1, 2007, Eleanor Licensing and CR entered into a license
agreement, whereby Eleanor Licensing licensed to CR certain intellectual property
rights to permit CR to manufacture and sell officially licensed replicas of the star car
character "Eleanor" as she appears in the GI60S Remake.  A copy of that license
agreement is attached to this counter-claim as Exhibit 16 and incorporated by this
reference.

74.    Pursuant to paragraph 9.3 of the license agreement, CR was obligated to
provide to Eleanor Licensing the first replica built under the license agreement,
denoted as "Eleanor" Number 1.  CR built "Eleanor" Number 1 and delivered it to
Eleanor Licensing; however, the title to "Eleanor" Number 1 was never delivered.

75.    On or about October 16, 2009, CR terminated its license agreement with Eleanor Licensing.  At all times after October 16, 2009, CR was aware that Eleanor Licensing retained custody of "Eleanor" Number 1.

76.    On May 23, 2014, over four years after the termination of the license agreement, and with full knowledge that the Halicki Parties retained custody of "Eleanor" Number 1, Jason, owner of CR, filed a false petition for replevin in the District Court of Canadian County in the State of Oklahoma, entitled *Jason Engel, DBA, Classic Recreations LLC v. Fusion Motor Sports, Inc.*, as case number CJ-2014-299.  Denice had Fusion Motor Sports, Inc. ("Fusion"), a licensee of the Halicki Parties, place "Eleanor" Number 1 on public display.  In that petition, Jason falsely stated under oath that he was the owner of "Eleanor" Number 1 and that Fusion was "concealing, damaged or destroyed the vehicle."  This petition was never served on Fusion or the Halicki Parties.  Based on this false petition, the Oklahoma court issued an Order of Replevin on May 23, 2014.

77.    Jason then made a false stolen car report with the Los Angeles Police Department, causing LA TRAP (Taskforce for Regional Autotheft Prevention) to raid the Fusion showroom and seize "Eleanor" Number 1 based upon the false police report.

78.    As a result of these false actions, the Halicki Parties were forced to file a lawsuit in the Los Angeles County Superior Court, entitled *Eleanor Licensing, LLC v Classic Recreations, LLC,* case number EC062924.  On April 5, 2016, the Halicki Parties obtained a judgment quieting title in "Eleanor" Number 1 in their favor, along with permanent injunctions, a copy of which is attached to this counter-claim as Exhibit 17 and incorporated by this reference.  The judgment, which was affirmed by the California Court of Appeal in *Eleanor Licensing LLC v. Classic Recreations LLC* (2018) 21 Cal.App.5th 599, contained the following language in paragraph six, which was not disturbed by the Court of Appeal: "The court issues a permanent injunction precluding defendants Classic Recreations LLC, T&D Motor Company Inc., Jason

Engel and Tony Engel from seeking possession of or harming the subject vehicle with VIN MS67FB070309TW referred to as '"Eleanor" No. 1' and/or Eleanor Licensing, LLC's rights and rights in the subject vehicle."

79.    Accordingly, CR, Tony and Jason remain subject to the injunctions, including an injunction prohibiting them from harming any of Eleanor Licensing's rights, including the rights in "Eleanor" and her look.

## The Continuing Efforts of the Counter-Defendants to Misappropriate the Rights to "Eleanor"

80.    CR holds a license from CSL.  According to CR's website, every CR comes with an official Shelby serial number and is listed in the official Shelby Worldwide Registry.

81.    Each "GT500CR" built by CR begins with an actual Ford 1967 or 1968 Mustang body.

82.    CR, under license from and with approval from the Shelby Parties, is building, marketing and selling the "GT500CR" as described in paragraph 30 and depicted in Exhibit 7.  The Halicki Parties have sent a cease and desist letter to CR, but CR and the Shelby Parties have persisted in their activities.

83.    The Shelby Parties are licensing CR to manufacture and sell "Eleanors" which CR is calling "GT500CR," in violation of the "Shelby Acknowledgement," Exhibit 15.  As described in paragraph 70, the Shelby Parties are not allowed to use or license in any way shape or form any of the property rights that were transferred to Denice.  As noted in Exhibit 15, the Shelby Parties transferred all rights to the GI60S Remake and particularly the "Eleanor" car character from the GI60S Remake to Denice.  They also acknowledged that Denice owns the copyright to the character "Eleanor" from the GI60S remake, including "Eleanor's" look and image as she appears in the GI60S Remake.

84. CR has violated the permanent injunction contained in the judgment Exhibit 17 by building, marketing and selling "Eleanors" called "GT500CR." In addition, CR has been advertising that it is building "Eleanors" called "GT500CR."

85. SpeedKore is a vendor/supplier of CR. SpeedKore is advertising and building infringing counterfeit "Eleanor" parts and building infringing counterfeit "Eleanor" carbon bodies called "GT500CR CARBON." Attached as Exhibit 18 to this counter-claim and incorporated by this reference are articles in which these carbon bodies are referred to as "Eleanor."

### The Shelby Parties' Violation of the Confidentiality Clause of the
### Confidential Settlement Agreement

86. On June 29, 2020, Michael Leone, a business consultant of the Halicki Parties, sent a letter to SpeedKore, demanding that it cease and desist from its infringing activities.

87. On July 6, 2020, Caroline H. Mankey, attorney for the Shelby Parties and CR, responded to Leone's letter, by email. This email contained Mankey's response to Leone's letter, and a copy of a letter that Cummings (a trustee of the Trust) had previously sent to the Halicki Parties' attorney, which enclosed a copy of the Confidential Settlement Agreement. This email was copied to several people at SpeedKore, including Jim Kacmarcik, Dave Salvaggio, Tom Porter, and Lyle Brummer. The inclusion of the Confidential Settlement Agreement in the email sent to SpeedKore was a direct breach of the Confidential Settlement Agreement.

### FIRST CLAIM FOR RELIEF
### Breach of Written Contract
### (Against the Shelby Parties)

88. The Halicki Parties incorporate the allegations in the previous paragraphs as if fully set forth.

89. The Confidential Settlement Agreement is a valid and enforceable contract. The Shelby Acknowledgement is a valid and enforceable contract.

90.     The Confidential Settlement Agreement contains a confidentiality clause that specifically provides that it shall remain confidential and shall not be revealed to anyone other than specifically described categories of people or entities. The confidentiality clause states that the only statement, written or verbal, that may be made by either party is: "CARROLL SHELBY AND DENICE SHAKARIAN HALICKI HAVE AMICABLY RESOLVED THEIR DIFFERENCES AND SETTLED THE LITIGATION BETWEEN THEM. EACH WILL CONTINUE IN THEIR BUSINESS VENTURES."

91.     The Halicki Parties have complied with the terms of the Confidential Settlement Agreement, including the confidentiality clause.

92.     On or about July 6, 2020, the Shelby Parties breached the confidentiality clause by emailing a complete, unredacted, copy of the Confidential Settlement Agreement to various people at SpeedKore, as previously alleged.

93.     This disclosure of the Confidential Settlement Agreement was made without authorization by the Halicki Parties.

94.     The Halicki Parties have been damaged by the disclosure of the Confidential Settlement Agreement in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### Breach of Written Contract
### (Against the Shelby Parties)

95.     The Halicki Parties incorporate the allegations in the previous paragraphs as if fully set forth.

96.     The Shelby Acknowledgement, Exhibit 15, is a valid and enforceable contract, for which consideration was provided and received.

97.     The Shelby Parties have breached the Shelby Acknowledgement by the following acts, including but not limited to the following:

a.   In paragraph 1, Shelby transferred to Denice Halicki all rights to the GI60S remake and the star car character "Eleanor" from the GI60S

27

remake.  Yet the Shelby Parties are using design aspects from the "Eleanor" from the GI60S Remake to market the vehicles being built by CR under license from the Shelby Parties, in violation of this provision.

b.  In paragraph 2, Shelby transferred to Denice Halicki all rights to the trademarks regarding "Eleanor", "E", and GI60S from the Original GI60S, the GI60S Remake, and all sequels.  Yet the Shelby Parties are using the Halicki Parties' trademarks to market the vehicles being built by CR under license from the Shelby Parties, in violation of this provision.

c.  In paragraph 3, Shelby stated that he shall not use, or license in any way shape or form, any of the property rights being transferred to Denice. Yet the Shelby Parties are using design aspects from the "Eleanor" from the GI60S Remake and the Halicki Parties' trademarks to market the vehicles being built by CR under license from the Shelby Parties, in violation of this provision.

d.  In paragraph 4, Shelby restated that Denice owned the copyright to "Eleanor" from the GI60S Remake.  Yet the Shelby Parties are using design aspects from the "Eleanor" from the GI60S Remake to market the vehicles being built by CR under license from the Shelby Parties, in violation of this provision.

e.  In paragraph 5, Shelby was prohibited from suing Denice or any of her entities or licensees for licensing, using, manufacturing, or selling "Eleanors" from the GI60S remake.  Yet the Shelby Parties have filed this very lawsuit which arises out of the Halicki Parties' assertion of their rights in the "Eleanor" from the GI60S Remake.

98.    The Halicki Parties have been damaged by the Shelby Parties' breach of the Confidential Settlement Agreement and the Shelby Acknowledgement by, among other things, loss of royalties from their licensees, and incurring attorney fees

in defense of this improper action.  The amount of damages will be proven at trial.

### THIRD CLAIM FOR RELIEF

### False Designation of Origin under 15 U.S.C. § 1125(a)

### (Against all Counter-Defendants)

99.    The Halicki Parties incorporate the allegations in the previous paragraphs as if fully set forth.

100.    The Halicki Parties' intellectual property rights in "Eleanor" and the "Gone in 60 Seconds" film franchise, as acknowledged by the Shelby Parties and as existed independent of any acknowledgment by the Shelby Parties, are distinctive goods and services.  Through the many years of sales and advertising by the Halicki Parties and Toby, they have become associated in the minds of consumers with the high quality products and services produced and/or authorized by the Halicki Parties.

101.    The counter-defendants' advertising, production and sales of "Eleanor" and "Eleanor" parts, and branding them as authentic Shelby vehicles and GT500CRs, constitutes "reverse passing off" which is prohibited under Section 43a of the Lanham Act, which forbids the use of any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion or deception, pursuant to 15 U.S.C. § 1125(a).

102.    The counter-defendants' advertising, production and sales of "Eleanor" and "Eleanor" parts, and branding them as authentic Shelby vehicles and GT500CRs, was intended to, was likely to, and did in fact, cause confusion and deception in the marketplace as to whether the Halicki Parties own the rights to "Eleanor" and to the "Gone in 60 Seconds" franchise.

103.    The counter-defendants' reverse passing off has caused and, if not enjoined, will continue to cause, irreparable and continuing harm to the Halicki Parties, for which they have no adequate legal remedy.  Accordingly, the Halicki Parties are entitled to provisional, preliminary and permanent injunctive relief to compel cessation of all such deceptive, confusing and harmful conduct.

104.    The acts of the counter-defendants constituting reverse passing off have all been performed in coordination with every other counter-defendant, such that each is liable for the acts of the other.

105.    As a direct and proximate result of counter-defendants' wrongful conduct, the Halicki Parties have been and will continue to be damaged by, without limitation, a diminution in the value of their rights in "Eleanor" and the "Gone in 60 Seconds" film franchise, the loss of royalties from their current and future licensees, loss of their reputation and goodwill, harm to the reputation and goodwill of the "Eleanor" and "Gone in 60 Seconds" brand, in an amount to be proven at trial.

106.    The actions of the counter-defendants was and continues to be knowing, deliberate, willful, fraudulent, and without extenuating circumstances, entitling the Halicki Parties to recover three times the amount of actual damages or profits, and attorney's fees and costs incurred in this action, and the counter-defendants' profits pursuant to 15 U.S.C. § 1117(a).

107.    The counter-defendants' unauthorized reverse passing off has caused and, if not enjoined, will continue to cause, irreparable and continuing harm to the Halicki Parties for which there is no adequate legal remedy, so that the Halicki Parties are entitled to provisional, preliminary and permanent injunctive relief to compel cessation of all infringing, confusing, and otherwise harmful conduct pursuant to 15 U.S.C. § 1116(a).

## FOURTH CLAIM FOR RELIEF

### Common Law Unfair Competition

### (Against all Counter-Defendants

108.    The Halicki Parties incorporate the allegations in the previous paragraphs as if fully set forth.

109.    The counter-defendants' misconduct constitutes unfair competition in that it offends established public policy and is immoral, unethical, oppressive, unscrupulous and injurious to consumers.

110.    The counter-defendants' misconduct has resulted in damage to the Halicki Parties, without limitation, in the form of lost profits and damage to reputation and goodwill.

111.    The acts of unfair competition alleged herein were committed with oppression, fraud and malice.  Specifically, the counter-defendants are aware that the Halicki Parties are the exclusive owners of the rights in "Eleanor" and the "Gone in 60 Seconds" film franchise.  The Shelby Parties are aware of the confidential settlement agreement and the Shelby Acknowledgement.  CR, Jason and Tony are subject to permanent injunctions, Exhibit 17.

112.    The actions of the counter-defendants constitute malice and oppression and support the imposition of punitive damages.

### FIFTH CLAIM FOR RELIEF

### Breach of Written Contract

### (Against the Shelby Parties)

113.    The Halicki Parties incorporate the allegations in the previous paragraphs as if fully set forth.

114.    The Confidential Settlement Agreement is a valid and enforceable contract.  The Confidential Settlement Agreement contains express rights and duties of the Shelby Parties and the Halicki Parties.

115.    The Halicki Parties have complied with all terms of the Confidential Settlement Agreement.

116.    The Shelby Parties have breached the terms of the Confidential Settlement Agreement.

117.    The Halicki Parties have been damaged by the Shelby Parties' breach of the Confidential Settlement Agreement words and photographs and the Shelby Acknowledgement by, among other things, loss of royalties from their licensees, and incurring attorney fees in defense of this improper action.  The amount of damages will be proven at trial.

## SIXTH CLAIM FOR RELIEF

### Copyright Infringement

### (Against all Counter-Defendants)

118.    The Halicki Parties incorporate the allegations in the previous paragraphs as if fully set forth.

119.    Denice owns a valid copyright in the Original GI60S, the GI60S Remake, and "Eleanor."

120.    The counter-defendants have engaged in actionable copying of constituent elements of the work that are original.

121.    The Halicki Parties have been damaged in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF

### Violation of California Business & Professions Code § 17200, et seq.

### (Against all Counter-Defendants)

122.    The Halicki Parties incorporate the allegations in the previous paragraphs as if fully set forth.

123.    California Business & Professions Code Section 17200 prohibits any unlawful, unfair or fraudulent business act or practice.  Specifically, the counter-defendants are aware that the Halicki Parties are the exclusive owners of the rights in "Eleanor" and the "Gone in 60 Seconds" film franchise.  The Shelby Parties are aware of the confidential settlement agreement and the Shelby Acknowledgement.  CR, Jason and Tony are subject to permanent injunctions, Exhibit 17.  The counter-defendants' misconduct constitutes an unfair business practice in violation of the California Unfair Business Practices Act, Cal Bus. & Prof. Code § 17200, *et seq.*

124.    The counter-defendants have engaged in a business practice of ongoing unlawful trademark, trade dress, and copyright infringement in violation of the Halicki Parties' rights in order to misappropriate profits and income that belong to the Halicki Parties.  Unless the counter-defendants' unfair practices against the

Halicki Parties are enjoined, the Halicki Parties will continue to sustain financial injury and irreparable damage to their business and reputation, and competition will decrease in the market.

125.    As a result of these acts, the Halicki Parties have lost money or property and suffered injury in fact, in an amount to be proven at trial.

126.    The counter-defendants' wrongful conduct has caused and, if not enjoined, will continue to cause irreparable and continuing harm to the Halicki Parties, for which they have no adequate legal remedy. Accordingly, the Halicki Parties are entitled to provisional, preliminary and permanent injunctive relief. The Halicki Parties are also entitled to restitution of all monies and property obtained by the counter-defendants as a result of their wrongful conduct.

## EIGHTH CLAIM FOR RELIEF

### Declaratory Relief

### (Against the Shelby Parties)

127.    The Halicki Parties incorporate the allegations in the previous paragraphs as if fully set forth.

128.    An actual and justiciable controversy exists between the Halicki Parties and the Shelby Parties regarding the parties' respective rights and responsibilities regarding the Shelby Acknowledgment and the Confidential Settlement Agreement.

129.    The Halicki Parties desire a judicial determination of the respective rights and duties of the Halicki Parties and the Shelby Parties with respect to the breach by the Shelby Parties of the terms of the Shelby Acknowledgment and the Confidential Settlement Agreement.

## NINTH CLAIM FOR RELIEF

### Declaratory Relief

### (Against all Counter-Defendants)

130.    The Halicki Parties incorporate the allegations in the previous paragraphs as if fully set forth.

**COUNTERCLAIM**

131.   An actual and justiciable controversy exists between the Halicki Parties and the counter-defendant regarding the parties' respective rights and responsibilities regarding vehicles being manufactured, marketed, licensed and sold by the counter-defendants with "Eleanor" attributes and "Eleanor" parts, and branding them as authentic Shelby vehicles and GT500CRs.

132.   The Halicki Parties seek a declaratory judgment that vehicles being manufactured, marketed, licensed and sold by the counter-defendants with "Eleanor" attributes and "Eleanor" parts, and branded as authentic Shelby vehicles and GT500CRs, infringe on the Halicki Parties' rights.

## TENTH CLAIM FOR RELIEF

### Violation of the Anticybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1125(d)

### (Against CR, Jason, and Tony)

133.   The Halicki Parties incorporate the allegations in the previous paragraphs as if fully set forth.

134.   The CR Parties are registering, trafficking in, and/or using a domain name confusingly similar to, or dilutive of, the "Eleanor" trademark.

135.   The CR Parties have had a bad faith intent to profit from the mark.

136.   The CR Parties have registered, trafficked in, and have used a domain name that is identical to, confusingly similar to, and/or dilutive of the "Eleanor" distinctive mark.

137.   The Halicki Parties have been damaged in an amount to be proven at trial.

## ELEVENTH CLAIM FOR RELIEF

### Declaratory Relief

### (Against CR, Jason, and Tony)

138.   The Halicki Parties incorporate the allegations in the previous paragraphs as if fully set forth.

**COUNTERCLAIM**

139.    An actual and justiciable controversy exists between the Halicki Parties and the CR Parties regarding the parties' respective rights and responsibilities in regards to the judgment obtained by the Halicki Parties, Exhibit 17.

140.    The Halicki Parties desire a judicial determination that the CR Parties actions have violated the permanent injunctions contained in the judgment Exhibit 17 by building, marketing and selling "Eleanors" called "GT500CR."  In addition, CR has been advertising that it is building "Eleanors" called "GT500CR."

## TWELFTH CLAIM FOR RELIEF

### Trademark Infringement

### (Against all Counter-Defendants)

141.    The Halicki Parties incorporate the allegations in the previous paragraphs as if fully set forth.

142.    The Halicki Parties have valid marks entitled to protection.

143.    The counter-defendants have used the same or a similar mark in commerce in connection with the sale or advertising of goods or services without the consent of the Halicki Parties.

144.    The Halicki Parties have been damaged in an amount to be proven at trial.

## PRAYER

WHEREFORE, the Halicki Parties pray for relief as follows:

1.    Compensatory damages in an amount to be proven at trial;

2.    A declaration of the respective rights and duties of the Halicki Parties and the Shelby Parties with respect to the breach by the Shelby Parties of the terms of the Shelby Acknowledgment and the Confidential Settlement Agreement.

3.    A declaration that vehicles being manufactured, marketed, licensed and sold by the counter-defendants with "Eleanor" attributes and "Eleanor" parts, and branded as authentic Shelby vehicles and GT500CRs, infringe on the Halicki Parties' rights.

4.    A declaration that the CR Parties actions have violated the permanent injunctions contained in the judgment Exhibit 17 by building, marketing and selling "Eleanors" called "GT500CR."  In addition, CR has been advertising that it is building "Eleanors" called "GT500CR."

5.    The granting of a permanent injunction enjoining the counter-defendants, their employees, agents, officers, directors, managers, attorneys, successors, affiliates, subsidiaries, and assigns, and all of those in active concert and participation with any of the foregoing persons and entities from using any of the Halicki Parties' rights as to the "Eleanor" copyrighted star car character, her name, look, image, and goodwill as she appears in the GI60S Remake;

6.    Damages up to three times actual damages pursuant to the Lanham Act;

7.    Disgorgement of improperly obtained profits pursuant to the Lanham Act, enhanced as appropriate to compensate the Halicki Parties for the damages sustained;

8.    Punitive and exemplary damages;

9.    Pre-judgment interest;

10.    Attorney fees and costs;

11.    Statutory penalties, and

12.    Such other relief as the court deems just and proper.


Dated: November 16, 2020                              **CLARK HILL LLP**


                                                      By: _David L. Brandon_____
                                                      David L. Brandon
                                                      Ryan C. McKim
                                                      Attorneys for defendants and
                                                      counterclaimants Denice Shakarian
                                                      Halicki and Eleanor Licensing, LLC, and
                                                      Gone in 60 Seconds Motorsports, LLC

**COUNTERCLAIM**