1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Notice has been delivered by First Class U.S. Mail
to all counsel (or parties) at their last known address
of record in this action on this date

Date: Nov 29 2022, 1:57 pm

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CARROLL SHELBY LICENSING, INC. et al.,

                    Plaintiffs,

          v.

DENICE SHAKARIAN HALICKI et al.,

                    Defendants.

AND RELATED COUNTERCLAIMS.

Case No. 8:20-cv-01344-MCS-DFM

**ORDER RE: MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 287, 290–91, 294, 296)**

**(PROVISIONALLY FILED UNDER SEAL)**

Carroll Shelby Licensing, Inc. and Carroll Hall Shelby Trust (collectively, "Shelby Parties"); Denice Shakarian Halicki, Eleanor Licensing, LLC, and Gone in 60 Seconds Motorsports, LLC (collectively, "Halicki Parties"); and Classic Recreations, LLC, Jason Engel, and Tony Engel (collectively, "CR Parties") separately move for summary judgment on an issue central to this case: whether "Eleanor," the designation used to refer to a series of automobiles across four feature films, is a character subject to copyright protection. (Shelby CMSJ, ECF No. 287; Halicki CMSJ, ECF No. 294; CR CMSJ, ECF No. 291.) The motions are fully briefed.

The Shelby Parties and Halicki Parties also filed motions for partial summary judgment concerning other issues. (Shelby MPSJ, ECF No. 296; Halicki MPSJ, ECF No. 290.) These motions are also fully briefed.

The Court heard oral argument on the motions on June 13, 2022. (Mins., ECF No. 328.) Based on the discussion at oral argument and arguments in the papers concerning ownership of the intellectual property interests at issue, the Court ordered the joinder of Hollywood Pictures and denied the motions without prejudice to renewal on July 1, 2022. (Order Requiring Joinder, ECF No. 336.) On August 7, 2022, after Hollywood Pictures submitted additional information, the Court vacated the joinder order, reopened the motions, and took the motions under submission. (Order Vacating Joinder Order, ECF No. 345.)

## I.      BACKGROUND

This case concerns the 1974 film *Gone in 60 Seconds*, the 1982 film *The Junkman*, the 1983 film *Deadline Auto Theft*, and the 2000 remake of *Gone in 60 Seconds*.[1] All four films feature Ford Mustang cars given the designation "Eleanor." The Halicki Parties own the copyrights to the first three films (the "trilogy"), and the Court assumes for the purpose of this Order that they own any intellectual property

---

[1] For disambiguation, the Court refers to the 2000 film as the remake.

rights and interests in Eleanor as it[2] appears in the remake. Over a decade ago, the Halicki Parties and related entities initiated litigation against the Shelby Parties and related entities,[3] claiming that the Shelby Parties were licensing improperly obtained trademarks relating to Eleanor for manufacture of imitation vehicles labeled GT500E. After years of litigation, including a trip to the circuit court and back, the parties entered a settlement agreement purporting to resolve the dispute.

The détente did not last. Under license from the Shelby Parties, the CR Parties make a series of cars with the designation GT500CR that the Halicki Parties claim infringes their rights in the Eleanor character. The Halicki Parties demanded that the CR Parties cease and desist, and they also began contacting GT500E owners and an auction house to assert their purported intellectual property interests in those vehicles and effectively prevent their resale. The Shelby Parties initiated this suit thereafter, claiming, inter alia, that the Halicki Parties' conduct breaches the settlement agreement. The Halicki Parties maintain counterclaims against the Shelby Parties and CR Parties for, inter alia, copyright infringement and breach of the settlement agreement.

## II.   LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing law, the resolution of that fact might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of establishing the absence of a genuine issue of material fact lies with

---

[2] The Court uses gender-neutral pronouns for Eleanor in this Order. *See Chicago Manual of Style* § 8.118 (17th ed. 2017).

[3] Which particular entities were party to the prior proceedings is immaterial to the parties' arguments and the Court's analysis. For ease of reference, the Court refers to the parties to the previous litigation as the Shelby Parties and the Halicki Parties.

the moving party, *see Celotex*, 477 U.S. at 322–23, and the court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party, *Scott v. Harris*, 550 U.S. 372, 378 (2007). To meet its burden,

> [t]he moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000). Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). There is no genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id.* at 587.

## III.    DISCUSSION

### A.    Evidentiary Issues

The Halicki Parties submitted requests for judicial notice of certain documents. (RJN ISO Halicki MPSJ, ECF No. 290-5; RJN ISO Halicki Opp'ns, ECF Nos. 300-32, 301-32, 302-32.) The Shelby Parties objected to judicial notice of some of the documents on the basis of relevance. (Shelby Objs. to RJN ISO Halicki Opp'ns, ECF No. 324-1.) The Halicki Parties do not explain why the documents are judicially noticeable and which adjudicative facts they seek to extract from them. The Halicki Parties appear to rely on some of these documents, including judicial opinions and legal briefs, in support of their legal rhetoric. (*E.g.*, Halicki Opp'n to Shelby CMSJ 16, ECF No. 300 (citing appeal briefs of which they requested notice).) The Court has considered these documents for those limited argumentative purposes, *see* Fed. R. Evid. 201

advisory committee's note (discussing judicial use of nonadjudicative facts), but does not need to take judicial notice of adjudicative facts in these documents to resolve the motions. The requests are denied accordingly.

The parties submitted voluminous evidentiary objections. (Halicki Objs. to Rhee Decl. ISO Shelby MSJs, ECF Nos. 300-33, 302-33; Shelby Objs. to Halicki & Leone Decls. ISO Halicki MSJs, ECF No. 308-1; Halicki Objs. to Cummings Decl. ISO Shelby Opp'ns, ECF No. 314; Halicki Objs. to Rhee Decl. ISO Shelby Opp'ns, ECF No. 315; Shelby Objs. to Halicki & Leone Decls. ISO Halicki Opp'ns, 324-2.) The Court need not resolve many of the objections to adjudicate these motions. *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1118–19 (E.D. Cal. 2006) (lamenting overuse of evidentiary objections in motions for summary judgment). To the extent the Court relies on objected-to evidence in this Order, the relevant objections are overruled.

**B.  Copyrightability Claims**

The parties dispute whether Eleanor is a character subject to copyright protection. [4] Long have the parties skirmished over this issue, but no court has definitively resolved it. In one of the leading cases in this circuit on character copyrightability, an appellate panel examining the Eleanor character suggested that Eleanor might be protectable but ultimately remanded "this fact-intensive issue . . . to the District Court for a finding in the first instance as to whether Eleanor is entitled to

---

[4] As a threshold issue, the Halicki Parties assert that the Shelby Parties should be estopped from contesting Eleanor's copyrightability because they agreed to transfer any copyright in Eleanor to the Halicki Parties in the parties' settlement agreement. (*E.g.*, Halicki CMSJ 20; Halicki Opp'n to Shelby CMSJ 18.) The Court rejects this argument for the same reasons the Court has rejected it twice before: "contract law cannot resolve a question that is reserved to federal copyright law." (Order Re: Mots. for Summ. J. 9, ECF No. 232 (citing *Kabehie v. Zoland*, 102 Cal. App. 4th 513, 523 (2002)); *accord* Order Re: Mots. In Limine 8, ECF No. 256.) In any event, the settlement agreement resolves questions of ownership of the Eleanor intellectual property, not its validity. (*See* Settlement Agreement §§ 1–2, ECF No. 289-6.) The Shelby Parties are not estopped from taking a position on the validity of the property.

copyright protection." *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1225 (9th Cir. 2008). The parties settled the matter (or at least attempted to) before the issue could be conclusively resolved on remand. Unfortunately, this did not stop another Ninth Circuit panel from reviewing *Halicki Films*, recharacterizing its facts, and advancing a discussion of copyrightability with the implied yet strong suggestion that Eleanor is subject to protection. *See DC Comics v. Towle*, 802 F.3d 1012, 1019–20 (9th Cir. 2015).[5]

Much of the Ninth Circuit panel's commentary on the copyrightability issue appears to have stemmed from an unfortunate practice on the part of the Halicki Parties to embellish facts in their briefing. Due to space limitations or inadvertence, several of these exaggerations were left unchallenged and made their way into court orders when this matter was before prior judicial officers. From there, factual inaccuracies made their way into a published Ninth Circuit opinion that likely assumed the facts were true. Unfortunately, they were not. For example, the Ninth Circuit in *Halicki Films* stated that in the original and remake *Gone in 60 Seconds* films, "thefts of the other cars go largely as planned, but whenever the main human character tries to steal Eleanor, circumstances invariably become complicated." 547 F.3d at 1225. The Halicki Parties' briefs parrot a similar conclusion. (Halicki CMSJ 6 ("All cars are 'Gone in 60 Seconds' (boosted) as planned, but not Eleanor . . . .").) This conclusion is plainly false. In the original film, several vehicle heists take left turns, as one thief is surprised by a live tiger in the back seat of a vehicular mark, and others debate what to do after discovering bricks of heroin in another stolen vehicle. In the remake, one thief is surprised to

_____

[5] Curiously, the *DC Comics* panel concluded that "Eleanor's ability to consistently disrupt heists by her presence was more pertinent to [their] analysis of whether the car should qualify as a sufficiently distinctive character than Eleanor's make and model." 802 F.3d at 1020 (citing *Halicki Films*, 547 F.3d at 1225). But neither Eleanor's supposed heist-foiling presence nor its make and model were discussed at much length in the *Halicki Films* panel's reasoning and, given the disposition of remand, what discussion there was amounted to no more than dicta. 547 F.3d at 1225.

discover a snake in a vehicle with license plate SNAKE, the apparent owners of one vehicle interrupt a heist by getting intimate in view of the vehicle, and keys for three vehicles must be retrieved from the bowels of a canine by feeding it laxatives. While the Court recognizes the importance of zealous advocacy, parties need always be mindful of their obligations to be candid with the Court and to fulfill their obligations under Rule 11(b).

Accordingly, in connection with the copyrightability motions, the Court dispenses with the parties' argumentative characterizations of the facts (and other judicial officers' recitations of them). Instead, the Court has independently scrutinized the four feature films in which Eleanor appears. *See* 17 U.S.C. § 102(a) (conferring copyright protection "in original works of authorship fixed in any tangible medium of expression"—that is, not from commentary on such works); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 52 (2d Cir. 1986) ("[I]n copyright infringement cases the works themselves supersede and control contrary descriptions of them. As the finally released version of the film was the best and most relevant evidence on substantial similarity, the judge was not required to consider the voiceover version in deciding the motion for summary judgment."); *cf. Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984) (engaging in an "independent review of the works" on de novo review of summary judgment on issue of substantial similarity, noting limited usefulness of party's proffered list of similarities between copyrighted works as "inherently subjective and unreliable").[6] Having done so, the Court concludes as a matter of law that Eleanor is not subject to copyright protection.[7]

---

[6] On this basis, the Court sustains the parties' objections to the portions of the Halicki, Leone, and Rhee declarations characterizing facts about the films' depictions.

[7] To the extent the Court's order resolving an earlier round of summary judgment motion practice conflicts with this one, the prior order (ECF No. 232) is abrogated. After the Court resolved the prior motions, the Shelby Parties and Halicki Parties convincingly argued that the question of copyrightability could be resolved in summary judgment proceedings because the Court may determine the issue as a matter of law

1    The Ninth Circuit has adopted a three-element test to resolve whether a character

2  featured in a work is independently copyrightable.[8] As stated by the most recent Ninth

3  Circuit panel to articulate the test:

> Although characters are not an enumerated copyrightable
> subject matter under the Copyright Act, there is a long history
> of extending copyright protection to graphically-depicted
> characters. However, not every comic book, television, or
> motion picture character is entitled to copyright protection. A
> character is entitled to copyright protection if (1) the character
> has physical as well as conceptual qualities, (2) the character
> is sufficiently delineated to be recognizable as the same
> character whenever it appears and displays consistent,
> identifiable character traits and attributes, and (3) the
> character is especially distinctive and contains some unique
> elements of expression.

*Daniels v. Walt Disney Co.*, 958 F.3d 767, 771 (9th Cir. 2020) (cleaned up); *accord DC
Comics*, 802 F.3d at 1021; *Halicki Films*, 547 F.3d at 1224. The parties do not dispute
the first element,[9] which is readily met: across all four works, Ford Mustang

---

given the limited and undisputed universe of works in which a car named Eleanor
appears. (*See generally* Apr. 18, 2022 Hr'g Tr. 15–47, ECF No. 284.) *Cf. DC Comics*,
802 F.3d at 1022–23 ("Neither party disputes the relevant facts regarding the Batmobile
here. Accordingly, we are well-equipped to determine whether, as a matter of law, these
undisputed facts establish that the Batmobile is an 'especially distinctive' character
entitled to copyright protection.").

[8] Copyright protection also extends to characters under an alternative "story being told"
test. *Daniels v. Walt Disney Co.*, 958 F.3d 767, 773–74 (9th Cir. 2020). Because the
parties do not advance a theory of copyrightability under the test, the Court assumes
that Eleanor does not meet it. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925,
929–30 (9th Cir. 2003).

[9] The Shelby Parties conceded the first element at oral argument in a prior summary
judgment proceeding. (Oct. 18, 2021 Hr'g Tr. 10, ECF No. 193.) The Court assumes

automobiles are given the designation Eleanor and assigned feminine pronouns. Accordingly, the Court focuses its analysis on the second and third elements of the test.

In this analysis, the Court has considered the four films together as a closed, cohesive universe of works, which is consistent with how Ninth Circuit panels have applied the test. *See Daniels*, 958 F.3d at 772–73 (evaluating "every iteration" of the claimed characters); *DC Comics*, 802 F.3d at 1021 (noting characteristics of the Batmobile comprising "a consistent theme throughout the comic books, television series, and motion picture, even though the precise nature of the . . . characteristics have changed from time to time"). The Court acknowledges some ambiguity in the *Daniels* test that might cast doubt on the propriety of this approach—or the wisdom of the test as articulated. The second prong requires courts to consider whether a character is "recognizable as the same character *whenever it appears*" and emphasizes the consistency of character traits and attributes. *Daniels*, 958 F.3d at 771 (emphasis added). This suggests, as the Carroll Shelby parties submit, (June 27, 2022 Hr'g Tr. 46–47, ECF No. 334), that a character cannot be afforded independent copyright protection unless there are multiple works in which the character appears, given that measuring consistency and recognizability across appearances would be fatuous without a collection of works to evaluate.

Further, the consistency inquiry raises the question of whether a character could become uncopyrightable, or whether the copyrightable interest in a character could mutate, upon the publication of a work or works featuring a copyrightable character with traits and attributes inconsistent with prior iterations. For example, the Ninth Circuit has long approved of a district court decision finding a copyrightable interest in the character of James Bond. *Daniels*, 958 F.3d at 771 (citing with approval *Metro-*

---

that, by declining to discuss the first element in their brief opposing the Halicki Parties' motion or respond to the Halicki Parties' assertion that they conceded the point, the CR Parties also do not dispute that the element is met. (*See* Halicki CMSJ 20–21; Halicki CMSJ CR Opp'n 11–13, ECF No. 304.)

*Goldwyn-Mayer, Inc. v. Am. Honda Motor Corp.*, 900 F. Supp. 1287 (C.D. Cal. 1995)); *DC Comics*, 902 F.3d at 1020 (same); *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1175 (9th Cir. 2003) (same). Under the *Daniels* framework, the Court wonders how the interest in Bond might be affected (and whether it *should* be affected) if the next actor to be cast in the role were a woman. *Cf. Metro-Goldwyn-Mayer*, 900 F. Supp. at 1296 (identifying "*his* overt sexuality" as one of the claimed "character traits that are specific to Bond" (emphasis added)). These reservations about the *Daniels* test, however, fall outside the scope of what this Court is asked, and has authority, to do here. The Court applies the test as best as it can be interpreted.

First, however, the Court briefly summarizes its observations from films depicting cars designated as Eleanor as relevant to the *Daniels* analysis.

> ### 1.   *Appearances in the Works*
>
> #### a.   *Gone in 60 Seconds* (1974)

In *Gone in 60 Seconds*, the primary characteristic of cars with the Eleanor designation is their fungibility. In the film, protagonist Maindrian Pace and his team are assigned by an unnamed, apparently disreputable individual to steal 48 different automobiles of various makes and models within a limited amount of time. Pace asks his associate to assign each type of vehicle to be stolen a common, feminine given name as a codename, and he instructs his team to use only the codenames. The Eleanor designation apparently refers to a Ford Mustang.[10] That is, the Eleanor designation primarily serves a taxonomic or classificatory, rather than appellative, function. Accordingly, the heist team in the film refer to four different vehicles by the name

---

[10] Although the characters in the film use the Eleanor designation to identify only 1973 Ford Mustang fastbacks with yellow and black coloring, it is unclear whether the name designation is so specific. As depicted in one shot, the name designations may simply refer to makes or models. For example, "Judy" is a "Ferrari" of unknown model, and "Nancy" is an "El Dorado" of unstated (though implied) make. (App. fig. 1.) That said, Pace recounts that Eleanor is "the last of the Mustangs," implying that multiple Ford Mustangs were on the list of cars to be stolen.

Eleanor to denote that they fit the description of the car they must steal.

The gang of thieves encounters the first Eleanor at the airport. After Pace and his associate identify the vehicle as an Eleanor, the associate approaches the driver-side door to steal the vehicle only to encounter a woman with glasses and curlers apparently asleep in the driver's seat. (App. fig. 2.) Saving face, the associate explains, "I thought it was my car," and retreats with a heckling Pace. Having taken notice of the license plate, Pace locates the vehicle and steals it from the driveway of its owners, the woman with glasses and curlers and a man later identified as Harold Dwight Smith. Smith and a police vehicle pursue Pace. The police arrest Smith, who explains he was pursuing his stolen "yellow Mustang." The police return Smith to his house to find the Mustang in the driveway. Pace later explains that he returned the car to spite Smith, whom he dislikes for his mishandling of insurance claims.

The second Eleanor appears only briefly. A woman parks her Ford Mustang at a residence in Gardena, California. Pace pulls up to the residence and uses a tool to disengage the vehicle's lock and enter it. (App. fig. 3.) Later, Pace's ally alerts him to a classified advertisement in the newspaper indicating the vehicle is uninsured. Having sworn not to boost uninsured vehicles, Pace abandons the Mustang on a dirt road.

The film spends the most screen time with the third Eleanor. Pace and an accomplice first encounter a Ford Mustang on the road after stealing the second. Pace remarks, "When you don't need 'em, they're all over the place. . . . Never know, we might need another Eleanor." He takes note of the vehicle's apparent home, the International Towers in Long Beach. (App. fig. 4.) After abandoning the second vehicle, Pace steals the third from the International Towers. Having been tipped off by a disloyal member of Pace's team, the police engage Pace in a chase sequence that lasts over 40 minutes. Over the course of the sequence, Pace's vehicle sustains significant damage to its body. In the climax of the chase, Pace's vehicle careens over an overturned vehicle and flies through the air in a minute-long slow motion shot. (App. fig. 5.) Having lost his pursuers, Pace leaves the vehicle with an attendant at a car wash.

Pace discovers the fourth Ford Mustang at the car wash. He convinces its owner to leave him with the vehicle under false pretenses. He drives off, replaces the license plate, and is allowed to drive off at a police checkpoint. (App. fig. 6.) No character refers to the fourth vehicle as an Eleanor.

In short, Eleanor in *Gone in 60 Seconds* is a taxonomical idea the protagonists apply to vehicles with a shared set of physical characteristics—apparently, their make and model. But each instance of Eleanor featured in the film has unique conceptual characteristics, such as ownership, provenance, and insurance status, and physical characteristics, such as distinct license plate numbers and, particularly in the case of the vehicle driven in the chase sequence, damage. Although "ELEANOR" is billed as the star of the film in its opening credits sequence, it is unclear to which instance of Eleanor, if any in particular, the credits refer. (App. fig. 7.) Further, although people in the film often refer to Eleanor instances by name and use feminine pronouns to discuss cars fitting the designation, no human addresses an Eleanor car as if it is human.

b.   *The Junkman* (1982)

In contrast with the first film, Eleanor's name in *The Junkman* serves an appellative function. In a meta turn, *The Junkman* is set against the backdrop of the fictionalized production of a film featuring car stunts and the premiere of *Gone in 60 Seconds*. Harlan Hollis, the fictional director of *Gone in 60 Seconds*, is targeted for assassination before the film's premiere. A yellow and black Ford Mustang appears in four new sequences, one nondiegetic and three diegetic, and in clips from the first film.[11] In a single shot of the nondiegetic opening credit sequence, a toy car, a yellow and black Ford Mustang with damage mimicking that sustained to the vehicle in the chase scene

---

[11] One clip depicts part of the chase scene within a video screen as Hollis directs the editing of *Gone in 60 Seconds*. (App. fig. 8.) Another displays images from the chase scene in quick succession as Hollis views footage from the film through a film camera. The slow-motion jump sequence from the first film intercuts shots featuring film crew names during the closing credits sequence.

from *Gone in 60 Seconds*, sits in a diorama and takes credit as a "Special Guest." The vehicle is unnamed. (App. fig. 9.)

In the three diegetic scenes, the physical appearance of the single vehicle depicted is similar to that of the vehicle the protagonist drives and severely damages in the chase sequence in *Gone in 60 Seconds*. The damage to the body of the car matches the damage to the car from the prior film, but the car in *The Junkman* is painted with messages written across its side: "'Eleanor' from the movie *Gone in 60 Seconds*," and a pull quote exclaiming, "The most hair raising chase scene ever filmed!" In the first scene, two people in a studio warehouse collection of vehicles, toys, and memorabilia argue over Eleanor's present location. Referring to the vehicle by the name Eleanor, one directs the other to have the automobile transported to the location of the premiere of *Gone in 60 Seconds*. Neither talks to the vehicle. (App. fig. 10.) In the second scene, Hollis evades a gunman on foot through the warehouse. Eventually, Hollis locates the Mustang, drives it through a wall, and uses it to climb over another wall to escape the gunman. The people in the scene do not name the car or talk to it. (App. fig. 11.) In the third sequence, the climactic action sequence at the premiere of *Gone in 60 Seconds*, a stylized, painted depiction of a yellow Ford Mustang is featured on *Gone in 60 Seconds* posters, and Eleanor appears in the background of certain shots. The vehicle is depicted only fleetingly in frame. (App. fig. 12.)[12]

In *The Junkman*, Eleanor appears as a film prop or an objet d'art. As demonstrated by Eleanor's diegetic appearances in a warehouse collection location and at the fictional premiere of the original film, its functions as a vehicle are secondary to its symbolic meaning as an emblem or relic of *Gone in 60 Seconds*.

---

[12] The Halicki Parties aver that this scene features "Eleanor at her world premiere . . . surrounded by her various posters and with the lead reporter wearing an Eleanor t-shirt." (Halicki CMSJ 7.) This representation is an embellishment, to say the least. The Court has searched diligently for a depiction of reporter character Susan Clark wearing an Eleanor shirt and has not found one.

c.      *Deadline Auto Theft* (1983)

*Deadline Auto Theft* recycles and repurposes footage from *Gone in 60 Seconds* and *The Junkman* in service of a revised plot echoing the first film featuring protagonist Maindrian Pace. There are minimal differences between the original film and *Deadline Auto Theft* relevant to the analysis here: the scene at the airport with the first Eleanor is left on the cutting room floor, some dialogue is changed or removed, and Eleanor is not billed in any credits sequence.

d.      *Gone in 60 Seconds* (2000)

In the remake, the codename Eleanor again serves a taxonomic function. Retired car thief Memphis Raines must steal 50 cars within a limited amount of time; else, a gangster will kill his brother. Raines assembles a team and assigns each type of vehicle to be stolen a feminine codename so the team may discuss their marks without garnering the attention of law enforcement. In this film, the Eleanor designation refers to a 1967 Ford Mustang Shelby GT500,[13] an uncommon vehicle within the narrative. The film establishes that Raines has never successfully stolen an Eleanor, notwithstanding multiple attempts. Raines describes Eleanor as a "unicorn."

The film visually depicts two instances of cars of the Eleanor designation. The first is a vehicle painted gray and black located at the International Towers in Long Beach. (App. fig. 13.) The vehicle is the only auto fitting the Eleanor description in the area. Raines talks to this instance of Eleanor as if it is human on several occasions:

---

[13] The Halicki Parties submit that the vehicle portrayed on screen in the film is not a Ford Mustang Shelby GT500 in reality. (Halicki CMSJ 4.) This point is irrelevant to the copyrightability analysis. Nicolas Cage is not a car thief named Memphis Raines in reality. What matters here is how the purported character *appears* in the works. *See Daniels*, 958 F.3d at 771; *Walker*, 784 F.2d at 52. The CR Parties offer evidence showing that the filmmakers intended the vehicles in the remake to appear as GT500s, which is how the film portrays them and the Court perceives them. (*See* CR Parties' Resp. to Halicki Parties' Statement of Uncontroverted Facts ISO Halicki CMSJ ¶¶ 9–10, ECF No. 304-1.)

"We're going to get through this this time, right?" "I know we've got a history, Eleanor. . . . You take care of me, I'll take care of you."

This Eleanor is the last of the 50 vehicles to be stolen. At the International Towers, Raines uses tools to break into the car and start it. Upon his exit, he encounters law enforcement, beginning a chase that serves as the film's climax. During the chase sequence, Raines skillfully drives the Eleanor through an urban area. Pursued by multiple police vehicles and a helicopter on the Los Angeles River, Raines engages the vehicle's nitrous oxide system for a burst of speed. Raines breaks the Eleanor's side mirror, the vehicle's engine stops, and Raines pleads for it to restart. Raines circumvents a traffic jam by using the bed of a tow truck as a ramp and flying over the jam, resulting in further damage to the Eleanor. (App. fig. 14.) Upon delivery, the antagonist orders the vehicle to be destroyed.

During the film's denouement, Raines's brother presents Raines with keys to the second instance of Eleanor. Raines's brother explains that he lawfully purchased the vehicle. The car is rusting and stripped of paint, and its engine sputters and struggles. (App. fig. 15.)

The Eleanor designation in the remake serves a similar purpose to the designation used in the original film: it is a taxonomic identifier used to refer to cars of a similar physical description. The designation again describes *any* vehicle of a certain phenotype regardless of other physical and conceptual characteristics such as provenance, color, and operability. Notably, the car described by the Eleanor moniker here is different from the car described by the name in the trilogy.

Having reviewed the films, the Court now applies the *Daniels* test to the purported Eleanor character the Halicki Parties seek to protect.

          2.     *Sufficient Delineation and Consistent, Identifiable Traits and Attributes*

In the second prong of the character copyrightability test, courts examine whether "the character is sufficiently delineated to be recognizable as the same character

whenever it appears and displays consistent, identifiable character traits and attributes." *Daniels*, 958 F.3d at 771 (cleaned up). "Although a character that has appeared in multiple productions or iterations 'need not have a consistent appearance,' it 'must display consistent, identifiable character traits and attributes' such that it is recognizable whenever it appears." *Id.* (quoting *DC Comics*, 802 F.3d at 1021). "By contrast, a character that lacks a core set of consistent and identifiable character traits and attributes is not protectable, because that character is not immediately recognizable as the same character whenever it appears." *Id.*

According to the Halicki Parties, Eleanor is "a highly customized Ford Fastback Mustang" "continually referred to with the unique name 'Eleanor.'" (Halicki CMSJ 21.) Eleanor is "hard to steal, and is a 'unicorn' or elusive beauty, sensitive, temperamental, and exhibits strength, talent, and endurance." (*Id.*) Eleanor is "able to outrun and outmaneuver police," "save[s] her leading man," and is "capable of performing . . . death defying jumps and . . . hair raising long chase scenes." (Halicki CMSJ Reply 2, ECF No. 319.) Eleanor also "breaks down" and "doesn't start," and "people talk to her." (June 27, 2022 Hr'g Tr. 23.)

As should be evident from the summary above, most of these traits and attributes are not consistently or identifiably exhibited by the character in the works. Some are *never* exhibited. The Court acknowledges that a character may be protectable despite some level of inconsistency among depictions. *See DC Comics*, 802 F.3d at 1021 (concluding the second prong analysis favored protection of the Batmobile "even though the precise nature of the bat-like characteristics have changed from time to time"). Still, "the *persistence* of a character's traits and attributes" are "*key* to determining whether the character qualifies for copyright protection." *Id.* (emphases added). Here, the volume and primacy of the inconsistencies erode much of what the Halicki Parties claim is fundamental to the Eleanor character. In short, "changes across each iteration" of Eleanor illustrate the lack of delineation and "[l]ightly sketched" nature of the character. *Daniels*, 958 F.3d at 772–73 (internal quotation marks omitted).

The Court considers each asserted characteristic in turn.

Physical appearance plays a role in the second-prong inquiry but "alone is not decisive." *Id.* The films consistently depict cars of the Eleanor designation with the physical characteristics of Ford Mustangs (and, of course, attendant conceptual characteristics attaching to that make and model). However, the films' inconsistent depictions of vehicles called Eleanors undercut any other delineating physical characteristics.

First, the type of Ford Mustang described by the Eleanor codename changes between the trilogy and the remake. In the trilogy, Eleanors are 1973 Ford Mustang fastbacks. They are modern vehicles common enough on the road that the heist teams in *Gone in 60 Seconds* and *Deadline Auto Theft* encounter multiple instances of such vehicles without actively searching for them. The unexceptional nature of the Eleanors in the trilogy is most apparent in *Gone in 60 Seconds*, where one of Pace's accomplices avoids the suspicion of an owner of a Ford Mustang he attempted to steal by explaining that he thought it was his car. The plausibility of the explanation rests on the premise that yellow Ford Mustangs are common enough to be mistaken for one another. In contrast, the Eleanors in the remake are 1967 Ford Mustang Shelby GT500s, which are classic, uncommon cars. One character in the remake remarks that this type of vehicle is one of the rarest on the list of vehicles to be stolen, and that there is only one such vehicle in the area. The contrasting makes, models, and years of the vehicle classes described by the Eleanor designations in the trilogy and the remake not only diminish the physical similarities between the depictions, but they also weaken any conceptual connotations about the vehicles that might be shared between depictions, such as value, rarity, and style.

Second, the physical condition and appearance of the Eleanors is not consistent among and within the films. In *Gone in 60 Seconds*, *Deadline Auto Theft*, and the remake, one instance of Eleanor appears first in pristine condition and, over the course of the film, sustains increasing amounts of damage during chase sequences. Other

Eleanors have static physical appearances: three of the Eleanors in *Gone in 60 Seconds* and *Deadline Auto Theft* maintain an undamaged appearance, and the Eleanor in the diegetic scenes in *The Junkman* maintains a damaged appearance with cleanly painted messages printed along its body. The other depictions of a Ford Mustang in *The Junkman* are a toy in a diorama and an illustration on a poster. This physical appearance issue is most apparent in the remake. The vehicle gifted to the protagonist at the conclusion of the film is not immediately recognizable as an Eleanor by virtue of its physical characteristics as a Ford Mustang Shelby GT500. The Eleanor with the most screen time in the film is a sleek, shiny, fast car, whereas the Eleanor at the conclusion is rusty, decrepit, and slow. Had the vehicle not been identified as an Eleanor in spoken dialogue, a viewer might not recognize the vehicle as an Eleanor by physical appearance alone. Thus, the Eleanor character cannot be delineated on the basis of its physical condition, old or new, damaged or undamaged.

Third, physical customizations or modifications to the Ford Mustangs are not consistent or identifiable.[14] The Halicki Parties submit that the Eleanors in the trilogy are "highly customized" and featured "a custom color that was not offered by Ford (or Shelby)." (Halicki CMSJ 6.) There is nothing particularly identifiable about the color of the vehicles portrayed; it reads as a standard yellow car color and, within the context of the narrative of *Gone in 60 Seconds* and *Deadline Auto Theft* at least, is implied to

---

[14] At oral argument, counsel for the Halicki Parties suggested the modifications to Eleanor go to its originality in the third prong, not to considerations in the second prong. (June 27, 2022 Hr'g Tr. 26–27.) But the Court must examine which characteristics of Eleanor are identifiable and consistent such that the character is sufficiently delineated so as to be recognizable. Car modifications play a role here insofar as they are traits or attributes of the character. For example, in the second prong inquiry, a Ninth Circuit panel observed that part of what made the Batmobile sufficiently delineated was its nonstandard equipment with "high-tech gadgets and weaponry." *DC Comics*, 802 F.3d at 1021 (internal quotation marks omitted). Analogously, the alleged "highly customized" nature of Eleanor should be considered at the second step if the Halicki Parties assert it as a defining trait of the character.

be a standard car color. Any other customizations to the Eleanors in the trilogy are not readily identifiable in the works themselves. In any event, these characteristics are not shared with either of the Eleanors portrayed in the remake. The apparent modifications to the first Eleanor portrayed in the remake, such as the nitrous oxide switch with a button labeled "GO-BABY-GO" and unique inset lights, (*see* Halicki Parties' Statement of Uncontroverted Facts ¶ 11, ECF No. 294-1), in turn are inconsistent with the identifiable modifications, if any, to the Eleanors in the trilogy. No set of modifications or customizations is consistently portrayed in connection with Eleanor vehicles. In short, the only consistent and identifiable physical attributes of automobiles designated Eleanor are their make and model.

The strongest conceptual link common to the cars named Eleanor across the films and within each film is the Eleanor designation itself. Not every Ford Mustang that appears on screen is called by the Eleanor designation, particularly in *The Junkman*, in which Eleanor's name is not spoken except in a single scene of dialogue between two ancillary characters. But the vehicles in the other three films fitting the respective Eleanor descriptions are almost uniformly referred to by the Eleanor name. Notwithstanding, the use of the Eleanor designation in those three films to classify vehicle phenotypes, as opposed to naming specific vehicles, undermines the delineation of the purported character. For example, in *Gone in 60 Seconds* and *Deadline Auto Theft*, each instance of Eleanor is fungible, as only one must be stolen to complete the ordered heist. The taxonomic codename system in these films leads the viewer to conclude that each new Ford Mustang that appears on screen in a sequence is a *different* vehicle from the others that appeared in the film.[15] In other words, because Eleanor is

_____

[15] Eleanor's fungibility apparently gave rise to an error in the Shelby Parties' briefing. The Shelby Parties took the position that *five* instances of Eleanor appeared in *Gone in 60 Seconds*. (Shelby CMSJ 11.) Their counsel apparently did not recognize that the Eleanor Pace's team encountered at the airport was the same Eleanor Smith pursues. Only through close attention to the dialogue and recognition of the woman with curlers

effectively synonymous with "1973 Ford Mustang fastback" in these films, its value as a delineating characteristic of any given instance of the class of vehicles is diminished. Regardless, the Court accepts for the purpose of argument that the Eleanor name is a consistent, identifiable trait.

The conceptual characteristics consistent among depictions of Eleanor virtually end there. Eleanor is not particularly "hard to steal"; Raines is able to secure the first Eleanor in the remake, and Pace is able to get behind the driver's wheel of all four Eleanors depicted in *Gone in 60 Seconds* and *Deadline Auto Theft*, within a matter of seconds (i.e., 60). To the extent these depictions of Eleanor are hard to *keep* stolen, whether due to a police chase or insurance status or else, other depictions of Eleanor are not portrayed as particularly easy or hard to steal because they are not subject to pilfering at all. No depiction of Eleanor in *The Junkman* is the target of theft, and the second Eleanor in the remake was lawfully purchased.

Many of the other conceptual characteristics identified by the Halicki Parties— that Eleanor can outmaneuver police vehicles, execute death-defying jumps, and endure long chases—apply only to the instances of Eleanor in *Gone in 60 Seconds*, *Deadline Auto Theft*, and the remake that are involved in the films' chase sequences. Other vehicles designated Eleanor in those films do not exhibit those characteristics, and the Eleanor in *The Junkman* does not exhibit them at all. Other claimed conceptual characteristics apply to only the first instance of Eleanor depicted in the remake. Only that vehicle (or vehicle class) is described or portrayed as a "unicorn" with a certain "elusive beauty," "mystique," and "aura." (Halicki CMSJ 5.) Only that vehicle exhibits any remotely human conceptual characteristics, such as sensitivity and temperament. Only that vehicle is spoken to by the protagonist as if it were human, contrary to

---

in both sequences could a viewer understand that the vehicles depicted in these scenes are the same. That experienced counsel entrenched in the facts of this case could make this error lays bare the lack of delineation of the purported character name here.

representations made by the Halicki Parties. (CMSJ 8 (claiming characters in *The Junkman* "talked to" Eleanor "as a character in the movie").) Only that vehicle breaks down and doesn't start—and even then, one would be hard pressed to extrapolate from the single scene in which the vehicle malfunctions that the vehicle's proclivity to break down is a character trait.

Finally, the Halicki Parties assign anthropomorphic characteristics to the character, such as strength, talent, endurance, and a tendency to "always sav[e] her leading man." (Halicki CMSJ 6.) In the Court's view, these characteristics are an invention of overzealous advocacy. Eleanor vehicles may have human names and feminine pronouns, but their anthropomorphic features begin and end there. Eleanor vehicles feature no more anthropomorphic traits than an ordinary automobile. The skillfulness and talent exhibited in the chase and action sequences in the films are more appropriately attributed to the human protagonists that drive the Eleanors, not metonymically to the vehicles themselves.

In short, at most, the Eleanor character's consistent and identifiable traits and attributes that make it recognizable are that it is a Ford Mustang called by the name Eleanor. These characteristics hardly amount to a "core set" of traits rendering the character "immediately recognizable." *Daniels*, 958 F.3d at 771. For example, anointing a 2023 Ford Mustang Mach-E with the name Eleanor would not make the vehicle immediately recognizable as an homage to, let alone an iteration of, the vehicles that appear in the *Gone in 60 Seconds* franchise. The characteristics shared by the automobiles depicted in the films are too lightly sketched to meet the second prong of the *Daniels* test.

3.   *Special Distinctiveness and Unique Elements of Expression*

In the third prong of the test, courts consider whether the character is especially distinctive and contains some unique elements of expression. *Daniels*, 958 F.3d at 771. Characters do not meet this element if they are a "stock character" like a magician in standard magician garb, *DC Comics*, 802 F.3d at 1021, or a character that "fit[s] general,

21

stereotypical categories" like a loyal friend or older scholar, *McCormick v. Sony Pictures Ent.*, No. CV 07-05697 MMM (RCx), 2009 WL 10672263, at *14 (C.D. Cal. July 20, 2009), *aff'd*, 411 F. App'x 122 (9th Cir. 2011).

For the sake of argument, the Court assumes the second prong is met on the basis of Eleanor's consistent and identifiable characteristics—that is, its name, make, and model. Given these characteristics, the Court examines whether Eleanor is especially distinct and exhibits unique elements of expression.

"[T]he mere delineation of a character name" is not "sufficient to satisfy the distinctiveness requirement." *See Conan Props. Int'l LLC v. Sanchez*, No. 17-CV-162 (FB), 2018 U.S. Dist. LEXIS 98631, at *31 (E.D.N.Y. June 8, 2018) (applying analogous Second Circuit test), *adopted as modified*, 2018 U.S. Dist. LEXIS 138203 (E.D.N.Y. Aug. 15, 2018). The case at bar makes this principle obvious, as the Eleanor name is not especially distinctive or unique. In *Gone in 60 Seconds*, *Deadline Auto Theft*, and the remake, the heist teams use the car codename system to avoid arousing suspicion by law enforcement. That is, within the narrative of the films, the thieves employ common, feminine given names *because* they are indistinct. Eleanor is a common spelling of a standard feminine name frequently used in the United States. Assigning a human name and gendered pronouns to a car or other inanimate vehicle is not particularly unique,[16] and certainly not unique enough to justify intellectual property protection. *Cf. Daniels*, 958 F.3d at 773 ("Developing a character as an anthropomorphized version of a specific emotion is not sufficient, in itself, to establish a copyrightable character."). Unlike the Batmobile, Eleanor is not a "unique and highly

---

[16] For example, popular media is littered with named, gendered vehicles, *see generally, e.g.*, *Sentient Vehicle*, TV Tropes, https://tvtropes.org/pmwiki/pmwiki.php/Main/SentientVehicle (last visited Nov. 28, 2022), and gendering vessels is common enough for grammatical rules to be constructed around the practice, *Chicago Manual of Style* § 5.43 ("Pronouns enhance personification when a feminine or masculine pronoun is used as if the antecedent represented a female or male person (as was traditionally done, for example, when a ship or other vessel was referred to with the pronoun *she* or *her*).").

recognizable name" that would evoke recognition as the character from the *Gone in 60 Seconds* franchise. *DC Comics*, 802 F.3d at 1022.

It should be equally obvious that Eleanor's make and model do not make it especially distinctive. Even within the narrative of the *Gone in 60 Seconds*, *Deadline Auto Theft*, and the remake, Ford Mustang cars fitting the Eleanor designation are not unique. The name describes a class of vehicles. In *Gone in 60 Seconds* and *Deadline Auto Theft*, Eleanors are practically a dime a dozen. The Ford Mustang characteristics of Eleanor make it no more than a stock Ford Mustang. *See DC Comics*, 802 F.3d at 1021 (to be protectable, a character "cannot be a stock character such as a magician in standard magician garb" (citing *Rice*, 330 F.3d at 1175)).

Considered together or alone, Eleanor's consistent and identifiable characteristics do not make the character distinct enough for independent copyright protection. The third prong of the *Daniels* test is unmet.

### 4. *Conclusion*

For the reasons discussed above, the Shelby Parties' motion for partial summary judgment on the issue of copyrightability is granted in substantial part, and the Halicki Parties' motion on the issue is denied. Eleanor is not entitled to standalone copyright protection as a matter of law. On this basis, the Court dismisses the Halicki Parties' fourth, sixth, seventh, and ninth counterclaims in their entirety.[17]

Because Eleanor is not subject to copyright protection, the Shelby Parties' motion for partial summary judgment on the issue of substantial similarity, which assumes that

---

[17] The Shelby Parties also requested judgment in their favor on the Halicki Parties' second and fifth claims for breach of contract, (*see* Shelby CMSJ Proposed Order, ECF No. 287-15), but for the reasons described *infra*, the copyrightability issue is not entirely dispositive of these claims. Although the Shelby Parties did not request judgment in favor of the CR Parties as relief, (*see id.*), the claims against the CR Parties may be dismissed on the same basis the Court dismisses the claims against the Shelby Parties, i.e., the lack of a copyright interest in Eleanor, *see Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 742–43 (9th Cir. 2008).

Eleanor is copyrightable, (Shelby MPSJ 3), is moot. The Court denies that motion accordingly. In their motion for partial summary judgment on the issue of copyrightability, the CR Parties raise arguments separate from the *Daniels* test. (*See* CR CMSJ 11–17.) Because the *Daniels* analysis here disposes of the copyrightability issue, the Court also denies the CR Parties' motion as moot.

### C.   Contract Claims

The Halicki Parties move for a finding that they are not liable on the Shelby Parties' claims for breach of contract and breach of the implied covenant of good faith and fair dealing and for a finding that the Shelby Parties and CR Parties are liable on the Halicki Parties' counterclaims for breach of contract. (Halicki MPSJ 2–3.) The Court examines each claim in turn.

#### 1.   Shelby Parties' Claim for Breach of Contract

The Shelby Parties claim that the Halicki Parties breached the settlement agreement that ended the previous federal action. (FAC ¶¶ 42–46, ECF No. 13; *see generally* Settlement Agreement, ECF No. 289-6.) The settlement agreement is governed by California law. (*Id.* § 20.) Under California law, a claim for breach of contract requires a plaintiff to show (1) the existence of a contract, (2) the plaintiff's performance or excuse for nonperformance, (3) the defendant's breach of a contractual obligation, and (4) damages. *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). The Shelby Parties claim the Halicki Parties breached the agreement by:

> a.   Denying the Shelby Parties' trademark, trade dress and other rights in the GT500 vehicles by contending that the Shelby Parties' business partners and licensees are not permitted to manufacture, market or sell GT500 vehicles;
>
> b.   Asserting claims against the Shelby Parties' business partners and licensees for using the SHELBY Marks and trade dress of the GT500; and
>
> c.   Asserting claims against the Shelby Parties' customer,

1      which claims had been released by Defendants pursuant to the

2      Settlement Agreement.

3    (FAC ¶ 44.)[18] "The Halicki Parties acknowledge that they have asserted claims against

4    the GT500E customers, as well as the Shelby Parties' licensees who are manufacturing

5    the GT500CR vehicles . . . ." (Halicki MPSJ 26.) Notwithstanding, the Halicki Parties

6    argue that the text of the settlement agreement does not preclude them from asserting

7    or threatening to assert claims against nonparties concerning the GT500E vehicles that

8    were the subject of the prior litigation. (*Id.* at 23–26.) Citing section 17, the Shelby

9    Parties contend that the Halicki Parties released any claims against innocent past,

10   present, and future owners and vendors of GT500Es, so their conduct violates that

11   provision of the agreement. (*See* Shelby Opp'n to Halicki MPSJ 9–11, ECF No. 307.)[19]

12       The Court determines as a matter of law that the settlement agreement is not

13   reasonably susceptible to the Shelby Parties' interpretation of section 17. Contract

14   interpretation generally presents a question of law for the trial court. *Yi v. Circle K*

15   *Stores, Inc.*, 258 F. Supp. 3d 1075, 1082–83 (C.D. Cal. 2017) (citing *Parsons v. Bristol*

---

17   [18] In their brief, the Shelby Parties assert that the Halicki Parties breached the settlement

18   agreement by authorizing their licensee to rebadge a Shelby GT500 to be sold as an

19   Eleanor. (Shelby Opp'n to Halicki MPSJ 9, 16–17, ECF No. 307.) The Shelby Parties

20   did not advance this theory in their pleading, (*see* FAC ¶¶ 42–52), and the deadline to

21   amend the pleadings has long since passed, (*see* Order Re: Jury Trial § I, ECF No. 64).

     To the extent the Shelby Parties seek leave to amend their pleading to assert a new

22   theory at this late stage of the case, the Court denies such leave for lack of good cause.

23   *See* Fed. R. Civ. P. 16(b)(4); *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th

     Cir. 2002).

24   [19] The Shelby Parties apparently abandon any theories of breach resting on other

     provisions of the agreement, such as the Halicki Parties' release of trade dress claims

25   concerning the GT500. (*See* Shelby Opp'n to Halicki MPSJ 20 ("[T]rade dress . . . is

     not an issue in this case.").) *See also USA Petroleum Co. v. Atl. Richfield Co.*, 13 F.3d

26   1276, 1284 (9th Cir. 1994) ("It is a well-settled rule that a party opposing a summary

27   judgment motion must inform the trial judge of the reasons, *legal or factual*, why

     summary judgment should not be entered." (quoting *Liberles v. County of Cook*, 709

28   F.2d 1122, 1126 (7th Cir. 1983))).

*Dev. Co.*, 62 Cal. 2d 861, 865 (1965)). Courts apply a two-step approach when parties disagree about contractual meaning:

> First, the court asks whether, as a matter of law, the contract terms are ambiguous; that is, the court considers extrinsic evidence to determine whether the contract is reasonably susceptible to a party's proffered interpretation. Second, if ambiguity persists, the court admits extrinsic or parol evidence to help interpret the contract.

*Yi*, 258 F. Supp. 3d at 1083 (citation omitted). In the first step, courts decide "whether the language is 'reasonably susceptible' to the interpretation urged by the party"; if it is not, the analysis ends. *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 393 (2006) (internal quotation marks omitted). If the language is reasonably susceptible to more than one meaning, but there is no material conflict in the extrinsic evidence, a court may interpret the contract as a matter of law. But if there is a conflict in the extrinsic evidence, the conflict must be resolved by the factfinder. *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1127 (2008).

Section 17 of the agreement pertains to "the Eleanor contracts from customers of Unique Motorcars/Unique Performance."[20] (Settlement Agreement § 17.) By its own text, the "provision only applies to contracts with . . . specific existing customers." (*Id.*) The provision does not release any claims. Instead, the preceding section requires the dismissal of pending litigation and release of any existing or past claims between the Shelby Parties and the Halicki Parties. The release does not contemplate nonparties or future claims. (*Id.* § 16.) As admitted in the Shelby Parties' pleading, "the Settlement Agreement did not expressly address a release by Defendants of any potential claims

---

[20] The settlement agreement is written in all caps. For readability, the Court uses sentence case for quotations of the settlement agreement in this Order.

against customers of the Shelby Parties or their licensees who had purchased vehicles manufactured by Shelby's licensees." (FAC ¶ 49.)

The Shelby Parties offer no material extrinsic evidence or cogent argument to support their position that the agreement "makes clear that innocent owners" of GT500Es, or any other nonparties to the settlement agreement, "are innocent and not to be harassed." (Shelby Opp'n to Halicki MPSJ 10; *see also id.* at 15–16.) Section 17 contains no anti-harassment language. The Shelby Parties assert that their interpretation is viable because the Halicki Parties did not take action against GT500E owners for a decade after the agreement, (*id.* at 16), but the Halicki Parties' inaction cannot generate a new contractual obligation untethered to the text of the settlement agreement, *see S. Cal. Edison Co. v. Superior Ct.*, 37 Cal. App. 4th 839, 851 (1995) ("[T]he conduct of one party to the contract is by no means conclusive evidence as to the meaning of the contract."); *cf. Yi*, 258 F. Supp. 3d at 1084 (concluding that "even the extrinsic evidence, including the parties' course of conduct and actions, does not render Plaintiff's interpretation" of an assignment offer without an express price term "sufficiently reasonable" where parties did "not dispute that Defendant never made any promises, oral or otherwise regarding the Assignment Offer terms prior to signing"). Irrespective of whether the Halicki Parties have any valid claims against nonparties, (*see generally id.* at 11–15), the Shelby Parties have not tied the Halicki Parties' conduct to the breach of any obligation in the settlement agreement. As a result, the claim for breach of contract must be dismissed.

### 2.   Shelby Parties' Claim for Breach of Implied Covenant

The Shelby Parties assert the Halicki Parties breached the implied covenant of good faith and fair dealing attaching to the settlement agreement by asserting claims against the Shelby Parties' customers and licensees concerning vehicles that allegedly infringe the Halicki Parties' intellectual property. (FAC ¶¶ 47–52.)

California law implies a covenant of good faith and fair dealing in every contract "to prevent a contracting party from depriving the other party of the benefits of the

contract." *Moore v. Wells Fargo Bank, N.A.*, 39 Cal. App. 5th 280, 291 (2019). "The scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract," but a "violation of an express provision is not required." *Id.* (cleaned up). "A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable." *Id.* (internal quotation marks omitted). Generally, this is a question of fact. *Id.* at 292.

Here, there are triable issues as to whether the Halicki Parties' conduct toward nonparties to the settlement agreement deprives the Shelby Parties of the benefits of the agreement and was objectively unreasonable. The settlement agreement, which arose from litigation over the intellectual property interests in GT500Es, releases past and present claims between the parties. (Settlement Agreement § 16.) The Halicki Parties agreed to transfer all intellectual property rights in the GT500 to the Shelby Parties, (*id.* § 5), and acknowledged that the Shelby Parties had trade dress rights in the Shelby GT500 and would "continue to manufacture, market, sell and/or license" them, (*id.* §§ 6–7). The Halicki Parties agreed not to "initiate any lawsuit against Shelby or his business partners or licensees for licensing or using the trade dress" of the GT500 and "release[d] and waive[d] any such claims." (*Id.* § 7.) The Shelby Parties' counsel from the prior litigation testified that he was under the impression that the agreement resolved the entire dispute as to the intellectual property interests in the vehicles at issue in the prior litigation. (*See* Cummings Dep. 105–12, ECF No. 289-11.)

Viewing the evidence in the light most favorable to the Shelby Parties, there is a genuine dispute as to whether the purpose and express terms of the settlement agreement, particularly its purpose to resolve the intellectual property dispute over the GT500Es and its express terms affirming the Shelby Parties' intellectual property rights in the GT500, prohibit the Halicki Parties from asserting claims against nonparties concerning the GT500E. The Shelby Parties offer evidence and argument that could convince a jury that the Halicki Parties' conduct lacked a valid legal foundation and thus was objectively unreasonable. (Shelby Opp'n to Halicki MPSJ 11–15.)

1    The Halicki Parties assert that the Shelby Parties cannot maintain their claim

2    because implying an obligation not to make claims against GT500E customers would

3    contravene the express terms of the settlement agreement. (Halicki MPSJ 25–26 (citing,

4    inter alia, *Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 374

5    (1992)).) Not so. Although the contract releases claims among the Shelby Parties, the

6    Halicki Parties, and their business partners and licensees, (*see* Settlement Agreement

7    §§ 7–8, 16), the contract is silent as to the release or maintenance of claims against

8    GT500E owners.

9    This claim survives the Halicki Parties' motion.

10   3.   Halicki Parties' Breach of Contract Claims against Shelby Parties

11   In their second and fifth claims, the Halicki Parties contend the Shelby Parties

12   breached the settlement agreement and a side letter described in section 12 of the

13   settlement agreement. (SACC ¶¶ 97–101, 116–23, ECF No. 69.)[21] The settlement

14   agreement and the side letter provide that the Shelby Parties "shall not use, or license

15   in any way, shape or form any of the property rights as described herein transferred to"

16   the Halicki Parties, which rights expressly include the copyright to the Eleanor character

17   from the remake. (Settlement Agreement §§ 2–3; *accord* Shelby Acknowledgement,

18   ECF No. 290-22.) The Shelby Parties also agreed not to sue the Halicki Parties "for

19   licensing, using, manufacturing or selling Eleanors from the original or remake Gone

20   in 60 Seconds," as embodied in photographs attached to the settlement agreement.

21   (Settlement Agreement § 8; *accord* Shelby Acknowledgement.) The Halicki Parties

22   assert that the Shelby Parties breached the former obligation by licensing the

23   GT500CRs and the latter obligation by initiating this lawsuit. (SACC ¶¶ 100, 121;

24   Halicki MPSJ 29–30.)[22]

25   _____

26   [21] The Court assumes the side letter binds the Shelby Parties, though its form and
27   content suggest it serves as a public statement of some obligations imposed by the
     confidential settlement agreement, not as an independent contract.

28   [22] The Halicki Parties offer other breach theories in their pleadings that they do not

1   The Shelby Parties assert that the Halicki Parties' contract claims hinge on the

2   copyright inquiry. (*See* Shelby Opp'n to Halicki MPSJ 17–21; *accord* Shelby CMSJ

3   Proposed Order, ECF No. 287-15 (proposing summary judgment in favor of the Shelby

4   Parties on the contract claims based on the issues presented in their copyrightability

5   motion).) This is true in part but not in toto. First, even with the Court's determination

6   that there is no independent copyright in the Eleanor character, Shelby still agreed not

7   to "use, or license in any way" the intellectual property rights in the remake film itself.

8   (Settlement Agreement § 3; *see id.* § 1.) The intellectual property the Shelby Parties

9   must refrain from using or licensing is broader in scope than the purported copyright in

10  Eleanor. Second, the copyright question does not resolve the Halicki Parties' second

11  theory of breach, which is predicated on the Shelby Parties' initiation of this lawsuit.

12  Nevertheless, summary judgment in the Halicki Parties' favor is inappropriate

13  for at least three reasons. First, there is a triable dispute as to whether the Halicki Parties

14  performed their obligations under the settlement agreement. The Shelby Parties offer

15  evidence that the Halicki Parties' licensee converted a Shelby GT500 into an Eleanor.

16  (Shelby Parties' Resps. to Halicki Parties' Statement of Uncontroverted Facts ISO

17  Halicki MPSJ ¶ 55, ECF No. 307-1.) Viewing this evidence in the light most favorable

18  to the Shelby Parties, a reasonable factfinder could determine that this conduct amounts

19  to a material nonperformance of the Halicki Parties' obligation not to allow entities they

20  control to "use a 'Shelby GT-500' vehicle in manufacturing or selling of Eleanors."

21  (Settlement Agreement § 8; *see id.* § 1.)[23] *See also Brown v. Grimes*, 192 Cal. App. 4th

22  265, 277 (2011) ("Normally the question of whether a breach of an obligation is a

---

25  present in their motion. (*See* SAC ¶¶ 100, 121.)

26  [23] Although the Court does not authorize this as a theory upon which the Shelby Parties
    may rest their affirmative claim for breach of contract, *see supra* note 18, the Halicki

27  Parties bear the burden of proving performance or excuse for nonperformance in
    support of their claim, so their purported nonperformance of this obligation properly

28  may be considered in connection with the Halicki Parties' claim.

material breach, so as to excuse performance by the other party, is a question of fact.").

Second, the Halicki Parties do not meet their burden at summary judgment as to their theory of breach of the Shelby Parties' obligation not to use *Gone in 60 Seconds* and Eleanor intellectual property. This theory relies on a wholly conclusory substantial similarity argument insufficiently developed in the one paragraph of analysis the Halicki Parties devote to it in the moving brief. (Halicki MPSJ 29.) The Halicki Parties' assertion is particularly unavailing given the Court's determination that there is no independent copyright in Eleanor. In any event, the Shelby Parties proffer evidence giving rise to a genuine dispute as to whether the GT500CR's design is "substantially the same" as the vehicles previously produced by the CR Parties under a license from the Halicki Parties and, therefore, as to whether the Shelby Parties' licensing of those vehicles breaches the settlement agreement. (Shelby Parties' Resps. to Halicki Parties' Statement of Uncontroverted Facts ISO Halicki MPSJ ¶¶ 65–66.)

Third, the Halicki Parties do not meet their burden of production or persuasion as to their theory of breach of the Shelby Parties' obligation to refrain from bringing suit. *See Nissan Fire*, 210 F.3d at 1102. The Shelby Parties agreed not to sue the Halicki Parties for "licensing, using, manufacturing or selling Eleanors." (Settlement Agreement § 8.) The Halicki Parties fail to show the conduct for which the Shelby Parties sued the Halicki Parties—"asserting the rights that the Shelby Parties expressly acknowledged belonged to the Halicki Parties," (Halicki MPSJ 30)—fits within any of the four limited categories of conduct for which the Shelby Parties agreed not to sue the Halicki Parties—licensing, using, manufacturing, or selling Eleanors.

Summary judgment on the Halicki Parties' second and fifth counterclaims for breach of contract against the Shelby Parties is inappropriate.

### 4.   Halicki Parties' Breach of Contract Claim against CR Parties

The Halicki Parties rest their breach of contract claim against the CR Parties on a licensing agreement between the two sets of parties for the right to use "intellectual property rights, trademarks, and copyrightable material relating to 'Gone in 60 Seconds'

and 'Eleanor' . . . consisting of the star car character 'Eleanor' from each movie." (Eleanor License § 1.1, ECF No. 290-23; *see* SACC ¶¶ 89–96.) The licensing agreement is governed by California law. (Eleanor License § 23.1.) In the motion, the Halicki Parties assert that, by manufacturing GT500CR vehicles "substantially similar to the Eleanor car character replicas which the CR parties had been building under the Eleanor License," (Halicki MPSJ 29), the CR Parties breached their agreement to "refrain from further use of the Licensed Properties or any further reference to it, direct or indirect, in connection with the manufacture, sale, distribution or promotion of Licensee's products" after termination of the licensing agreement, (Eleanor License § 17.1).

For reasons similar to those discussed in the preceding section, the Halicki Parties have not met their summary judgment burden on this claim. The argument they advance concerning the purported breach amounts to no more than a bare conclusion that the GT500CR is substantially similar to vehicles the CR Parties previously produced under a license. Again, the Court questions the merit of this argument given that Eleanor is not subject to copyright protection. At the least, there is a triable issue of fact as to whether the GT500CR is substantially the same as the vehicles the CR Parties built under the licensing agreement and, accordingly, whether manufacturing the GT500CR violates the agreement. (CR Parties' Resp. to Halicki Parties' Statement of Uncontroverted Facts ISO Halicki MPSJ ¶¶ 65–66, ECF No. 303-1.)

Summary judgment on the Halicki Parties' first counterclaim for breach of contract against the CR Parties is inappropriate.[24]

///

---

[24] The Court declines to reach the CR Parties' arguments for denying the motion.

**IV.     CONCLUSION**

The Court grants in substantial part the Shelby Parties' motion for partial summary judgment on the issue of copyrightability and denies the Halicki Parties and CR Parties' motions on the issue. The Court denies the Shelby Parties' motion for partial summary judgment on substantial similarity. The Court grants in part and denies in part the Halicki Parties' motion for partial summary judgment on the contract claims.

Eleanor is not entitled to standalone copyright protection as a matter of law. The Halicki Parties' fourth, sixth, seventh, and ninth claims advanced in the Second Amended Counterclaim are dismissed. The Shelby Parties' first claim for breach of contract advanced in the First Amended Complaint is dismissed.

**IT IS SO ORDERED.**

Dated: November 29, 2022

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE

33

# **APPENDIX**

Figure 1: The list of vehicle descriptions and their codenames in *Gone in 60 Seconds*



Figure 2: The unsuccessful attempt to steal the first Eleanor in *Gone in 60 Seconds*



34

1

Figure 3: Pace prepares to steal the second Eleanor in *Gone in 60 Seconds*

2

3

4

5



6

7

8

9

10

11

12

13

14

Figure 4: Pace spots the third Eleanor in *Gone in 60 Seconds*

15

16

17

18

19



20

21

22

23

24

25

26

27

28

1  Figure 5: The third Eleanor's slow motion jump in *Gone in 60 Seconds*



Figure 6: Pace at a police checkpoint with the fourth Eleanor in *Gone in 60 Seconds*



Figure 7: Card featuring ELEANOR in the *Gone in 60 Seconds* opening title sequence



Figure 8: A clip from *Gone in 60 Seconds* shown through a screen in *The Junkman*



37

Figure 9: The diorama version of the damaged vehicle in *The Junkman*'s opening credits



Figure 10: Two men argue over Eleanor in *The Junkman*



Figure 11: Hollis drives a vehicle through a wall to escape a gunman in *The Junkman*



Figure 12: An obscured vehicle at the film premiere in *The Junkman*



Figure 13: Raines surveys the Eleanor at the International Towers in the remake



Figure 14: Raines flies through the sky with the Eleanor over a traffic jam in the remake



Figure 15: Raines's crew surprises him with another Eleanor in the remake