1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10   CARROLL SHELBY LICENSING,          Case No. 8:20-cv-01344-MCS-DFM
11   INC. et al.,
                                        **BENCH VERDICT**
12              Plaintiffs,

13         v.

14
     DENICE SHAKARIAN HALICKI et
15   al.,

16
                Defendants.
17

18

19         On March 22–23 and June 5, 2023, the Court held a bench trial on the remaining

20   claims asserted by Plaintiffs and Counterclaim Defendants Carroll Shelby Licensing,

21   Inc. and Carroll Hall Shelby Trust (together, "Shelby Parties") against Defendants and

22   Counterclaimants Denice Shakarian Halicki, Eleanor Licensing, LLC, and Gone in 60

23   Seconds Motorsports, LLC (together, "Halicki Parties"), and the remaining claims

24   asserted by the Halicki Parties against the Shelby Parties and Counterclaim Defendants

25   Classic Recreations, LLC, Jason Engel, and Tony Engel (together, "CR Parties"). The

26   Court has considered all the evidence and argument presented at the live hearings,

27   written declarations of direct testimony, and arguments presented in briefs the Court

28   authorized.

1

## I.   THRESHOLD ISSUES

Within their closing brief, the CR Parties move under Federal Rule of Civil Procedure 52(c) for special findings. (CR Closing Br. 23–31, ECF No. 423.) To the extent the findings the CR Parties seek are not made in this Verdict, the motion is denied without prejudice on procedural grounds. The Court ordered any Rule 52(c) motion to be filed separately from the closing briefs. (Tr. 548.)[1] The Court set word limits for the closing briefs anticipating that any Rule 52(c) motion would be ventilated separately. Given the constraints placed on the closing briefs, the Halicki Parties did not have a full and complete opportunity to respond to the CR Parties' motion. Because the Rule 52(c) motion was not presented separately as ordered, C.D. Cal. R. 6-1; (Tr. 548), the Court does not consider it.

The parties submitted voluminous objections to the direct testimony declarations. (ECF Nos. 399, 402–04.) In the interest of judicial economy, the Court resolves only the objections necessary to the disposition in this Verdict. Unless otherwise noted, objections to cited evidence are overruled. The Court reserves decision on all remaining objections.

The Shelby Parties argue that the Halicki Parties waived argument as to some of the Shelby Parties' claims and the Halicki Parties' affirmative defenses by failing to address them in their initial closing argument brief. (Shelby Resp. Br. 20, ECF No. 428.) The Court does not deem argument on these claims and defenses waived. The Court afforded the parties three separate opportunities to present argument after the close of evidence: initial closing briefs, responsive closing briefs, and oral argument at the June 5 hearing. (*See* Tr. 545.) The staged structure of closing argument permitted all parties to present their arguments and respond to others' in one way or another. The Shelby

---

[1] The transcript for the first day of trial is filed as ECF No. 415, and the consecutively paginated transcript for the second day of trial is filed as ECF No. 416. The Court cites the page numbers supplied by the court reporter.

Parties do not provide, and the Court is unaware of, any authority supporting the proposition that a party may waive argument on claims or defenses by declining to address them at the first available opportunity. Such a rule would be injudicious given that closing argument in a bench trial is discretionary in the first place. Robert E. Jones et al., *Rutter Group Practice Guide: Federal Civil Trials & Evidence* § 17:25 (2023).

The Halicki Parties contend in various parts of their closing materials that the Court should make adverse inferences against the CR Parties based on spoliation of evidence. For example, they assert that the Court should draw an adverse inference that the CR Parties continuously used the Eleanor trademark in the advertisement of GT500CR vehicles, (Halicki Closing Br. 32);[2] that Classic Recreations changed its name to CR Sales, LLC, (Halicki Resp. Br. 28, ECF No. 427); and that Classic Recreations' limited liability company veil should be pierced, (*id.* at 28–30). These requests were untimely presented in the closing briefs, well after the deadline to file discovery motions or motions in limine in which an adverse inference properly might be sought as a sanction upon fair and full adversary briefing. Indeed, this is not the first time that the Court has rejected the Halicki Parties' untimely requests for similar sanctions. (*See* 1st MSJ Order 20, ECF No. 232; Order Re: MILs 8, ECF No. 256.) The Court declines to entertain these untimely requests for adverse inferences and rests its Verdict solely on the evidence presented at trial.

## II.    RECITATION OF REMAINING CLAIMS AND DEFENSES

Since entry of the Final Pre-Trial Conference Order ("FPTCO," ECF No. 408), the Shelby Parties withdrew their common law unfair competition claim and laches and unclean hands defenses. (Shelby Closing Br. 8 n.2, ECF No. 422.)

The Halicki Parties consistently maintained "affirmative" defenses of failure to state a claim. (Halicki Am. Mem. 36–37, ECF No. 398.) Failure to state a claim is not

---

[2] The Halicki Parties' closing brief spans two consecutively paginated docket entries, ECF Nos. 421 and 421-1. The Court cites the page numbers supplied by Halicki Parties.

properly construed as an affirmative defense. *Barnes v. AT&T Pension Benefit Plan*, 718 F. Supp. 2d 1167, 1174 (N.D. Cal. 2010); *see Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002) ("A defense which demonstrates that plaintiff has not met its burden of proof is not an affirmative defense."). Accordingly, the Court disregards these "affirmative" defenses in setting forth this Verdict but considers the Halicki Parties' evidence and arguments favoring judgment in their favor on the Shelby Parties' claims.

In their proposed findings of fact and conclusions of law, the Halicki Parties submit that they "proved by a preponderance of the evidence that the Shelby Parties have failed to mitigate their damages." (Halicki Am. Proposed Findings of Fact & Conclusions of Law ¶¶ 88–89, ECF No. 420.) As confirmed in post-trial briefing, (Halicki Statement Regarding Affirmative Defense, ECF No. 437), the Halicki Parties maintain no failure-to-mitigate affirmative defense, (*see generally* FPTCO 8–65). Accordingly, the Court disregards failure to mitigate as an affirmative defense but considers the Halicki Parties' evidence and arguments favoring judgment in their favor on the damages elements of the Shelby Parties' claims.

Accordingly, retaining the numbering provided by the parties, the Court understands the live claims and defenses to be as follows.

The Shelby Parties assert against the Halicki Parties claims for (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) false designation of origin by reverse passing off in violation of the Lanham Act, 15 U.S.C. § 1125(a); (5) trade libel; (7) violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200; and (8) declaratory judgment. The Halicki Parties assert affirmative defenses of (1) lack of standing and (20) unclean hands.

The Halicki Parties assert against the Shelby Parties counterclaims for (2) breach of contract; (3) false designation of origin by reverse passing off in violation of the Lanham Act, 15 U.S.C. § 1125(a); (5) breach of contract; and (8) declaratory relief. The Shelby Parties assert affirmative defenses of (2) a statute of limitations bar and

(4) waiver, estoppel, and acquiescence.

The Halicki Parties assert against the CR Parties counterclaims for (1) breach of contract; (3) false designation of origin by reverse passing off in violation of the Lanham Act, 15 U.S.C. § 1125(a); and (12) trademark infringement. The CR Parties assert affirmative defenses of (2) a statute of limitations bar; (3) laches; (4) waiver, estoppel, and acquiescence; and (5) unclean hands.

## III.   FINDINGS OF FACT[3]

### A.   The Shelby Parties

1.      Carroll Shelby Licensing, Inc. is a Texas corporation with its principal place of business in California. (FPTCO Ex. A ¶ 4.)

2.      Carroll Hall Shelby Trust is a trust organized and existing under the laws of California. Its trustees are M. Neil Cummings and Joe Conway. (*Id.* ¶ 5.)

3.      Carroll Shelby was a race car driver. After retiring from professional racing, he designed race cars. He passed away in 2012. (Cummings Decl. ¶¶ 3–4, ECF No. 390.)

4.      The Carroll Hall Shelby Trust owns numerous trademarks consisting of or featuring the name Shelby and/or vehicles designed by Shelby. Carroll Shelby Licensing is the licensing agent of the Carroll Hall Shelby Trust. (*Id.* ¶¶ 6–9.)

### B.   The Halicki Parties

5.      Denice Shakarian Halicki is an individual residing in California. (FPTCO Ex. A ¶ 1.)

6.      Eleanor Licensing, LLC is a Delaware limited liability company with its principal place of business in California. (*Id.* ¶ 2.) Halicki is the majority member and manager of the company, and her mother is a minority owner. (Halicki Decl. ¶ 1, ECF

---

[3] In some instances, evidence presented at trial directly contradicts these findings. The Court's decision not to cite the contradictory evidence should not be mistaken for a failure to consider it; instead, the Court simply does not credit it.

No. 392; Tr. 258–59.) Halicki, her attorneys, and Michael Leone, a consultant to the Halicki Parties who assists with intellectual property issues, control the company. (Tr. 180, 259; Leone Decl. ¶ 1, ECF No. 391.)

7.    Gone in 60 Seconds Motorsports, LLC is a Delaware limited liability company with its principal place of business in California. (FPTCO Ex. A ¶ 3; Halicki Decl. ¶ 1.)

8.    Halicki's late husband, H.B. "Toby" Halicki, produced, directed, financed, marketed, promoted, and acted in the 1974 film *Gone in 60 Seconds*. The film involves a group of car thieves who have a list of cars they must steal. (FPTCO Ex. A ¶¶ 9–11.)

9.    *Gone in 60 Seconds* and two other films Toby Halicki produced, the 1982 film *The Junkman* and the 1983 film *Deadline Auto Theft* (all together, the "trilogy"), all feature Ford Mustangs identified in each film by the name Eleanor. (Halicki Decl. ¶¶ 32–33.)

10.    Toby Halicki died in 1989. Halicki secured the rights to *Gone in 60 Seconds* from his estate in 1994. (FPTCO Ex. A ¶¶ 11–12.) Halicki owns the copyrights and trademarks to the trilogy. (Halicki Decl. ¶¶ 36, 82; Leone Decl. ¶ 42; Trial Exs. 765–69.)

11.    With Halicki as an executive producer, Disney released a remake of *Gone in 60 Seconds* in 2000 starring Nicolas Cage, Angelina Jolie, and Robert Duvall (the "remake"). Like the original, the remake involves a group of car thieves who have a list of cars they must steal. (FPTCO Ex. A ¶ 13.) Halicki owns the merchandising rights to the Eleanor car as it appears in the remake, (Trial Exs. 512, 761; Halicki Decl. ¶ 70), but Disney owns the copyright to and other intellectual property interests in the motion

picture, (Trial Ex. 512;[4] Olson Decl. ¶ 2, ECF No. 343-1[5]). Disney disclaims any intellectual property interest it has in the Eleanor car as it appears in the remake. (Halicki Decl. ¶ 70 (referring to Olson Decl. ¶ 3).)

12. The Court previously determined that "Eleanor is not entitled to standalone copyright protection as a matter of law." (2d MSJ Order 23, ECF No. 350.)[6]

### C.   The CR Parties

13. Classic Recreations, LLC is an Oklahoma limited liability company with its principal place of business in Oklahoma. (FPTCO Ex. A ¶ 6.)

14. Jason Engel and Tony Engel are the sole members of Classic Recreations, LLC. (*Id.* ¶¶ 6–8; J. Engel Decl. ¶ 5, ECF No. 393; T. Engel Decl. ¶ 3, ECF No. 394.)[7] Classic Recreations made and sold cars. Jason Engel ran the business. (J. Engel Decl. ¶ 8; T. Engel Decl. ¶ 6.)

### D.   Facts Pertaining to Claims Between the Halicki Parties and CR Parties

15. In 2007, Eleanor Licensing and Classic Recreations entered into a license agreement with Classic Recreations (the "Eleanor License"). (FPTCO Ex. A ¶ 14; J. Engel Decl. ¶ 6; T. Engel Decl. ¶¶ 6–7; Halicki Decl. ¶ 132.) The Engels are not parties to the agreement in their individual capacity. (Trial Ex. 62 ("Eleanor License"), at 1, ECF No. 393-1; J. Engel Decl. ¶ 7; T. Engel Decl. ¶ 5; *see* Halicki Decl. ¶ 132.)

///

---

[4] The parties to the contract setting forth these rights are Halicki and Hollywood Pictures, but the distinction between Hollywood Pictures and Disney is immaterial to this Verdict. (*See, e.g.*, Halicki Decl. ¶ 40 ("It is my understanding that [Hollywood Pictures] is a subsidiary and a dba of Disney Enterprises, Inc.").)

[5] The Olson declaration is part of the case record but not the trial record. The Court does not rest its findings on the declaration but cites it for context.

[6] This is a conclusion of law, but the Court includes it here to provide context.

[7] The company was suspended for much of this litigation, but it was reinstated on March 7, 2023. (*See* Closing Tr. 31–32, ECF No. 432.)

16.     In pertinent part, the Eleanor License authorized Classic Recreations to:

> use the following intellectual property rights, trademarks, and copyrightable material relating to "Gone in 60 Seconds" and "Eleanor" that are controlled by [Eleanor Licensing] in connection with a "Gone in 60 Seconds" automobile vehicle based on the "Gone in 60 Seconds" 1974 Original movie and the "Gone in 60 Seconds" 2000 Remake movie and consisting of the star car character "Eleanor" from each movie. ('Licensed Properties')[.]

(Eleanor License § 1.1.)

17.     Section 17 of the Eleanor License is titled "AFTER EXPIRATION OR TERMINATION." Section 17.1 provides:

> After the expiration or other termination of this Agreement, all rights granted to [Classic Recreations] under this Agreement revert to [Eleanor Licensing]. [Classic Recreations] must refrain from further use of the Licensed Properties or any further reference to it, direct or indirect, in connection with the manufacture, sale, distribution or promotion of [Classic Recreations'] products.

(*Id.* § 17.1.)

18.     Under the Eleanor License, the CR Parties built and marketed vehicles using the licensed properties. (*See* Halicki Decl. ¶¶ 137–38; Trial Ex. 583.) Classic Recreations terminated the Eleanor License on October 16, 2009. (FPTCO Ex. A ¶ 24.)

19.     Upon the termination of the Eleanor License, "CR stopped using the 'Gone in 60 Seconds' and 'Eleanor' marks and has not built any cars like the black and grey 'Eleanor' car in the Remake." (J. Engel Decl. ¶ 33.)

20.     Classic Recreations and Carroll Shelby Licensing subsequently entered a license agreement. The license term commenced November 1, 2009, and the license is

still in effect today, though the current licensee is now nonparty CR Sales, LLC. (FPTCO Ex. A ¶¶ 25–28; Trial Ex. 128; Cummings Decl. ¶ 54.)

21.     Beginning around 2010, the CR Parties manufactured cars labeled GT500CR pursuant to the license from Carroll Shelby Licensing. (FPTCO Ex. A ¶ 29; *see* J. Engel Decl. ¶¶ 39, 43.) Classic Recreations did not manufacture or sell the GT500CR Carbon, a car with the same look as the GT500CR but featuring carbon fiber materials. (Tr. 435; FPTCO Ex. A ¶ 30.) The GT500CR does not feature an exaggerated, raised hump feature or small dual headlights with a custom molded 3-inch hole and a 2-inch light inset from the main headlight. (J. Engel Decl. ¶ 37; Tr. 171–72.)

22.     The Court credits the testimony of Jason Engel as to the following facts:

> Neither CR nor [Jason Engel] have ever passed off a car either of [them] made as someone else's car design. Neither CR nor [Jason Engel] have ever taken another company's car or car part and removed its brand or name and replaced it with [their] own or Shelby's. . . . In every car that CR and [Jason Engel] ever sold, [they] never claimed that someone else's name, brand, or creation was [their] own or Shelby's.

(J. Engel Decl. ¶ 23; *accord* T. Engel Decl. ¶¶ 8–9 (declaring similarly).)

23.     In February 2020, Leone encountered an advertisement that appeared in Google search results for the query "Eleanor star car." The hyperlink text read: "Custom Eleanor Mustangs | Classic Recreations®." (Trial Ex. 197; Leone Decl. ¶ 150.)[8] In an undated text message to a contact at Classic Recreations' marketing firm, Jason Engel expressed incredulousness concerning a similar internet advertisement inviting the consumer to build an "Eleanor Mustang": "Wtf? We just paused this campaign. Why would anyone do this ?" (Trial Ex. 194, at 1; *see* Tr. 444–47.) The marketing firm did

---

[8] For reasons discussed in more detail *infra*, the advertisement in Trial Exhibit 197 has not been admitted as evidence, but the Court credits Leone's testimony that he perceived such an advertisement.

not create the "Custom Eleanor Mustangs | Classic Recreations®" advertising campaign on behalf of Classic Recreations. (Tr. 445.)

D. **Facts Pertaining to the Claims Between the Shelby Parties and the Halicki Parties**

24.    On October 25, 2004, Halicki and affiliated entities filed a complaint against the Shelby Parties and others in the United States District Court for the Central District of California, Case No. 2:04-cv-08813-SJO-PJW. (FPTCO Ex. A ¶ 15.)

25.    On October 23, 2007, Halicki, Eleanor Licensing, and affiliated entities filed a complaint against the Shelby Parties and others in the United States District Court for the Central District of California, Case No. 2:07-cv-06859-SJO-PJW. (*Id.* ¶ 16.)

26.    On December 4, 2008, Shelby and his affiliates filed a complaint against Halicki and her affiliates, Classic Recreations, and others in the United States District Court for the Central District of California, Case No. 2:08-cv-08004-SJO-PJW. (*Id.* ¶ 17.)

27.    These cases concerned cars described as the GT500E, 40–50 of which were manufactured by Unique Performance under a license from Carroll Shelby Licensing and which were designed to look like one of the cars called Eleanor from the remake film. (Cummings Decl. ¶¶ 17–19.) GT500E vehicles built by Unique featured an exaggerated, raised hump feature on its hood and custom molded lights inset from the main headlight. (*See* Trial Ex. 7 ("Settlement Agreement"), at 9–11.)

28.    On October 30, 2009, Carroll Shelby; Carroll Shelby Licensing; Shelby Automobiles, Inc.; Carroll Hall Shelby Trust; Carroll Shelby Engineering, Inc.; Carroll Shelby Motors, Inc.; Carroll Shelby International, Inc.; Halicki; the Original Gone in 60 Seconds LLC; Halicki Films, LLC; and Eleanor Licensing entered into a confidential settlement agreement. (FPTCO Ex. A ¶ 19; *see generally* Settlement Agreement.) Cummings and Leone, individuals involved in the negotiation of the Settlement Agreement, testified that its purpose was to resolve all issues between Shelby and his

affiliates and Halicki and her affiliates regarding GT500E vehicles. (Cummings Decl. ¶¶ 24–25, 36, 39–41; Tr. 106–09, 110, 136–38, 142–43, 144.) Cummings acknowledged at trial, however, "that the settlement did not resolve all issues with respect to everyone in the world regarding the GT500Es that were built." (Tr. 52.)

29.    Numerous provisions of the Settlement Agreement are relevant here. The Settlement Agreement transfers from the Shelby Parties, among others, to Halicki and Eleanor Licensing, among others, "all right, goodwill, title, intellectual property rights, and interest to the 'copyrights' in and to the following: remake of 'Gone in 60 Seconds,' and particularly the 'Eleanor' car character from the remake," (Settlement Agreement § 1),[9] as well as "all right, goodwill, title, intellectual property rights, and interest to the 'trademarks' in and to the following: 'Eleanor'; 'E'; and 'Gone in 60 Seconds' from the original, remake and sequels," (*id.* § 2). The Shelby Parties agreed not to "use, or license in any way, shape or form any of the property rights transferred to Halicki described herein." (*Id.* § 3.)

30.    The Settlement Agreement further provides:

> Shelby shall not use, manufacture, license, or copy, the exaggerated, raised hump feature of the Eleanor hood ("Eleanor Hood"), or the specific design of the Eleanor small dual headlights with custom molded 3-inch hole and 2-inch light inset from the main headlight ("Eleanor Inset Lights"), as seen in the remake Gone in 60 Seconds, unless Ford Motor Company is the one that has manufactured the product.

(*Id.* § 4.)

31.    The Settlement Agreement provides: "Halicki and all other entities she owns or controls hereby transfer[] to Shelby all intellectual property rights in and to the

---

[9] The Settlement Agreement is written in all caps. For readability, the Court uses sentence case for quotations of the Settlement Agreement.

'GT-500,' 'Shelby' and 'Carroll Shelby' trademarks." (*Id.* § 5.) Halicki acknowledged that Shelby has "trade dress rights in the 'Shelby GT-500' vehicle" depicted in a photograph appended to the contract, and Shelby acknowledged that Halicki has trade dress rights in the Eleanor Hood and Inset Lights. (*Id.* § 6.)

32.    Halicki acknowledged that Shelby would continue to use the GT500 intellectual property and agreed not to "initiate any lawsuit against Shelby or his business partners or licensees for licensing or using the trade dress of the GT-500 as embodied in the photograph attached [to the Settlement Agreement], and hereby release[d] and waive[d] any such claims." (*Id.* § 7.)

33.    The Settlement Agreement states:

> Shelby will not initiate any lawsuit against Halicki or her
> business   partners   or   licensees   for   licensing,   using,
> manufacturing or selling Eleanors from the original or remake
> Gone in 60 Seconds (vehicles or merchandise) as embodied
> in the photograph attached [to the settlement agreement], and
> hereby releases and waives any such claims.

(*Id.* § 8.)

34.    The agreement provides disparate treatment of Unique customers with "Eleanor contracts" that existed before Unique filed for bankruptcy. (*Id.* § 17.) The contract requires the Shelby Parties to "use best efforts to convince the customers to choose a different car that doesn't have the Eleanor Hood and Eleanor Inset Lights," but authorizes them to "complete and deliver" automobiles under the existing contracts. (*Id.*) "Other than as set forth above," however, the Shelby Parties agreed that they and their licensees "shall not manufacture or sell any Eleanors." (*Id.*)

35.    Although the parties agreed to keep the Settlement Agreement confidential, the contract provided for the execution of a nonconfidential side letter by Shelby acknowledging the effects of certain provisions therein. (*Id.* § 12.) Pursuant to this provision, Shelby and the Carroll Hall Shelby Trust generated the acknowledgment

letter dated November 2, 2009. (Cummings Decl. ¶ 42; "Shelby Acknowledgment,"
Trial Ex. 104.)

36.     Beginning in 2019, Cummings was informed that the Halicki Parties had
demanded that GT500E owners remove Shelby badging from their vehicles and replace
it with Eleanor badging. Barrett-Jackson, an auction house that had sold several
GT500Es in the past, told Cummings that it would no longer sell GT500Es at auction
given the Halicki Parties' assertions of infringement. (Cummings Decl. ¶¶ 46–51;
*accord* Davis Decl. ¶ 7, ECF No. 382 ("Barrett-Jackson's policy was generally to refuse
consignment of Shelby GT500E cars, as well as any other similar Mustangs that Mr.
Leone identified as infringing on Ms. Halicki's character copyright.").) At least one
GT500E owner attempted to list his vehicle for auction, but the auction house refused
to do so unless he received a license from the Halicki Parties. (Rojany Decl. ¶¶ 2–6,
ECF No. 385.)[10]

37.     Mrs. Jordan,[11] Billy Wagner, and Matt Farncombe owned GT500E
vehicles that more likely than not were manufactured by Unique. (Tr. 137, 165;
Cummings Decl. ¶¶ 17–18.) The Halicki Parties entered licensing agreements with
Jordan, Wagner, and Farncombe under which the GT500E owners agreed to market and
sell their vehicles "with the official licensed badging and emblems" of Eleanor and
*Gone in 60 Seconds*. (Trial Ex. 16 (Wagner license agreement); *accord* Trial Ex. 360
(requiring Farncombe to "market and sell [his] Vehicle with only the official licensed
badging and emblems"); *see* Trial Ex. 18 (documents showing Eleanor Licensing issued
a certificate of authenticity for Jordan's vehicle); Leone Decl. ¶ 124.) The Halicki

---

[10] Evidence probative of other GT500E owners' feelings about the Shelby Parties and
Halicki Parties was excluded, (*see* Tr. 551), or not admissible for its truth, (*id.* at 459–
60). Further, the Court sustains the Halicki Parties' objection to the testimony of James
Hankerson on account of a failure to disclose the substance of the testimony prior to
trial. (Halicki Evid. Objs. ¶ 92, ECF No. 399 (citing Fed. R. Civ. P. 37(c)(1)).)
[11] The parties have not provided evidence of Mrs. Jordan's given name.

Parties did not remove Shelby badging from these GT500Es or ask the GT500E owners or its licensee dealership, Fusion Motor Company, to do so. (Leone Decl. ¶ 128; Tr. 147.) No one removed the Shelby branding from Farncombe's GT500E. (Leone Decl. ¶ 128.)[12]

38.     In 2020, counsel for the Halicki Parties sent a letter to Classic Recreations, and Leone sent a letter to Classic Recreations' vendor, terminated party SpeedKore.[13] The letters accused Classic Recreations and SpeedKore of violating the Halicki Parties' rights and demanded that they cease and desist "manufacturing and selling counterfeit Eleanors." (Trial Ex. 20; *accord* Trial Ex. 27.)

39.     According to Cummings, the Shelby Parties incurred approximately $5,000 in attorney's fees responding to these two letters "because Classic did not have its own counsel at the time." (Cummings Decl. ¶ 61; *see also* Trial Exs. 21, 30 (responsive correspondence by counsel for the Shelby Parties).)

40.     Jason Engel declared that "at least two customers who had pending offers . . . confirmed that they were not going to purchase a Shelby GT500CR because of the risk that they would be sued by the person that licensed the Eleanor." (J. Engel Decl. ¶ 49.) Those customers' orders were for vehicles that cost approximately $259,000 each, and Shelby would have received 10% of that amount as royalties. (*Id.*)[14]

41.     The Shelby Parties initiated the instant lawsuit in 2020, complaining that the Halicki Parties wrongfully demanded that GT500E owners replace Shelby badging with Eleanor marks, threatened to sue an auction company if it allowed a Shelby vehicle to be sold at auction without rebadging, and sent a cease-and-desist letter accusing the

---

[12] The parties apparently agree on this fact, (*see* Shelby Closing Br. 20; Halicki Resp. Br. 45), although Leone's personal knowledge of Farncombe's sale rests on hearsay.

[13] The Court dismissed the claims against SpeedKore for lack of personal jurisdiction. (Order Re: Pending Mots. 14, ECF No. 100.)

[14] For reasons discussed in more detail *infra*, the Court does not credit the evidence cited in paragraphs 39 and 40. Instead, the Court includes these paragraphs in the findings of fact only for context.

CR Parties of infringing their intellectual property by manufacturing and selling the GT500CR, among other allegations of misconduct. (*E.g.*, First Am. Compl. ¶¶ 32–41, ECF No. 13.)

## IV.    CONCLUSIONS OF LAW

### A.    Halicki Affirmative Defense 1: Standing

42.    Because Halicki's First Affirmative Defense presents a jurisdictional issue implicating all the Shelby Parties' claims, the Court begins its analysis here. *See Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 653–54 (9th Cir. 2002). The Halicki Parties submit that the Shelby Parties suffered no injury in fact "to the extent any claim exists for any impropriety in licensing the GT500E vehicles." (FPTCO 26.) Instead, they claim, the GT500E owners are "the proper part[ies] with standing to assert any claims based on the negotiation and consummation of those license agreements, not the Shelby Parties." (*Id.*)

43.    To demonstrate Article III standing, a party must demonstrate it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "[T]he injury must affect the plaintiff in a personal and individual way." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992). Only in limited circumstances may a party have standing to vindicate a nonparty's rights. *See McCollum v. Cal. Dep't of Corr. & Rehab.*, 647 F.3d 870, 879 (9th Cir. 2011) ("[A] plaintiff must show his own injury, a close relationship between himself and the parties whose rights he asserts, and the inability of the parties to assert their own rights.").

44.    The Shelby Parties have not shown they have standing to vindicate the rights of nonparty GT500E owners, but they do not need to do so—they have standing to pursue their own claims of injury. They seek a remedy for damages they incurred due to alleged breaches of a contract to which they are parties. (*E.g.*, Shelby Mem. 11, ECF No. 364 (proffering that the Shelby Parties would present evidence of "reputational

damages, corrective advertising expenses, and attorneys' fees paid pre-litigation").) The breach of a contractual obligation generates a concrete injury to a contracting party sufficient to confer constitutional standing, even in the absence of proof of damages. *See Perry v. Newsom*, 18 F.4th 622, 639 (9th Cir. 2021) (Ikuta, J., dissenting) (collecting authorities for the proposition that "a breach of contract is itself a concrete injury for purposes of Article III standing, regardless of whether a plaintiff suffers actual damages"); *cf. Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) (noting that an award of nominal damages may provide redress sufficient to satisfy constitutional standing). Under their other claims, the Shelby Parties similarly seek remedies for damages they assert *they* suffered as a result of the Halicki Parties' conduct, notwithstanding that some alleged conduct also—and, in some respects, more directly—impacted nonparty GT500E owners. (*E.g.*, Shelby Mem. 12, 14, 16–20; Shelby Closing Br. 12–13, 15–16, 22–26, 30.)

45.    To the extent the Halicki Parties submit that the Shelby Parties cannot recover damages to vindicate injuries suffered by GT500E owners, they are correct; but this is a damages inquiry that must be examined in the context of each claim's merits and is distinct from the constitutional injury-in-fact requirement.

46.    The Court rejects Halicki's Affirmative Defense 1.

**B.    Shelby Claim 1: Breach of Contract**

47.    The Shelby Parties contend that the Halicki Parties breached the Settlement Agreement "by asserting claims against the Shelby Parties' business partners and licensees for manufacturing, marketing, and selling GT500CRs and GT500CR Carbons using SHELBY Marks and GT500 trade dress." (FPTCO 8.)

48.    To prevail on a claim for breach of contract, the claimant must prove by a preponderance of the evidence (1) that the claimant and the defendant entered into a contract; (2) that the claimant did all, or substantially all, of the significant things that the contract required, or that the claimant was excused from performance; (3) that the defendant failed to do something that the contract required it to do or did something the

contract prohibited it from doing; (4) that the claimant was harmed; and (5) that the breach was a substantial factor in causing the claimant's harm. CACI No. 303.

49. The Shelby Parties, Halicki, and Eleanor Licensing, among other contracting parties, entered into a valid contract, the Settlement Agreement. The Shelby Parties have not proven that Gone in 60 Seconds Motorsports is party to the Settlement Agreement or by some other mechanism may be liable for a breach thereof.

50. The Shelby Parties did all, or substantially all, of the significant things that the Settlement Agreement required.[15]

51. The Shelby Parties assert that the Halicki Parties breached Sections 5 to 7 of the Settlement Agreement by "demanding that both CR and SpeedKore cease and desist manufacture of the GT500CR and/or GT500CR Carbon, asserting they were infringing [Halicki's] rights and threatening legal action based on the same." (Shelby Closing Br. 12.)

52. Sections 5 and 6 of the Settlement Agreement do not contain provisions requiring the Halicki Parties to refrain from doing anything. They pertain to the transfer of intellectual property and proclaim acknowledgments of the contracting parties' respective intellectual property rights. Sending cease-and-desist communications is no breach of these provisions. *See Buzzed Barbers, LLC v. State Farm Gen. Ins. Co.*, No. 2:23-cv-03171-MCS-PD, 2023 U.S. Dist. LEXIS 111994, at *10 (C.D. Cal. June 28, 2023) (Scarsi, J.) ("It is axiomatic that a party cannot breach an obligation the contract did not impose.").

53. Section 7 contains another acknowledgment of rights, but it also affirmatively restricts Halicki and Eleanor Licensing from "initiat[ing] any lawsuit against Shelby or his business partners or licensees for licensing or using the trade dress

---

[15] The Shelby Parties' first claim and the Halicki Parties' fifth counterclaim mirror one another in that each accuses the other of breach of the Settlement Agreement. Accordingly, the analysis of breach in one claim informs the analysis of substantial performance in the other.

of the GT-500." (Settlement Agreement § 7.) The Shelby Parties offer no interpretation of this provision under which sending cease-and-desist communications constitutes "initiat[ing] any lawsuit." Such conduct cannot breach Section 7.

54. For the first time in their closing brief, the Shelby Parties rest a theory of breach on the Halicki Parties' assertion of counterclaims against them, Classic Recreations, and SpeedKore in this lawsuit. (Shelby Closing Br. 12 ("Since the complaint in this matter was filed, Halicki has also sued Shelby, CR and SpeedKore for licensing and making the GT500CR, in flat violation of ¶ 7 [of the Settlement Agreement].").) The Shelby Parties never pleaded this theory. Before the FPTCO replaced the pleadings, the Shelby Parties' operative complaint was the First Amended Complaint, which predated the filing of any counterclaims. The Shelby Parties declined to amend their pleading to incorporate a breach theory resting on the Halicki Parties' counterclaims before the pleading amendment deadline. The Court will disregard this belated theory of the claim and strikes reference to it in the FPTCO. *See Polar Bear Prods. v. Timex Corp.*, 384 F.3d 700, 719 (9th Cir. 2004) (affirming district court's decision to rebuff claims that appeared for the first time in the pretrial order); *Missigman v. USI Ne., Inc.*, 131 F. Supp. 2d 495, 517–18 (S.D.N.Y. 2001) ("Courts routinely refuse to allow parties to raise additional claims or defenses, for the first time, in the pretrial order after the completion of discovery.").

55. Even had the Shelby Parties proven a breach, they have not proven damages. The Shelby Parties seek lost royalties based on Jason Engel's testimony that two unidentified customers told him at some unspecified time they would not purchase GT500CRs because of the risk of being sued. (Shelby Closing Br. 12–13 (citing, inter alia, J. Engel Decl. ¶¶ 48–52).) Jason Engel's testimony to this end is plainly hearsay that must be discounted. Fed. R. Evid. 802. Even if some exception or exemption to the hearsay rule applied, the Court would not credit the testimony as establishing by a preponderance of the evidence that the unidentified customers would have completed the GT500CR transactions but for the cease-and-desist letters sent to Classic

Recreations and SpeedKore or the filing of the counterclaims; there is no evidence that the customers even knew about the Halicki Parties' communications or counterclaims, as distinguished from their other acts in furtherance of protecting their claimed intellectual property interests. *See Sargon Enters., Inc. v. Univ. of S. Cal.*, 55 Cal. 4th 747, 773–74 (2012) ("The general principle is that damages for the loss of prospective profits are recoverable where the evidence makes reasonably certain their occurrence and extent." (cleaned up).) The Halicki Parties also seek to recover attorney's fees they incurred "to respond to Mr. Brandon's letters . . . because Classic [Recreations] did not have its own counsel at the time." (Cummings Decl. ¶ 61; *accord* Shelby Closing Br. 12–13.) Even assuming the cease-and-desist communications compelled the Shelby Parties to respond through counsel in a manner sufficient to prove causation of damages,[16] the Shelby Parties have not proven the quantity of fees with reasonable certainty, such as by substantiating Cummings's declaration with facts about the amount of time spent drafting responses and the billable rate of the drafting attorneys sufficient even to provide a ballpark estimation of the lodestar. *Cf. Roberts v. City & County of Honolulu*, 938 F.3d 1020, 1023–24 (9th Cir. 2019) (discussing lodestar method to calculate reasonable attorney's fees). Without such support, the Court finds incredible Cummings's representation that the two letters counsel sent on behalf of the Shelby Parties in response to the Halicki Parties' correspondence, which total six pages, represent $5,000 worth of attorney work. (Trial Exs. 21, 30.)

56.    Shelby Claim 1 is dismissed.

///

---

[16] That the Shelby Parties acted *because* Classic Recreations was unrepresented at the time suggests that the Halicki Parties' correspondence was not a proximate cause of the Shelby Parties' expenditure of fees. Cal. Civ. Code § 3300. The issue is underexplored in the parties' papers, and attorney's fees are not an available remedy for other reasons, so the Court declines to rest its decision here on causation of damages.

**C.     Shelby Claim 2: Breach of the Implied Covenant of Good Faith and
Fair Dealing**

57.     The Shelby Parties assert that the Halicki Parties frustrated the purpose of
the Settlement Agreement, deprived the Shelby Parties of its benefits, and breached the
implied covenant of good faith and fair dealing "by asserting claims against GT500E
owners for allegedly infringing the Halicki Parties' purported copyright." (FPTCO 8.)

58.     Under California law, in every contract there is an implied promise of good
faith and fair dealing. This implied promise means that each party will not do anything
to unfairly interfere with the right of any other party to receive the benefits of the
contract. Good faith means honesty of purpose without any intention to mislead or to
take unfair advantage of another. Generally speaking, it means being faithful to one's
duty or obligation. However, the implied promise of good faith and fair dealing cannot
create obligations that are inconsistent with the terms of the contract. CACI No. 325.

59.     To prevail on a claim for breach of the implied covenant of good faith and
fair dealing, a claimant must prove by a preponderance of the evidence (1) that the
claimant and the defendant entered into a contract; (2) that the claimant did all, or
substantially all, of the significant things that the contract required it to do, or that the
claimant was excused from performance; (3) that the defendant prevented the claimant
from receiving the benefits under the contract; (4) that, by doing so, the defendant did
not act fairly and in good faith; and (5) that the claimant was harmed by the defendant's
conduct. *Id.*

60.     As provided in paragraphs 49 to 50 of this Verdict, the Shelby Parties have
shown that the Settlement Agreement is a contract binding them, Halicki, and Eleanor
Licensing, but not Gone in 60 Seconds Motorsports. The Shelby Parties did all or
substantially all of the significant things the contract required them to do.

61.     The Shelby Parties assert that the Halicki Parties breached the implied
covenant "by wrongfully harassing owners of GT500Es and blocking their attempts to
resell their vehicles to extort money from them and force them to replace the Shelby

Marks thereon with Eleanor marks." (Shelby Closing Br. 14.) The Court understands this invective to mean that the conduct of which the Shelby Parties complain is the Halicki Parties' communications with GT500E owners requesting Eleanor licensing and rebadging and with auction houses threatening suit if they auctioned GT500Es not licensed by them. (*E.g.*, Davis Decl. ¶ 7; Trial Exs. 10, 45; Tr. 159–62.) The Shelby Parties have not proven by a preponderance of the evidence that this conduct "frustrate[d] [their] rights to the benefits of the agreement." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 36 (1995). The evidence demonstrates that the Settlement Agreement resolves claims related to the GT500E as between the Shelby Parties, Halicki, and Eleanor Licensing. (*E.g.*, Settlement Agreement preamble, at 1 ("[T]he parties now desire to settle and compromise all the claims *between them* that were brought or could have been brought . . . .") (emphasis added).) With limited exception,[17] the agreement does not expressly or impliedly confer benefits to noncontracting people or entities who own GT500Es or oversee transactions in GT500Es. Cummings acknowledged at trial that the Settlement Agreement did not require the Halicki Parties to globally release claims they have with respect to the GT500E. (*See* Tr. 52.) The Shelby Parties received the benefit of their bargain by, inter alia, securing the Halicki Parties' release of claims against them. (*E.g.*, Settlement Agreement § 16.) The Court declines the Shelby Parties' invitation to read the Settlement Agreement to foreclose the Halicki Parties from pursuing any claims related to the GT500E they have against nonparties, as their claim would require. *Cf. Balbo v. JAAM Transp. LLC*, No. SACV 22-1857 JVS (DFMx), 2023 U.S. Dist. LEXIS 34423, at *7 (C.D. Cal. Mar. 1, 2023) ("A claim for breach of the

---

[17] The contract might have had different implications for Unique customers whose orders the Shelby Parties fulfilled, (*see* Settlement Agreement § 17), but the evidence indicates that no such customers exist (*e.g.*, Tr. 117–18). The fact that the Settlement Agreement expressly discusses GT500E customers whose vehicles had not yet been delivered and provides no treatment of existing GT500E owners bolsters the conclusion that the contract's benefits to the Shelby Parties did not extend to protect existing GT500E owners.

implied covenant of good faith and fair dealing involves frustrating the benefits of the contract between the parties, not between Defendants and a third party.").

62.    Even had the Shelby Parties proven a breach, they have not proven damages. The Shelby Parties claim that the Halicki Parties' actions caused them a loss of goodwill and reputational damages, so they should recover money damages commensurate with the expense of corrective advertising. (Shelby Closing Br. 16.)[18] The Court rejects this argument for three independent reasons. First, although the cost of corrective advertising is a recognized remedy to address damage to goodwill and reputation in intellectual property infringement cases, *e.g.*, *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988 (9th Cir. 1995), its availability as a remedy for this contract-based claim is unclear. The Court is particularly skeptical given that the circuit court has recognized that corrective advertising awards are "crude measures of damage" to goodwill even in the intellectual property context. *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 209 n.8 (9th Cir. 1989). The Shelby Parties have not cited any authority, or provided any evidence, suggesting that the measure of the loss of goodwill and reputational damage caused by the Halicki Parties' conduct here is commensurate, or even correlated, with the cost of corrective advertising. The Court has found no supporting authority and questions the relation between the proposed campaign and the goodwill loss. For example, accepting that the Halicki Parties' communications with an individual GT500E owner cast a pall over that individual's perception of the Shelby Parties' reputation, the mass-market advertising campaign the Shelby Parties propose is not commensurate with the harm; the lost goodwill instead could be recovered by a less costly, targeted campaign focused on the GT500E owners with whom the Halicki Parties made contact.

---

[18] The Shelby Parties previously asserted they were entitled to fees and reputational damages separate from corrective advertising, (FPTCO 13), but they did not assert such remedies in their closing materials, including their proposed findings of fact and conclusions of law.

63.     Second, even if corrective advertising expenses were recoverable, the Shelby Parties have not proven that the Halicki Parties' communications caused them a loss of goodwill and reputation. *See Quia Corp. v. Mattel, Inc.*, No. C 10-1902 JF (HRL), 2011 U.S. Dist. LEXIS 76157, at *15–16 (N.D. Cal. July 14, 2011) ("A plaintiff need not show a specific measure of harm to its goodwill and reputation in order to recover corrective damages. However, compensatory damages are appropriate only where a plaintiff has shown that in fact it has been injured; it still must present non-speculative evidence that goodwill and reputation . . . was damaged in some way." (citation omitted)). In his declaration, Cummings stated that the Halicki Parties' conduct "caus[ed] Shelby's customers to become upset with and lose trust in Shelby and create[d] the appearance that the Shelby brand and trademarks are of little, lesser, or no value." (Cummings Decl. ¶ 65.) But this hearsay is contradicted by the Shelby Parties' own witnesses. A GT500E owner provided testimony about the high regard he has for the Shelby brand notwithstanding frustration caused by the Halicki Parties' actions. (Rojany Decl. ¶ 6.) Barrett-Jackson's president provided no testimony that the Halicki Parties' conduct had any effect on his esteem of the Shelby Parties. (*See generally* Davis Decl. ¶¶ 7–14.) If anything, the evidence demonstrates that the Halicki Parties' communications with GT500E owners and auction houses damaged the Halicki Parties' *own* goodwill and reputation, not the Shelby Parties'.

64.     Third, the Court finds unpersuasive the evidence supporting the proposed corrective advertising campaign. "An award of the cost of corrective advertising, like compensatory damage awards in general, is intended to make the plaintiff whole. It does so by allowing the plaintiff to recover the cost of advertising undertaken to restore the value plaintiff's trademark has lost due to defendant's infringement." *Adray*, 76 F.3d at 988. The Court excluded the opinion of the Shelby Parties' expert on corrective advertising. (1st MSJ Order 15–17.) Although Cummings testified about the costs of certain corrective advertising measures, (Cummings Decl. ¶ 69), the Court determines that his opinion that the proposed advertising campaign is "need[ed] . . . to set the record

straight and tell the truth," (*id.*), is, if not an inadmissible expert opinion by a lay witness, (*see* Tr. 104 (reserving decision on this issue)), unpersuasive given the broad scope of the proposed campaign in light of the asserted harm.

65.    Shelby Claim 2 is dismissed.

**D.    Shelby Claims 3 and 7: False Designation of Origin by Reverse Passing Off and Violation of the California Unfair Competition Law**

66.    The Shelby Parties claim that the Halicki Parties engaged in false designation of origin by reverse passing off by "(a) demanding that owners of at least four (4)[19] Shelby GT500Es remove the Shelby trademarks and emblems from his vehicles, replace them with Eleanor trademarks and/or other related markings, and pay a licensing fee; and (b) directing that Shelby trademarks and emblems be removed from at least two (2) Shelby GT500Es, and replaced with Eleanor trademarks and/or other related markings." (FPTCO 8–9.) The Unfair Competition Law claim rests on the same theory. (*Id.* at 9.)

67.    Reverse passing off in violation of the Lanham Act, 15 U.S.C. § 1125(a), occurs when a defendant "misrepresents someone else's goods or services as his own." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n.1 (2003). To prevail on a reverse passing off claim, a claimant must prove by the preponderance of the evidence that (1) the work at issue originated with the claimant; (2) the origin of the work was falsely designated by the defendant; (3) the false designation of origin was likely to cause consumer confusion; and (4) the claimant was harmed by the defendant's false designation of origin. *Syngenta Seeds, Inc. v. Delta Cotton Co-operative, Inc.*, 457 F.3d 1269, 1277 (Fed. Cir. 2006) (citing *Lipton v. Nature Co.*, 71 F.3d 464, 473 (2d Cir. 1995)); *see also OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 897 F.3d 1008, 1018 (9th Cir. 2018) (requiring likelihood of confusion).

---

[19] The Shelby Parties now assert only three such instances. (Shelby Closing Br. 20.)

24

68.     As a predicate issue, the Halicki Parties submit that the GT500Es were not used in commerce, so the Lanham Act does not apply. (Halicki Resp. Br. 45.) "'Use in commerce' is simply a jurisdictional predicate to any law passed by Congress under the Commerce Clause." *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005). The phrase has a "sweeping reach" in Lanham Act cases; a claimant need only "show that the defendant's conduct affects interstate commerce, such as through diminishing the plaintiff's ability to control use of the mark, thereby affecting the mark and its relationship to interstate commerce." *Browne v. McCain*, 612 F. Supp. 2d 1125, 1132 (C.D. Cal. 2009) (internal quotation marks omitted). The Shelby Parties show use in commerce here given evidence that the Halicki Parties' licensing demands impacted the market for vehicles bearing Shelby marks.[20]

69.     The Halicki Parties assert that the Shelby Parties are not the producers of the GT500Es on the basis that Carroll Shelby Licensing was only a trademark licensor; Unique actually built the vehicles. (Halicki Resp. Br. 45; *see* Cummings Decl. ¶¶ 17–18; Tr. 11.) "[T]he term 'origin' in section [15 U.S.C. § 1125] 'refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods.'" *OTR Wheel Eng'g*, 897 F.3d at 1016 (quoting *Dastar*, 539 U.S. at 37). The "producer" protected by the Lanham Act "include[s] not only the actual producer, but also the trademark owner who commission[s] or assume[s] responsibility for ('st[ands] behind') production of the physical product." *Dastar*, 539 U.S. 32; *see id.* at 32 n.5 (discussing history of protection of trademark licensors under § 1125(a)). The evidence is sufficient to demonstrate that Carroll Shelby Licensing as licensor "stood behind" the GT500E vehicles produced by Unique. *Id.* at 32 (internal quotation marks omitted). However, there is not enough evidence in the trial record to show that Carroll Shelby Hall Trust

---

[20] Notwithstanding, as discussed below in paragraph 70, the Halicki Parties' argument on this issue informs the false designation element of the claim.

was involved in the licensing either directly or as the principal of Carroll Shelby Licensing and may thus be considered the origin of the GT500E. The Court finds that the GT500Es at issue here originated with Carroll Shelby Licensing.

70.    The Shelby Parties have not shown that the Halicki Parties falsely designated the origin of Jordan, Wagner, and Farncombe's GT500Es. As an initial matter, the parties agree that no one removed and replaced Shelby branding from Farncombe's GT500E; accordingly, there cannot be a misrepresentation about the origin of his vehicle. More broadly, this is not the paradigmatic reverse passing off case in which a defendant *sells* the claimant's product as its own. *See* Anne Gilson Lalonde & Jerome Gilson, *Trademarks* § 7.02[5][b] (2d ed. 2023) (citing *Dastar*, 529 U.S. at 28 n.1). Instead, the Shelby Parties' theory rests on the Halicki Parties' licensing agreements with GT500E owners, under which the *owners* were obliged to market and sell their vehicles with Eleanor badging. The licensing agreements do not require the removal of Shelby branding, and the Halicki Parties did not themselves remove Shelby badging from these vehicles. The Shelby Parties assert in their responsive brief that their licensee dealership, Fusion, acted as the Halicki Parties' agent when they removed the Shelby logos from Jordan's car. (Shelby Resp. Br. 21.) They also ask the Court to determine Jordan and Wagner acted as the Halicki Parties' agents when they removed and replaced Shelby badging given their communications with GT500E owners and auction houses that "GT500Es are 'counterfeits' that could not, on pain of litigation, be sold without [Halicki's] permission, which [Halicki] was only willing to grant to owners who entered license agreements obligating them to pay [Halicki] and remove and replace the Shelby emblems on their cars with Eleanor ones." (*Id.* at 21–22.) These novel theories of the Halicki Parties' vicarious liability for acts of nonparty agents went unpleaded and have not been preserved for trial. Even if they had, the Shelby Parties have not proven that the Halicki Parties exercised the requisite control over their licensees to establish principal-agent relationships. *See Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1054–55 (9th Cir. 2017) (discussing federal common

law principles of agency). The Court credits Leone's testimony that the Halicki Parties did not instruct Fusion to remove Shelby badging from Eleanor-licensed vehicles and finds that the Halicki Parties did not exert the requisite control over the removal of Shelby badging from Jordan's vehicle. The Court declines to infer that Jordan and Wagner consented to act as Halicki Party agents, or that the Halicki Parties exercised a principal's control over removal of Shelby badging by entering contracts simply obliging Jordan and Wagner to use Eleanor badging. *See PetConnect Rescue, Inc. v. Salinas*, __ F. Supp. 3d __, No. 20-CV-00527-RSH-DEB, 2023 U.S. Dist. LEXIS 26135, at *29–31 (S.D. Cal. Feb. 15, 2023) (discussing principles of vicarious liability under the Lanham Act, and noting that the Ninth Circuit has determined that "a financial or contractual relationship, without more, is not enough" to establish control); *cf. Gibson Brands, Inc. v. Viacom Int'l, Inc.*, 640 F. App'x 677, 678 (9th Cir. 2016) ("[T]he degree of control necessary for a trademark licensing agreement does not, by itself, provide the degree of control necessary to impose vicarious liability . . . .").

71.     As the Shelby Parties note, (Shelby Closing Br. 26), their claim under the Unfair Competition Law lives or dies with the Lanham Act claim, *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994). The claim must be dismissed for the same reasons the Lanham Act claim must be dismissed.

72.     Shelby's Claims 3 and 7 are dismissed.

**E.     Shelby Claim 5: Trade Libel**

73.     The Shelby Parties submit that the Halicki Parties committed trade libel by "publicly making false statements of fact that the GT500E and GT500CR vehicles infringe upon the Halicki Parties' rights associated with the Eleanor vehicle and/or are Eleanor vehicles, and not Shelby vehicles," which "disparaged the Shelby Parties' trademark and trade dress rights, and goods and services." (FPTCO 9.)

74.     To establish a trade libel claim under California law, the claimant must prove (1) the defendant made a statement that would be clearly or necessarily understood to have disparaged the quality of the claimant's good or service; (2) the

27

statement was made to a person other than the claimant; (3) the statement was untrue; (4) the defendant knew that the statement was untrue or acted with reckless disregard of the truth or falsity of the statement; (5) the defendant knew or should have recognized that someone else might act in reliance on the statement, causing the claimant financial loss; (6) the plaintiff suffered direct financial harm because someone else acted in reliance on the statement; and (7) the defendant's conduct was a substantial factor in causing the claimant's harm. CACI No. 1731.

75.    The parties dispute whether the Halicki Parties knowingly made untrue, disparaging statements about the Shelby Parties' goods or services. (Shelby Closing Br. 27–31; Halicki Resp. Br. 41–44.) The Court declines to render a conclusion of law as to any of the first five elements because the sixth is dispositive.

76.    For reasons similar to those stated in paragraph 55, the Shelby Parties have not proven that they suffered direct financial harm due to the purported trade libel. There is no persuasive, let alone admissible, evidence proving that two unidentified prospective GT500CR purchasers acted in reliance on the Halicki Parties' statements when they elected not to follow through with a purchase. *See Muddy Waters, LLC v. Superior Ct.*, 62 Cal. App. 5th 905, 925 (2021) ("[I]t is only the loss of specific sales that can be recovered. This means, in the usual case, that the plaintiff must identify the particular purchasers who have refrained from dealing with him, and specify the transactions of which he claims to have been deprived." (internal quotation marks omitted)). This alone defeats the claim.

77.    Shelby Claim 5 is dismissed.

**F.    Shelby Claim 8: Declaratory Judgment**

78.    The Shelby Parties seek a judicial declaration that "(a) Shelby GT500CR vehicles do not infringe on any of the Halicki Parties' rights, (b) the Shelby GT500E vehicles manufactured prior to the Settlement Agreement do not infringe on any of the Halicki Parties' rights, and (c) the Halicki Parties have no right to prohibit or in any

way constrain the ownership or sale of any Shelby vehicles, including Shelby GT500E vehicles." (FPTCO 9–10.)

79.   "In a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act," *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995), because "facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within their grasp," *id.* at 289. In deciding whether declaratory relief is warranted, the district court "[e]ssentially . . . must balance concerns of judicial administration, comity, and fairness to the litigants." *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 672 (9th Cir. 2005) (internal quotation marks omitted). "[T]he court may, after a full consideration of the merits, exercise its discretion to refuse to grant declaratory relief because the state of the record is inadequate to support the extent of relief sought." *United States v. Washington*, 759 F.2d 1353, 1356 (9th Cir. 1985) (en banc); *see also Pub. Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 113–14 (1962) (holding that declaratory relief "should rest on an adequate and full-bodied record").

80.   The substantive arguments and conclusions the Shelby Parties present in support of their claim for declaratory relief are coextensive with those offered in connection with their claims for breach of contract and breach of the implied covenant of good faith and fair dealing. (*E.g.*, Shelby Closing Br. 9 ("These allegations [concerning the Settlement Agreement] formed the basis of dueling breach of contract claims *and Shelby's declaratory relief claim*."); *id.* at 13 ("Because this constitutes textbook breach of contract, the Court should . . . issue a declaratory judgment . . . ."); Shelby Am. Proposed Findings of Fact & Conclusions of Law ¶¶ 43–44, ECF No. 422-1 (resting proposed conclusions as to claim for declaratory relief on the Halicki Parties' purported breaches).) For the reasons discussed *supra*, the Shelby Parties are not

entitled to judgment in their favor on their contract-related claims, so their arguments in favor of a judicial declaration consistent with a judgment in their favor on those claims fail for similar reasons.

81.     The declaratory relief the Shelby Parties seek reasonably may be construed to extend beyond the scope of their contract-related claims. To wit, the Shelby Parties seek a declaration that GT500CR and GT500E vehicles do not infringe upon "the Halicki Parties' rights." (FPTCO 9.) The parties have litigated several claims in this action concerning the Halicki Parties' contract *and* intellectual property rights. None of the Shelby Parties' claims required an adjudication concerning the extent of the Halicki Parties' intellectual property rights, including their interests in the Eleanor car (if any), and the Shelby Parties have presented no argument to support a judicial declaration that the GT500CR and GT500E do not infringe the Halicki Parties' intellectual property rights.[21] Accordingly, to the extent the judicial declaration sought pertains to the Halicki Parties' intellectual property rights, the Court declines to exercise its discretion to issue such a declaration. *Washington*, 759 F.2d at 1356; *Rickover*, 369 U.S. at 113–14.

82.     Shelby's Claim 8 is dismissed.[22]

**G.     Halicki Affirmative Defense 20: Unclean Hands**

83.     The Halicki Parties assert that "the Shelby Parties have unclean hands based on their conduct which violated conscience, good faith, and other equitable principles." (FPTCO 28.)

---

[21] Nor might such a declaration be warranted upon the disposition of the Halicki Parties' counterclaims. In entering judgment against the Halicki Parties on their counterclaims, the Court merely concludes there is inadequate proof to warrant relief; the CR Parties' and Shelby Parties' defenses against those claims do not satisfy the Shelby Parties' *affirmative* burden to prove entitlement to declaratory relief.

[22] For the reasons discussed in the preceding paragraph, judgment on this claim will be entered without prejudice to reflect the Court's partial refusal of jurisdiction over the claim.

84.   Because the Court has concluded the Shelby Parties are not entitled to relief on any of their claims, the Court declines to reach this affirmative defense.

**H.   Halicki Counterclaim 1: Breach of Contract (Eleanor License)**

85.   The Halicki Parties claim that the CR Parties breached the Eleanor License. (FPTCO 35.)

86.   The elements of this claim are set forth in paragraph 48.

87.   The Eleanor License is a valid contract between Eleanor Licensing on the one hand and Classic Recreations on the other.[23] The Halicki Parties have not proven that Halicki and Gone in 60 Seconds Motorsports are parties to the Eleanor License or by some other mechanism may pursue a claim for breach thereupon. The Halicki Parties have not proven that Jason Engel, Tony Engel, or nonparty CR Sales, LLC are party to the Eleanor License or by some other mechanism may be liable for a breach thereof.

88.   Eleanor Licensing did all or substantially all of the significant things required by the Eleanor License. This element is not apparently in dispute. (*See* FPTCO 36; *see generally* CR Closing Br. 11–16 (presenting virtually no argument as to performance).)

89.   The Halicki Parties assert two theories of breach: (1) the CR Parties "continu[ed] to use the Licensed Properties including reference to the Licensed Properties, direct or indirect, in connection with the manufacture, sale, distribution, or promotion of the CR Parties' products" after termination of the Eleanor License; and (2) the CR Parties "us[ed] the Halicki Parties' trademarks in labeling, marketing, selling, and offering for sale counterfeit Eleanor vehicles" after the termination of the Eleanor License. (FPTCO 36.)

90.   The Halicki Parties' second theory finds no purchase in Classic Recreations' obligations under § 17.1: the contract does not expressly forbid the sale of

---

[23] The Court reaches this determination notwithstanding conclusions made *infra* calling into question whether a key licensing provision is illusory.

1    "counterfeit Eleanor vehicles," in the Halicki Parties' parlance, except insofar as it is

2    redundant to the first theory, which closely tracks the textual obligation. *See Buzzed*

3    *Barbers*, 2023 U.S. Dist. LEXIS 111994, at *10. Accordingly, the Court considers the

4    second theory only insofar as it overlaps with the first theory in deciding whether

5    Classic Recreations breached its obligations under § 17.1.

6          91.    The CR Parties contend that Section 17.1, the provision the Halicki Parties

7    assert the CR Parties breached, did not survive the termination of the Eleanor License

8    in 2009. (FPTCO 30.) The Court must interpret the provision to decide whether it

9    survived termination. *See Yi v. Circle K Stores, Inc.*, 258 F. Supp. 3d 1075, 1082–83

10   (C.D. Cal. 2017) (citing *Parsons v. Bristol Dev. Co.*, 62 Cal. 2d 861, 865 (1965)). Courts

11   apply a two-step approach to contract interpretation:

12               First, the court asks whether, as a matter of law, the contract

13               terms are ambiguous; that is, the court considers extrinsic

14               evidence to determine whether the contract is reasonably

15               susceptible to a party's proffered interpretation. Second, if

16               ambiguity persists, the court admits extrinsic or parol

17               evidence to help interpret the contract.

18   *Yi*, 258 F. Supp. 3d at 1083 (citation omitted). In the first step, courts decide "whether

19   the language is 'reasonably susceptible' to the interpretation urged by the party"; if it is

20   not, the analysis ends. *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 393 (2006)

21   (internal quotation marks omitted).

22         92.    The CR Parties assert that the contracting parties included express survival

23   language with respect to a different section of the Eleanor License, suggesting that the

24   contracting parties only intended that provision to survive termination. (*See* FPTCO 30;

25   *see also* Eleanor License § 13.2(b) ("This provision shall survive any expiration or

26   termination of this Agreement.").) But Section 17.1 is not reasonably susceptible to an

27   interpretation that the obligations set forth therein extinguish upon termination. Section

28   17 of the Eleanor License is titled "AFTER EXPIRATION OR TERMINATION,"

indicating that the entire section governs the contracting parties' post-termination obligations. Section 17.1 expressly obliges Classic Recreations to "*refrain* from further use of the Licensed Properties." This provision would be nonsensical if it applied only during the contract term, during which Classic Recreations enjoyed the right to use the licensed properties. (Eleanor License § 1.1.) The inclusion of the word "further" qualifying "use" supports a reading of Section 17.1 as a post-termination obligation: the contract contemplates Classic Recreations' *use* of licensed properties during its term and no *further use* afterward. A provision precluding further use of the licensed properties after the contract term would be meaningless if it expired after the contract term. The Court finds the term insusceptible to the CR Parties' proposed interpretation, which would render the obligation at issue an absurdity or surplusage. *See* Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."); *Coral Farms, L.P. v. Mahony*, 63 Cal. App. 5th 719, 727 (2021) ("Contracts are construed to avoid rendering terms surplusage." (internal quotation marks omitted)).

93.    The Halicki Parties assert the CR Parties breached the Eleanor License by building GT500CR vehicles. (Halicki Closing Br. 27.) The Halicki Parties have not proven that Classic Recreations used or referenced any of the licensed properties by making the GT500CR. The licensed properties include "intellectual property rights, trademarks, and copyrightable material relating to 'Gone in 60 Seconds' and 'Eleanor' that are controlled by Licensor [i.e., Eleanor Licensing]." (Eleanor License § 1.1.) The Halicki Parties do not argue and have not proven that the GT500CR vehicle embodies any of the intellectual property in *Gone in 60 Seconds* or the remake themselves. They have not argued or proven the GT500CR uses or references the Eleanor trademark. Instead, the Halicki Parties assert the GT500CR "look[s] like Eleanor." (Halicki Closing Br. 27; *accord* Halicki Resp. Br. 21 (focusing argument on "the *appearance* of Eleanor from the Remake").) The Halicki Parties do not taxonomize the species of intellectual property in the Eleanor car that might protect its appearance, perhaps

because the most obvious is copyright, to which the Court after an exhaustive review determined the Eleanor car is not entitled.

94.    Even assuming there exists an intellectual property right in the Eleanor car's appearance, the Halicki Parties present insufficient proof that Eleanor Licensing controls it. The record demonstrates that Halicki, not Eleanor Licensing, owns the merchandising rights to the Eleanor car as it appears in the remake. Notwithstanding the two parties' unity of interests in this litigation, given evidence that Halicki owns and acts through Eleanor Licensing, the Court cannot conclude that the latter controls rights owned by the former—instead, the Court infers the converse more likely to be true. (*E.g.*, Halicki Decl. ¶¶ 1, 76; Tr. 259.) Plus, whether Halicki's merchandising rights encompass the intellectual property right in the Eleanor car's appearance in the remake is uncertain and underexplored in the trial record. The Court already has expounded upon the uncertain nature of those rights. (Order Requiring Joinder 6–7, ECF No. 336, *vacated in part*, ECF No. 345.) In short, the Halicki Parties have not proven Classic Recreations used or referenced intellectual property Eleanor Licensing controls in the appearance of the Eleanor car as it appears in the remake by creating GT500CRs.

95.    The Halicki Parties also assert the CR Parties breached the agreement by using the Eleanor car name to market GT500CRs. (Halicki Closing Br. 31–32.) The evidence demonstrates that Halicki, not Eleanor Licensing, owns the trademark to the Eleanor car. There is not enough evidence for the Court to conclude that Eleanor Licensing controlled the trademark in the Eleanor car as it appears in the remake such that the trademark could constitute a licensed property Classic Recreations agreed to refrain from using or referencing.[24]

96.    Even if the Halicki Parties had proven a breach, they have not proven resulting damages. They presented virtually no evidence at trial of direct damages

[24] For the reasons set forth in more detail *infra* in paragraph 137, the Court also declines to find that Classic Recreations used the Eleanor mark in advertising.

caused by Classic Recreations' putative breaches. Instead, the Halicki Parties claim they are entitled to all funds Classic Recreations received from sale of GT500CR vehicles. (Halicki Closing Br. 34–36.) This amounts to a theory of disgorgement, which is unavailable here for interrelated but independent reasons. First, disgorgement is generally not available as a remedy for breach of contract. *See, e.g.*, *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, No. CV 99-7947-AHM (RZx), 2001 WL 1673258, at *3 (C.D. Cal. Aug. 15, 2001) (precluding plaintiff from seeking disgorgement as a contract remedy); *Mission Viejo Florist, Inc. v. Orchard Supply Co., LLC*, No. SACV 16-01841-CJC(KESx), 2018 U.S. Dist. LEXIS 225768, at *13–14 (C.D. Cal. Aug. 16, 2018) (same); *cf. Foster Poultry Farms, Inc. v. SunTrust Bank*, 377 F. App'x 665, 668 (9th Cir. 2010) ("Under California law, disgorgement of improperly obtained profits can be an appropriate remedy for breach of a contract protecting trade secrets and proprietary confidential information."); *see generally* Kimberly A. Gaab & Sara Church Reese, *California Practice Guide: Civil Procedure Before Trial Claims & Defenses* §§ 9:305–37 (2022) (enumerating remedies available for breach, which do not include equitable remedies such as disgorgement). Second, the Halicki Parties fail to argue, let alone prove, that a damages award would be an insufficient remedy such that an equitable remedy such as disgorgement might be available. *Barranco v. 3D Sys. Corp.*, 952 F.3d 1122, 1129 (9th Cir. 2020) ("The necessary prerequisite for a court to award equitable remedies is the absence of an adequate remedy at law." (internal quotation marks omitted)); *Ramona Manor Convalescent Hosp. v. Care Enters.*, 177 Cal. App. 3d 1120, 1140 (1986) ("[E]quitable relief will not be afforded when the plaintiff's remedies at law are adequate to redress his or her injury."). Other equitable remedies they seek as recompense for this claim, an accounting and a permanent injunction, (FPTCO 36), are unavailable for similar reasons.

97.     Finally, the Halicki Parties claim section § 23.5 of the Eleanor License entitles them to attorney's fees upon prevailing on a claim of breach. (Halicki Closing Br. 37.) That provision pertains to *arbitration* of disputes arising under the license.

(Eleanor License § 23.5 (providing in section titled "Arbitration" that "[t]he *arbitrator* shall be authorized to award attorney's fees and costs to the prevailing party" (emphasis added)).) The Halicki Parties offer no interpretation of the contract under which the Court might make a fee award, and the Court lacks any information suggesting the parties intended the provision to extend to a non-arbitral adjudication of any contract disputes. In any event, the Halicki Parties presented no evidence of the amount of fees and costs they incurred in prosecuting their claim.

98.     Halicki's Counterclaim 1 is dismissed.

**I.     Halicki   Counterclaim   2:   Breach   of   Contract   (Shelby Acknowledgment)**

99.     The Halicki Parties claim that the Shelby Parties breached the Shelby Acknowledgment. (FPTCO 36.)

100.    The elements of this claim are set forth in paragraph 48.

101.    The Halicki Parties have not proven the Shelby Acknowledgment is a contract. To make a contract, there must be parties capable of contracting, their consent, a   lawful   object,   and   consideration.   Cal.   Civ.   Code   § 1550.   The   Shelby Acknowledgment serves as a nonconfidential statement of some obligations imposed by the confidential Settlement Agreement. It bears no indicia of the consent of anyone but its signatories, Shelby and Carroll Hall Shelby Trust. Its creation was a term of the Settlement Agreement; it is supported by no separate consideration. It is not a contract.[25]

102.    Halicki's Counterclaim 2 is dismissed.

**J.     Halicki Counterclaim 3: False Designation of Origin by Reverse Passing Off**

103.    The Halicki Parties assert that the Shelby Parties and the CR Parties are liable for false designation of origin under the Lanham Act under a theory of reverse passing off "by marking counterfeit Eleanor replicas using the unique aspects, look,

---

[25] Even if it were, this claim would fail for all the reasons Halicki Counterclaim 5 fails.

image[,] and goodwill of the Eleanor car character with words, names, and symbols giving the false and misleading representation that the Shelby Parties and the CR Parties are authorized to license and sell Eleanor replicas." (FPTCO 39; *see also* Order Re: Final Pretrial Conference 1, ECF No. 386 (memorializing "the Halicki Parties' representation that their third counterclaim is a claim for reverse passing off").)

104.   The elements of this claim are set forth in paragraph 67.

105.   The claim falters at the first element: the Halicki Parties have not proven the existence of a work at issue that originated with them that is protected by the Lanham Act. *Syngenta Seeds*, 457 F.3d at 1277. The "origin of goods" referred to in the Lanham Act "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Dastar*, 539 U.S. at 37. The work the Halicki Parties assert the other parties passed off is the nontangible characteristics of whatever intellectual property interest in the Eleanor car they control. But "a claim for reverse passing off cannot be brought to prevent the copying of intellectual property." *OTR Wheel Eng'g*, 897 F.3d at 1012; *see also id.* at 1016 ("Copying is dealt with through the copyright and patent laws, not through trademark law."). There is no evidence of a tangible good produced by the Halicki Parties that may be the subject of this claim.[26]

106.   Halicki's Counterclaim 3 is dismissed.

**K.     Halicki Counterclaim 5: Breach of Contract (Settlement Agreement)**

107.   The Halicki Parties claim the Shelby Parties breached the Settlement Agreement. (FPTCO 40.)

---

[26] Contrasting with the conclusion the Court reached as to the Shelby Parties' reverse passing off claim, the Halicki Parties have not proven that they are the intellectual property "owner who commissioned or assumed responsibility for ('stood behind') production of the physical product," i.e., the GT500CR. *Dastar*, 539 U.S. 32. The evidence the Halicki Parties invoke, (Halicki Resp. Br. 47), undermines their claim: Classic Recreations produced the GT500CR purportedly in derogation of a terminated license, not in furtherance of a license the Halicki Parties stood behind.

108.   The elements of this claim are set forth in paragraph 48.

109.   As stated in paragraph 49, the Shelby Parties, Halicki, and Eleanor Licensing, among other contracting parties, entered into a contract, the Settlement Agreement. The Halicki Parties have not proven that Gone in 60 Seconds Motorsports is party to the Settlement Agreement or by some other mechanism may pursue a claim for breach thereupon.

110.   Halicki and Eleanor Licensing did all, or substantially all, of the significant things that the Settlement Agreement required.

111.   The Halicki Parties contend the Shelby Parties breached the Settlement Agreement "by (1) using and licensing the Halicki [P]arties' intellectual property rights; (2) licensing the CR Parties to manufacture, build, produce, market, and sell counterfeit Eleanor replicas; and (3) filing this lawsuit against the Halicki Parties for the Halicki Parties['] permitted enforcement of the Halicki Parties' rights." (FPTCO 43.)

112.   For reasons similar to those set forth in paragraph 90, the Court disregards the second theory of breach insofar as it departs from the Shelby Parties' contractual obligations. The Settlement Agreement does not oblige the Shelby Parties to do or refrain from doing anything with respect to "counterfeit Eleanor replicas," a phrase untethered to the text of the contract. The Settlement Agreement also does not restrict the Shelby Parties from building, producing, or marketing anything, except insofar as those acts are subsumed within the restrictions on use, licensure, manufacturing, copying, and sale set forth in the contract. Accordingly, the Court considers the second theory only under the framework of the restrictions set forth in the text of the Settlement Agreement.

113.   With this understanding, the Court finds that the Halicki Parties have not proven a breach under the first or second theories. The Settlement Agreement precludes the Shelby Parties from using or licensing "in any way, shape or form any of the property rights transferred to Halicki described herein." (Settlement Agreement § 3.) The Shelby Parties also agreed not to "use, manufacture, license, or copy" the Eleanor

Hood or Inset Lights "unless Ford Motor Company is the one that has manufactured the product." (*Id.* § 4.) Further, the Shelby Parties affirmed that they and their licensees "shall not manufacture or sell any Eleanors," with limited exceptions for existing customers. (*Id.* § 17.)

114.   The Halicki Parties argue for an expansive reading of these promises: they assert that the contract precludes the Shelby Parties from using not only the copyright and trademark rights described in Sections 1 and 2, but also any and all intellectual property concerning the Eleanor car or *Gone in 60 Seconds*, including features depicted in annotated images of vehicles appended to the Settlement Agreement. (Halicki Closing Br. 22–25.) In short, the Halicki Parties interpret the contract to restrict the Shelby Parties from "get[ting] any closer to Eleanor than the agreed photograph of a 1967 GT500." (*Id.* at 25.) The Shelby Parties proffer that the only provision relevant to this theory is Section 4, which precludes them from using, manufacturing, licensing, or copying the Eleanor Hood and Inset Lights. (Shelby Closing Br. 9–12.) The Settlement Agreement, which is not a model of clear contract drafting, is reasonably susceptible to both sides' interpretations. Applying the interpretation framework set forth in paragraph 91, the Court determines that the Settlement Agreement is ambiguous as to the scope of the prohibitions on use, licensing, manufacturing, and copying to which the Shelby Parties agreed. The Court finds that the contract in relevant part only prohibits, with limited exceptions inapplicable here, the Shelby Parties from using and licensing the copyrights and trademarks expressly transferred in Sections 1 and 2; from using, licensing, manufacturing, or copying the Eleanor Hood and Inset Lights described in Section 4 and specified in attached images; and from manufacturing or selling automobiles that have the Eleanor Hood and Inset Lights.[27]

---

[27] The Court's orders resolving the motions for summary judgment are abrogated insofar as they are inconsistent with this interpretation. Fed. R. Civ. P. 54(b). Specifically, the Court acknowledges it used overbroad, imprecise language in a prior order in which it stated, "The expansive text of the agreement, which forbids the Shelby

115.   The Court finds the text of the Settlement Agreement the most persuasive support for this interpretation. *See* Cal. Civ. Code §§ 1638–39. In Section 3, the Shelby Parties agreed not to "use, or license in any way, shape or form any of the property rights transferred to Halicki described herein." "Any way, shape or form" is an adverbial phrase modifying the verbs "use, or license"[28]—not, as the Halicki Parties suggest, the "property rights transferred to Halicki." (*See, e.g.*, Halicki Closing Br. 22–24.) The word "herein," an adverb modifying the participle "described" that modifies "property rights transferred to Halicki," "is inherently ambiguous." *Herein*, *Black's Law Dictionary* (11th ed. 2019). Given its placement in the provision directly after "property rights transferred to Halicki," and its placement in the contract directly after the only sections of the agreement to memorialize property rights transferred to Halicki,[29] however, "herein" connotes the rights expressly transferred in the preceding sections.

116.   Sections 1 and 2 are structured similarly to one another: the Shelby Parties agreed to transfer "all right, goodwill, title, intellectual property rights, and interest" to certain copyrights and trademarks. The Halicki Parties interpret these sections to confer any and all intellectual property rights regarding the Eleanor car. (Halicki Closing Br. 23.) But the transfer memorialized here is not so expansive: Section 1 transfers only

---

Parties from using or licensing all intellectual property rights in Eleanor, precludes this cabined reading" of the Settlement Agreement by the Shelby Parties "that the agreement only protects the Eleanor hood and inset lights." (1st MSJ Order 11.) For the reasons discussed below, the Court stands by its conclusion that summary judgment was inappropriate because "the parties' agreement contemplates more than the hood and inset lights," but repudiates any implication that the contract forbade use or license of "all intellectual property rights in Eleanor" or required reference to the attached photographs for interpretation. (*Id.*)

[28] Alternatively, the adverbial phrase might only modify the second verb, "license," but this issue is immaterial to the disposition. *See United States v. Nishiie*, 996 F.3d 1013, 1021–22 (9th Cir. 2021) (discussing series-qualifier and last-antecedent canons of construction).

[29] Section 9 of the agreement memorializes a *prospective* agreement to transfer rights conferred by the Patent and Trademark Office. It does not disturb this interpretation.

copyrights to the remake film and the Eleanor car character depicted in the remake, and Section 2 transfers only trademarks to Eleanor, E, and *Gone in 60 Seconds*. Notwithstanding the ostensibly broad reach of the phrase "all right, goodwill, title, intellectual property rights, and interest" used in these provisions, the text immediately following this phrase in each section cabins it to narrow flavors of intellectual property: "to the 'copyrights,'" (Settlement Agreement § 1), and "to the 'trademarks,'" (*id.* § 2). The provisions do not contemplate the transfer of rights other than copyrights and trademarks.

117.   None of the first three sections of the contract reference the appended images. Later sections do. (*E.g.*, Settlement Agreement § 4 ("The specifications for the Eleanor Hood and Eleanor Inset Lights are shown on the attached photos."); *id.* § 6 ("Halicki acknowledges that Shelby has trade dress rights . . . as depicted in the attached photograph . . . .").) The lack of reference to the images in these sections and the ample references to them in other sections shows the parties did not intend the images to affect the restriction on use and licensing in Section 3 or the scope of the property rights transferred in Sections 1 and 2. The Court determines that the images do not modify the obligations in Sections 1 to 3, which are limited to the property rights expressly transferred in the text. *U.S. Fid. & Guar. Co. v. Annunziata*, 67 N.Y.2d 229, 233 (1986) (holding that an inclusion of a provision in one contract clause and an omission of a similar provision in another "must be assumed to have been intentional under accepted canons of contract construction"); *accord* Cal. Civ. Proc. Code § 1858 ("In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, and to omit what has been inserted . . . ."). The Court interprets the restriction set forth in Section 3 to demand a reading of Sections 1–3 together without reference to any other parts of the contract, including the appended images. Accordingly, Section 3 precludes the Shelby Parties from using or licensing the copyrights in the remake film

and the Eleanor character from the remake and the trademarks in Eleanor, E, and *Gone in 60 Seconds* from the original and remake.

118.   Section 4 provides that the Shelby Parties "shall not use, manufacture, license, or copy" the Eleanor Hood or Inset Lights specified in the text and in attached images "unless Ford Motor Company is the one that has manufactured the product." The Halicki Parties assert that this provision should be read only to authorize use of the Eleanor Hood and Inset Lights in certain circumstances, i.e., that Section 4 operates as an exception to Section 3 in their broad construction of the provision. (*See* Halicki Closing Br. 24.) Not so; this is a restrictive provision separate from the restriction on use and licensure set forth in Section 3. This provision pertains to elements of trade dress, the Eleanor Hood and Inset Lights, that were not expressly transferred in Sections 1 and 2 and restricted in Section 3. The acts forbidden by Section 4 exceed those forbidden by Section 3: the Shelby Parties may not "use, manufacture, license, or copy" the Eleanor Hood and Inset Lights, (Settlement Agreement § 4), but they need only refrain from "use, or license" of the transferred copyrights and trademarks, (*id.* § 3). The "unless" clause provides an exception to the "shall not" restriction set forth in the preceding clauses in the section. Read as a whole, the provision restricts Shelby from using, licensing, manufacturing, or copying the Eleanor Hood and Inset Lights unless Ford makes products featuring them. This restriction is separate from and irrespective of the use and licensing restrictions set forth in Section 3.

119.   Section 17 pertains to existing "Eleanor contracts" with customers of Unique Motorcars and Unique Performance. In short, the provision allows the Shelby Parties to fulfill those contracts. It then provides, "Other than as set forth above, Shelby or any of his licensees shall not manufacture or sell any Eleanors." (*Id.* § 17.) The term "Eleanors" is undefined and ambiguous. The parties ascribed different meanings to the terms "Eleanor" and "Eleanors" in different contexts and sections of the contract. For example, the term is used to denote a character, (*id.* § 1), a trademark, (*id.* § 2), and an idea embodied in appended photographs, (*id.* § 8). Thus, other provisions of the

Settlement Agreement do not elucidate the meaning of the term as used in this one. Notwithstanding, within the context of Section 17, the parties ascribed a consistent meaning to "Eleanors": automobiles that have the Eleanor Hood and Inset Lights. The provision uses the words "Eleanor(s)," "car(s)," and "automobile(s)" interchangeably: "the names of any customers who desire the making of an *Eleanor* shall be provided to Halicki"; "Shelby shall only complete *automobiles* for customers that have existing contracts for the *automobiles*"; "manufacturing work on such *cars* shall only be performed by . . . licensees for Shelby." (*Id.* § 17 (emphases added).) Key to this interpretation is the requirement that the Shelby Parties persuade customers "to choose a *different* car *that doesn't have the Eleanor Hood and Eleanor Inset Lights*." (*Id.* (emphasis added).) This clause indicates that a car that does not have those features is "different" from the "car" described by the word Eleanor. This, in turn, suggests that the Eleanor Hood and Inset Lights are defining features of Eleanor as that term is used here. Accordingly, the Court understands "Eleanors" in Section 17 to refer to vehicles bearing the Eleanor Hood and Inset Lights like the automobiles Unique agreed to make, and thus that Section 17 restricts the Shelby Parties from manufacturing or selling automobiles with the Eleanor Hood and Inset Lights (with limited exceptions for unfulfilled Unique customers inapplicable here).

120.   The Court does not find the extrinsic evidence introduced by the parties at trial persuasive enough to disturb the interpretation this close reading engenders.

121.   Given this interpretation, the Halicki Parties have not proven a breach of Sections 3, 4, or 17. There is no independently copyrightable interest in the Eleanor car as a character; accordingly, the Halicki Parties have not proven the Shelby Parties used or licensed intellectual property that does not exist. The Halicki Parties have not proven that the Shelby Parties used or licensed the copyright in the remake itself.[30] The Halicki

---

[30] Even if the Halicki Parties had shown use or licensure of the copyright in the remake, in addition to the remedies problems described below, the Halicki Parties have not

Parties have not proven that the Shelby Parties used or licensed the trademarks in Eleanor, E, or *Gone in 60 Seconds*. The Halicki Parties have not proven that the Shelby Parties used, licensed, manufactured, or copied the Eleanor Hood and Inset Lights. And the Halicki Parties have not proven that the Shelby Parties manufactured or sold any automobiles bearing the Eleanor Hood and Inset Lights.

122.   The third theory of breach lacks merit. The contract forbids the Shelby Parties from initiating suit against Halicki and Eleanor Licensing "for licensing, using, manufacturing or selling Eleanors from the original or remake Gone in 60 Seconds." (Settlement Agreement § 8.) Although the Halicki Parties appear to contend that the conduct for which the Shelby Parties initiated suit falls within the meaning of "licensing . . . Eleanors," (*see* Halicki Closing Br. 10), they have not proffered any interpretation of "licensing" that might envelop the conduct giving rise to the Shelby Parties' claims, any interpretation of "Eleanors" that might extend to vehicles at issue in the Shelby Parties' claims, or any evidence or argument supporting the susceptibility of the provision to their preferred interpretations. Given the facts set forth in paragraph 41, the Halicki Parties similarly fail to show that the alleged conduct for which the Shelby Parties initiated suit fits within any of the four limited categories of conduct for which the Shelby Parties agreed not to sue the Halicki Parties—licensing, using, manufacturing, or selling Eleanors. (*See, e.g.*, First Am. Compl. ¶¶ 44, 51; FPTCO 8–10.)[31]

_____

proven resulting damages given that they do not own the film copyright—Disney does.
[31] Before trial, the Halicki Parties asserted that the Shelby Parties' First Amended Complaint presented an allegation that pertained to their licensing activities: the Shelby Parties alleged the Halicki Parties sent a letter to a GT500E owner demanding the owner remove Shelby marks, replace them with Eleanor marks, and pay a licensing fee. (Proposed FPTCO Ex. B, at 24–25, ECF No. 380-2 (citing First Am. Compl. ¶ 32).) The Halicki Parties did not develop this line of argument further at trial. Regardless, even accepting that the Halicki Parties sent the letter in an effort to secure a license, the Court declines to conclude that the conduct of which the Shelby Parties complain, sending a demand letter, falls within the scope of what the parties intended by

123.   Even had the Halicki Parties proven a breach, they have not proven damages. As previously noted, the Halicki Parties adduced virtually no evidence of damages at trial. For reasons similar to those stated in paragraph 96, the Halicki Parties have not shown equitable remedies of disgorgement, an accounting, or an injunction are available as a remedy for their claim of breach. (*See* Halicki Closing Br. 33–34 (seeking recovery of the Shelby Parties' royalties); FPTCO 43 (requesting an accounting and injunction).)

124.   The Halicki Parties further seek attorney's fees and costs as "[d]irect damages for the Shelby Parties breaching their agreement not to sue the Halicki Parties," (Halicki Closing Br. 36), and pursuant to Section 13 of the Settlement Agreement, which allows "the prevailing party" to recover "all reasonable costs and attorney's fees actually incurred," (Settlement Agreement § 13; *see* Halicki Closing Br. 36–37). But they have not adduced evidence of the sum of attorney's fees and costs they incurred in the defense of this lawsuit.

125.   Halicki's Counterclaim 5 is dismissed.

**L.    Halicki Counterclaim 8: Declaratory Relief**

126.   "The Halicki Parties seek declaratory relief that (1) neither the Shelby Acknowledgment nor the [Settlement Agreement] convey[s] any rights to parties other than the Halicki Parties and the Shelby Parties; and (2) neither the Shelby Acknowledgment nor the [Settlement Agreement] provide[s] any release or license to any imitation Eleanor replicas produced by or under license from the Shelby Parties." (FPTCO 43–44.)

127.   Paragraph 79 states the legal standard governing this claim.

128.   The Halicki Parties offer virtually no argument on this claim in their closing argument materials. The Halicki Parties are not entitled to the declaratory relief sought for many of the reasons the Court rejected Halicki Counterclaims 2 and 5. For

_____

"licensing . . . Eleanors."

example, the Shelby Acknowledgment is not a contract, so it could not have conveyed rights or provided releases or licenses.

129.   The Court also rejects the claim for unique reasons largely stemming from the Halicki Parties' imprecise articulation of the relief sought. They ask for a declaration that the Settlement Agreement does not convey rights to anyone other than the Shelby Parties and the Halicki Parties—defined as Carroll Shelby Licensing, Carroll Hall Shelby Trust, Halicki, Eleanor Licensing, and Gone in 60 Seconds Motorsports. (Halicki Am. Proposed Findings of Fact & Conclusions of Law ¶¶ 1, 4, 161.) But the Settlement Agreement contemplates the rights of other Shelby- and Halicki-affiliated contracting entities, (Settlement Agreement preamble, at 1), as well as their heirs, successors, and assigns, (*id.* § 21). The Halicki Parties request a declaration that the Settlement Agreement does not release or license "Eleanor replicas produced by or under license from the Shelby Parties," (Halicki Am. Proposed Findings of Fact & Conclusions of Law ¶ 162), but "Eleanor replicas" is not a term used in the Settlement Agreement, the Halicki Parties do not explain what they mean by it, and the Court declines to conjure an alternative judicial declaration tethered to the rights and obligations of the Settlement Agreement that might provide "specific relief through a decree of a conclusive character." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937). In sum, the Halicki Parties are not entitled to the declarations they request, and absent argument elucidating what the Halicki Parties seek to achieve through this claim, the Court declines to exercise its jurisdiction to provide any other form of declaratory relief. *Washington*, 759 F.2d at 1356.

130.   Halicki's Counterclaim 8 is dismissed.[32]

**M.   Halicki Counterclaim 12: Trademark Infringement**

131.   The Halicki Parties argue that the CR Parties infringed their trademarks "by (1) using ELEANOR trademarks on advertising vehicles online, including but not

---

[32] *See supra* note 22.

1  limited to Google Ads; and (2) using ELEANOR trademarks on engine and car

2  badging." (FPTCO 44–45.)

3      132.   "A trademark is a word, name, symbol, or device, or any combination of

4  these items that indicates the source of goods. The owner of a trademark has the right

5  to exclude others from using that trademark or a similar mark that is likely to cause

6  confusion in the marketplace. The main function of a trademark is to identify and

7  distinguish goods or services as the product of a particular manufacturer or merchant

8  and to protect its goodwill." *Ninth Circuit Model Civil Jury Instructions* § 15.1.

9      133.   The claimant has the burden of proving by a preponderance of the evidence

10  that the claimant is the owner of a valid trademark and that the defendant infringed that

11  trademark. *Id.*; *accord Lodestar Anstalt v. Bacardi & Co.*, 31 F.4th 1228, 1245 (9th Cir.

12  2022) ("[T]he two elements of trademark infringement . . . are (1) a protectible

13  ownership interest in the mark; and (2) a likelihood of consumer confusion in the

14  defendant's use of its allegedly infringing mark." (internal quotation marks omitted)).

15      134.   To succeed on a claim of infringement, the claimant must prove by a

16  preponderance of the evidence that the defendant, without the claimant's consent, used

17  in commerce a reproduction, copy, counterfeit or colorable imitation of the claimant's

18  mark in connection with the distribution or advertisement of goods, such that the

19  defendant's use of the mark is likely to cause confusion as to the source of the goods. It

20  is not necessary that the mark used by the defendant be an exact copy of the claimant's

21  mark. Rather, the claimant must demonstrate that, viewed in its entirety, the mark used

22  by the defendant is likely to cause confusion in the minds of reasonably prudent

23  purchasers or users as to the source of the product in question. *Ninth Circuit Model Civil*

24  *Jury Instructions* § 15.1.

25      135.   The Halicki Parties have proven that Halicki has a valid ownership interest

26  in the Eleanor trademarks. They have not proven that Eleanor Licensing and Gone in

27  60 Seconds Motorsports have an ownership interest in the marks. There is no evidence

28  or testimony to this effect, and the trademark registrations in the trial record only name

Halicki. The CR Parties question Halicki's ownership of the Eleanor trademarks given her agreement to assign Disney all rights in any sequels or remakes of *Gone in 60 Seconds*. (CR Closing Br. 13–14 (quoting, inter alia, Trial Ex. 512 § 4).) Their argument might have some merit if this claim rested upon Halicki's trademark interest in any sequels to or remakes of *Gone in 60 Seconds*, but the claim instead rests on Halicki's asserted trademark interest in the Eleanor car. The CR Parties do not adduce any cogent interpretation of Halicki's contracts with Disney that would suggest she transferred or disclaimed any trademark interest she owns in the Eleanor car independent of any sequel to or remake of *Gone in 60 Seconds*. The Court instead gives due weight to Halicki's Eleanor trademark registrations. *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) ("Registration of a mark is prima facie evidence of the validity of the mark, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark in connection with the goods specified in the registration.").

136.   The Court turns to the second element, toward which the Halicki Parties present two theories. The Halicki Parties have not proven infringement under their second theory, that Classic Recreations used Eleanor trademarks on engine and car badging without Halicki's consent. The Halicki Parties appear to concede this theory in their closing materials by declining to touch upon it in their closing brief, (*see* Halicki Closing Br. 31–33), and by stating in their responsive brief that the lack of Eleanor badging on GT500CRs "is irrelevant," (Halicki Resp. Br. 40). The Halicki Parties have neither argued nor shown that the CR Parties used Eleanor badging on vehicles they made without the Halicki Parties' consent.

137.   As to their first theory, the Halicki Parties have not proven that the CR Parties used the Eleanor trademark in online advertising. The claim rests upon an advertisement that purportedly appeared in Leone's Google search results. (Trial Ex. 197; Leone Decl. ¶ 150.) The unauthenticated exhibit containing the advertisement was not admitted at trial, Fed. R. Evid. 901, and neither the advertisement nor Leone's testimony about it is admissible or persuasive proof that any of the CR Parties placed

or paid for the advertisement, Fed. R. Evid. 802. Jason Engel's trial testimony and text messages instead show that the marketing firm published the advertisement without the direction, authority, consent, or knowledge of the CR Parties. Although the Halicki Parties would attribute the marketing firm's actions to the CR Parties, (Halicki Closing Br. 32), they offer no arguments or evidence supporting an agency relationship or any other mechanism by which this nonparty's actions might be attributable to any of the CR Parties. Without more, the Court declines to infer from the trial record that the CR Parties used the mark by placing or paying for the advertisement Leone encountered.

138.   Halicki's Counterclaim 12 is dismissed.

### N.   Shelby and CR Defenses to Halicki Counterclaims

139.   The Shelby Parties and CR Parties maintain affirmative defenses concerning the statute of limitations and the doctrines of waiver, estoppel, and acquiescence. (FPTCO 46–47, 53.) The CR Parties maintain additional defenses of laches and unclean hands. (*Id.* at 53–54.)

140.   Because the Court has concluded the Halicki Parties are not entitled to relief on any of their claims, the Court declines to reach these affirmative defenses.

## V.   CONCLUSION

All remaining claims and counterclaims are dismissed. The Court directs the Clerk to enter judgment consistent with this Verdict and the Court's prior orders.

**IT IS SO ORDERED.**

Dated: October 31, 2023

_____
MARK C. SCARSI
UNITED STATES DISTRICT JUDGE